FILED
IN CLERKS OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

: 2005 FEB -4 P 3: 52

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| CHARLES DANA TATRO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ACTUARIAL STRATEGIES, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

Civil Action No.

05 cv 40009

RECEIPT # _____
AMOUNT $ 50
SUMMONS ISSUED _N/A_
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY CLK. _____
DATE 2/4/05

## NOTICE OF REMOVAL

**TO:   CLERK OF COURT**
**U.S. DISTRICT COURT for the DISTRICT OF MASSACHUSETTS**

PLEASE TAKE NOTICE that the Defendant, Actuarial Strategies, Inc. ("Defendant"),

hereby files this Notice of Removal, pursuant to 28 U.S.C. §§ 1441(a) and 1446 and Rule 81(c)

of the Federal Rules of Civil Procedure. The grounds for removal are as follows:

1.       On or about February 1, 2004, Plaintiff commenced a civil action entitled Charles

Dana Tatro v. Actuarial Services, Inc., Civil Action No. 05-00185-C, in Superior Court,

Worcester County at Worcester, Massachusetts. Service of the Summons and Order of Notice,

Civil Action Cover Sheet, Plaintiff's Ex Parte Motion for a Short Order of Notice, Plaintiff's

Motion for the Appointment of a Special Process Server, Motion for Injunctive Relief and

Plaintiff's Complaint, Request for Injunctive Relief and Jury Demand was made on Defendant

on February 4, 2005. Copies of the Summons and Order of Notice, Civil Action Cover Sheet,

Plaintiff's Ex Parte Motion for a Short Order of Notice, Plaintiff's Motion for the Appointment

of a Special Process Server, Motion for Injunctive Relief and Plaintiff's Complaint, Request for

Injunctive Relief and Jury Demand are attached hereto as **Exhibit 1.**  There have been no further proceedings in this action.

      2.      The Complaint alleges various claims against Defendant arising out of Defendant's termination of Plaintiff's employment, including intentional interference with advantageous or contractual relations, unfair and deceptive trade practices pursuant to Mass. Gen. Laws ch. 93A §§ 2 and 11, declaratory judgment and injunctive relief.

      3.      The Complaint alleges that Plaintiff is a resident of the Commonwealth of Massachusetts.

      4.      Defendant Actuarial Strategies, Inc. is a corporation organized and existing under the laws of the State of Connecticut with a principal place of business in Bloomfield, Connecticut.

      5.      Based upon the allegations of Plaintiff's Complaint, the matter in controversy exceeds $75,000.  In addition, Defendant anticipates filing a counterclaim against Plaintiff seeking damages in excess of $75,000.

      6.      This Court has original subject matter jurisdiction under 28 U.S.C. §1332(a)(1) because the action is between citizens of different states.  Defendant, therefore, is entitled to have this action removed pursuant to 28 U.S.C. § 1441(a).

      7.      This action is removable to this Court pursuant to 28 U.S.C. § 1441(a) in that the United States District Court for the District of Massachusetts embraces the location in which the state court action is pending (i.e., Worcester, Massachusetts).

      8.      This Notice of Removal is being filed within thirty (30) days of Defendant's receipt of the Summons and Complaint, as required by 28 U.S.C. § 1446(b).

9.    Defendant will send a copy of this Notice of Removal to Plaintiff's counsel and to the Clerk of the Superior Court, Worcester County, to be filed with that Court, pursuant to 28 U.S.C. § 1446(d).

10.    Pursuant to Local Rule 81.1 of this Court, within thirty (30) days, Defendant will file with the Clerk of this Court certified or attested copies of all records and proceedings in the State Court and a certified or attested copy of all docket entries there.

WHEREFORE, Defendant hereby removes the above-captioned action now pending in the Superior Court, Worcester County, Massachusetts to the United States District Court for the District of Massachusetts.

Respectfully submitted,
ACTUARIAL STRATEGIES, INC.,
Defendant,

By its attorneys,

John P. McLafferty (BBO # 639179)
DAY, BERRY & HOWARD LLP
260 Franklin Street
Boston, Massachusetts 02110-3179
(617) 345-4600

DATED: February 4, 2005

-3-

## CERTIFICATE OF SERVICE

I, John P. McLafferty, hereby certify that on the 4th day of February, 2005, I served a true and correct copy of the foregoing via fax and overnight mail upon Plaintiff's counsel, John M. Wozniak, Esq., Wozniak & Padula, P.C., 82 Cape Road, Route 140, Mendon, MA 01756.

John P. McLafferty

# COMMONWEALTH OF MASSACHUSETTS

**WORCESTER, SS.**

**SUPERIOR COURT
DEPARTMENT OF THE
TRIAL COURT
CIVIL ACTION**

No. *05-0185C*

|   |   |   |
|---|---|---|
| Charles Dana Tatro | Plaintiff (s) | ) ) ) ) ) ) ) ) |
| v. |   |   |
| Actuarial Strategies, Inc | Defendant (s) |   |

**SUMMONS AND
ORDER OF NOTICE**

To the above-named Defendant:  Actuarial Strategies, Inc.

You are hereby summoned and required to serve upon
John M. Wozniak, Wozniak & Padula PC
..........................................................................................................................................
plaintiff's attorney, whose address is ..82..Cape..Rd..,...Mendon,..MA..01756...........................
an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the SUPERIOR COURT at WORCESTER, either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13 (a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

WE ALSO NOTIFY YOU that application has been made in said action, as appears in the complaint, for a preliminary injunction and that a hearing upon such application will be held at the court house at said Worcester    in the Superior Court    C    session without jury of our said court on  Tuesday       the 8th     day of February  A.D. 20 05    at 9 o'clock A.M., at which you may appear and show cause why such application should not be granted.

Witness, Barbara J. Rouse, Esquire, at Worcester, the   2nd      day of  Februar
in the year of our Lord two thousand and   five

_____
Clerk

NOTES:
1. This summons is issued pursuant to Rules 4 and 65 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption.
   If a separate summons is used for each defendant, each should be addressed to the particular defendant.

| CIVIL ACTION COVER SHEET | DOCKET NO.(S) 05 - 0185 | Trial Court of Massachusetts Superior Court Department County: Worcester |
|---|---|---|

| PLAINTIFF(S) Charles Dana Tatro | DEFENDANT(S) Actuarial Strategies, Inc. |
|---|---|
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Wozniak & Padula PC, John M. Wozniak 82 Cape Rd. Mendon, MA 01756 Board of Bar Overseers number: 536441 | ATTORNEY (If known) |

## Origin code and track designation

Place an x in one box only:
- [X] 1. F01 Original Complaint
- [ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
- [ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)
- [ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial)  (X)
- [ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60)  (X)
- [ ] 6. E10 Summary Process Appeal (X)

## TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. | TYPE OF ACTION (specify)   TRACK | IS THIS A JURY CASE? |
|---|---|---|
| B99 | Interference w/Contract  F | (X) Yes    ( ) No |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(Attach additional sheets as necessary)

FILED

FEB 0 4 2005

ATTEST: [signature]

CLERK

A. Documented medical expenses to date:
1. Total hospital expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . . .
2. Total Doctor expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . . .
3. Total chiropractic expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . . .
4. Total physical therapy expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . . .
5. Total other expenses (describe) . . . . . . . . . . . . . . . . . . . . . . . . . . . . Subtotal $ . . . . . . . . .
B. Documented lost wages and compensation to date . . . . . . . . . . . . . . . . . . . . $ . . . . . . . . .
C. Documented property damages to date . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . . .
D. Reasonably anticipated future medical and hospital expenses . . . . . . . . . . . . $ . . . . . . . . .
E. Reasonably anticipated lost wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . . .
F. Other documented items of damages (describe)

$ . . . . . . . . . . .
G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

$ . . . . . . . . . . .
TOTAL $ . . . . . . . . . . .

### CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):

The claims arise from the intentional interference with contractual relations and consequently, M.G.L. c. 93A

TOTAL $. 64,000.00

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record [signature]   DATE 2/1/05

AOTC-4 micros. 1/99
A.O.S.C. 1-2000

# COMMONWEALTH OF MASSACHUSETTS

Worcester, ss

Superior Court
C.A.No.

05-0185C

FILED

FEB 0 1 2005

ATTEST:

---

*Charles Dana Tatro*
    *Plaintiff,*  )

*v.*  )

*Actuarial Strategies, Inc.,*  )
    *Defendant.*  )

---

## PLAINTIFF'S EX PARTE MOTION FOR A SHORT ORDER OF NOTICE

The Plaintiff in this matter, Charles Dana Tatro (hereinafter "Plaintiff"), by and through

his attorney, John M. Wozniak, hereby moves this Honorable Court for a short order of notice on

Plaintiff's Motion for Injunctive Relief.

**WHEREFORE,** the Plaintiff respectfully requests that this Court grant his Motion for a

Short Order of Notice.

Respectfully Submitted,
The Plaintiff,
By His Attorney,

John M. Wozniak (BBO#556441)
Wozniak & Padula, P.C.
82 Cape Road, Rte. 140
Mendon, MA 01756
(508) 478-3788

Dated: February 1, 2005

# \COMMONWEALTH OF MASSACHUSETTS

Worcester, ss

Superior Court
C.A. No.

9810-90

05-0185 0

| | |
|---|---|
| **Charles Dana Tatro** ) | |
|     *Plaintiff,* ) | |
| *v.* ) | |
| ) | |
| **Actuarial Strategies, Inc.,** ) | |
|     *Defendant.* ) | |

ATTEST:  FEB 0 1 2005

CLERK

## PLAINTIFF'S EX PARTE MOTION FOR THE APPOINTMENT OF A SPECIAL PROCESS SERVER

The plaintiff, Charles Dana Tatro, (hereinafter "Plaintiff") hereby moves this Court for an order appointing D.H. Kamins & Associates, P.O. Box 557 Hopkinton, Massachusetts, a disinterested person as special process server, pursuant to Mass.R.Civ.P. 4, to serve any and all documents in conjunction with this matter.

In support of this Motion, the Plaintiff states that the appointment of D.H. Kamins is necessary to effectuate proper service with the necessary pleadings.

WHEREFORE, the Plaintiff respectfully requests this Court enter an order appointing D.H. Kamins & Associates, P.O. Box 557 Hopkinton, Massachusetts as a Special Process Server pursuant to Mass.R.Civ.P 4 and grant such other and further relief as is meet and just.

Respectfully Submitted,
The Plaintiff,
By Its Attorney,

John M. Wozniak BBO#556441
Wozniak & Padula, P.C.
82 Cape Road
Mendon, MA 01756
(508) 478-3788

Dated: February 1, 2005

\COMMONWEALTH OF MASSACHUSETTS

Worcester, ss

Superior Court
C.A. No.

| | |
|---|---|
| *Charles Dana Tatro* | ) |
| *Plaintiff,* | ) |
| *v.* | ) |
| | ) |
| *Actuarial Strategies, Inc.,* | ) |
| *Defendant.* | ) |
| | ) |

05-0185C

## PLAINTIFF'S EX PARTE MOTION FOR THE APPOINTMENT OF A SPECIAL PROCESS SERVER

The plaintiff, Charles Dana Tatro, (hereinafter "Plaintiff") hereby moves this Court for an order appointing D.H. Kamins & Associates, P.O. Box 557 Hopkinton, Massachusetts, a disinterested person as special process server, pursuant to Mass.R.Civ.P. 4, to serve any and all documents in conjunction with this matter.

In support of this Motion, the Plaintiff states that the appointment of D.H. Kamins is necessary to effectuate proper service with the necessary pleadings.

WHEREFORE, the Plaintiff respectfully requests this Court enter an order appointing D.H. Kamins & Associates, P.O. Box 557 Hopkinton, Massachusetts as a Special Process Server pursuant to Mass.R.Civ.P 4 and grant such other and further relief as is meet and just.

**FILED**

FEB 0 1 2005

Respectfully Submitted,
The Plaintiff,
By Its Attorney,

ATTEST:

CLERK

John M. Wozniak BBO#556441
Wozniak & Padula, P.C.
82 Cape Road
Mendon, MA 01756
(508) 478-3788

Dated: February 1, 2005

COMMONWEALTH OF MASSACHUSETTS

Worcester, ss

Superior Court
C.A.No.

| | |
|---|---|
| *Charles Dana Tatro* | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| *Actuarial Strategies, Inc.,* | ) |
| Defendant. | ) |
| | ) |

05-0185C

## MOTION FOR INJUNCTIVE RELIEF

The Plaintiff, Charles Dana Tatro (hereinafter "Plaintiff"), hereby moves this Court pursuant to M.R.C.P. 65, for the entry of an injunction against the Defendant, restraining and enjoining the Defendant from interfering with Plaintiff ability to obtain future employment and explore future business opportunities.

In support of this motion, the Plaintiff states that he has a likelihood of success on the merits in this case, the balance of harms weighs in his favor and he will suffer irreparable harm in the event this relief is not granted. In further support of this motion, the Plaintiff relies upon those facts and reasons set forth Plaintiffs Memorandum of Law in Support of Motion for Injunctive Relief, Affidavit of Charles Dana Tatro, and Verified Complaint and Jury Demand.

**WHEREFORE**, the Plaintiff respectfully requests that this Court enter an injunction restraining the Defendant from interfering with the Plaintiff ability to obtain future employment and explore future business opportunities and grant such other and further relief as is meet and just.

Respectfully Submitted,
The Plaintiff,
By His Attorney,

John M. Wozniak (BBO#556441)
Wozniak & Padula, P.C.
82 Cape Road, Rte. 140
Mendon, MA 01756
(508) 478-3788

Dated: February 1, 2005

**FILED**

FEB 0 1 2005

ATTEST:

CLERK

COMMONWEALTH OF MASSACHUSETTS

Worcester, ss                                                    Superior Court
                                                                 C.A.No.

| | |
|---|---|
| **Charles Dana Tatro** | ) |
| *Plaintiff,* | ) |
| *v.* | ) |
| | ) |
| **Actuarial Strategies, Inc.,** | ) |
| *Defendant.* | ) |
| | ) |

05-0185C

## PLAINTIFF'S EX PARTE MOTION FOR A SHORT ORDER OF NOTICE

The Plaintiff in this matter, Charles Dana Tatro (hereinafter "Plaintiff"), by and through

his attorney, John M. Wozniak, hereby moves this Honorable Court for a short order of notice on

Plaintiff's Motion for Injunctive Relief.

**WHEREFORE,** the Plaintiff respectfully requests that this Court grant his Motion for a

Short Order of Notice.

                                        Respectfully Submitted,
                                        The Plaintiff,
                                        By His Attorney,

                                        John M. Wozniak (BBO#556441)
                                        Wozniak & Padula, P.C.
                                        82 Cape Road, Rte. 140
                                        Mendon, MA 01756
Dated: February 1, 2005                 (508) 473-3698

**FILED**

FEB 0 1 2005
ATTEST:
                                        CLERK

COMMONWEALTH OF MASSACHUSETTS

Worcester, ss

Superior Court
C.A.No.

| | |
|---|---|
| *Charles Dana Tatro* | ) |
| *Plaintiff,* | ) |
| v. | ) |
| | ) |
| *Actuarial Strategies, Inc.,* | ) |
| *Defendant.* | ) |

**FILED**

**FEB 0 1 2005**

ATTEST:

CLERK

05-0185c

### PLAINTIFFS COMPLAINT, REQUEST FOR INJUNCTIVE RELIEF AND JURY DEMAND

#### PARTIES

1.  The plaintiff, Charles Dana Tatro (the "Plaintiff"), is an individual presently residing at 49 George Street, Mendon, Worcester County, Massachusetts.

2.  The defendant, Actuarial Strategies, Inc. (the "Defendant") is a Connecticut Corporation with a regular and usual place of business located in Bloomfield, Connecticut.

#### JURISDICTION

3.  Jurisdiction over the Defendant is proper pursuant to the long-arm statute, M.G.L. c. 223 A § 3 as follows:

    a.  The Defendant has transacted business in this Commonwealth;

    b.  The Defendant has contracted to supply services or things in this Commonwealth; and/or

    c.  The Defendant has caused tortuous injury by an act in this Commonwealth.

#### FACTS

4.  The Plaintiff has skills and training in the profession of an actuary. In fact, based upon skills, education and training, the Plaintiff is a Fellow of the Society of Actuaries.

5.   The Plaintiff began his career as an actuary employed by Manulife Financial, in the position of Actuary Vice President and Pricing Officer. The Plaintiff held that position with Manulife Financial, located in Boston, Massachusetts from 1993-2003.

6.   Following that period of employment, the Plaintiff joined Allmerica Financial, located in Worcester, Massachusetts in the capacity of Vice President and Chief Actuary and remained in that position for the years 2001-2003.

7.   In working with both companies, the Plaintiff gained skills and expertise in the areas of variable annuities amongst other things. It was this experience, background and the Plaintiff training that made him attractive to the Defendant.

8.   In fact, the Defendant had acquired the services of a professional recruiter and that representative approached the Plaintiff with the possibility of joining the Defendants Company.

9.   The Plaintiff was approached by Cary Lakenbach, the President of the Defendant to discuss his visions for the expansion of the Defendants business from a fundamentally single dimension firm to a multi-faceted full service firm. That meant expansion into the variable annuities market. At the time the Plaintiff was approached was Mr. Lakenbach, the Defendants business was primarily with respect to development and consulting in life insurance products and its proprietary product, TRIP.

10.  During the course of the Plaintiffs discussion with Mr. Lakenbach, he continually and repeatedly indicated there existed within the company strong partnership opportunities and a very generous policy of distributing profits.

11.  The proposals and representations made by Mr. Lakenbach appeared to be a positive opportunity for the Plaintiff. Despite its attraction, however, the Plaintiff had significant concerns, specifically, whether the Defendant held both the adequate resources to enter the desired markets and the real commitment to such an investment.

12. It was based upon these concerns that although the Plaintiff accepted the offer of employment, he refused the $20,000.00 incentive to relocate his family from Mendon, Massachusetts to Connecticut.

13. As previously indicated, the Plaintiff viewed the opportunity as having potential but saw shortcomings in the Defendants approach to entering the new markets and financial reliability.

14. Despite these concerns, the Plaintiff did in fact accept the Defendants offer pursuant to the terms and conditions contained in the initial offer letter dated December 16, 2002. A true and accurate copy of the agreement is attached hereto and identified as Exhibit A.

15. In addition to this acceptance letter, Mr. Lakenbach required the Plaintiff to execute an Intellectual Property Agreement Covenant Not to Compete. The Plaintiff at the time this document was placed before him, based upon the conversations he had with Mr. Lakenbach in conjunction with the initial interview, was led to believe that this agreement was entered into primarily and for the sole purpose of protecting the proprietary rights to products the Defendant had developed and patented. Specifically, it was the Plaintiffs belief that Mr. Lakenbach required the execution of the agreement to protect the proprietary TRIP product. Based upon this fact, the Plaintiff executed this agreement in conjunction with his acceptance of the position on December 20, 2002. A true and accurate copy of the Intellectual Property Agreement Covenant Not to Compete is attached hereto and identified as Exhibit B.

16. That Intellectual Property Agreement Covenant Not to Compete stated in pertinent part the following:

"8. I shall not, for a period of eighteen (18) months following the termination of my employment with the EMPLOYER, directly or indirectly:

(a) perform services, similar to those I have performed for the EMPLOYER for any person, persons, company, partnership or corporation whose business is competitive with the business being carried on by the EMPLOYER or with respect to such services, solicit any actual or active prospective customer of the EMPLOYER for whom I performed services while employed by the EMPLOYER during the twelve months preceding my termination of employment.

(b) nor call upon, divert or solicit any person, persons, company, partnership or corporation for the purpose of selling or marketing services or products competitive with the business being carried on by the EMPLOYER;"

17.    Initially, the employment began in a beneficial fashion. The Plaintiff became involved in all aspects of his position, which included amongst other things, product development. In that regard, the Plaintiff attended an event sponsored and paid for by Ruark Insurance Advisors. Although the Plaintiff attended this event, he had difficulty convincing Mr. Lakenbach to provide airfare, the only cost of attending. It was only upon the Plaintiff informing Mr. Lakenbach that he would pay it out of his own pocket that Mr. Lakenbach agreed that the Plaintiff could attend the meeting.

18.    In fact, while at this event, the Plaintiff developed his first client relationship with Merrill Lynch. That development took place in June of 2003, approximately six months after his start date. At that time, the Plaintiff was approached in conjunction with his attempts to develop the Merrill Lynch account and informed by Mr. Lakenbach that he did not have a chance of acquiring any work with Merrill Lynch as his contact, Debbie Adler, the chief actuary with Merrill Lynch did not like Mr. Lakenbach. Despite this fact, the Plaintiff was able to succeed in securing Merrill Lynch as a contact.

19.     Additionally, in August of 2003, the Plaintiffs past employer, Manulife indicated that they needed actuarial help. That help included modifying a program that the Plaintiff has originally designed while employed by them. It was at that time, that the Defendant began to act in a fashion indicative of bad faith toward the Plaintiff. Specifically, unlike any other letters of engagement, the Defendant modified the engagement letter with Manulife to include a provision stating Manulife could not solicit people for hire from the Defendant.

20.     Upon information and belief, this modification was made to the engagement letter for the sole purpose of closing any opportunities for the Plaintiff to either accept any future beneficial position with Manulife and/or any work for them outside the scope of his employment with the Defendant whatsoever.

21.     Despite that fact, the Plaintiff continued to work hard for the Defendant in attempts for securing new clientele and expansion into the variable annuity markets.

22.     As a consequence of his hard work, that in October or November of 2003 the Plaintiff was promoted to Vice President and Consulting Actuary in charge of variable annuities. In conjunction with that promotion, the Plaintiff received a $13,000.00 a year raise and was allowed to work three days at home and 2 days in the office.

23.     At the time the promotion was received, the Plaintiff was not required to resign the Intellectual Property Agreement.

24.     During the time subsequent to this promotion, the Plaintiff continued to aggressively expend efforts in a fashion, which he believed, was expected of him by the Defendant. Despite that fact, Mr. Lakenbach repeatedly complained that the Manulife business, at this time was earning approximately twenty to thirty thousand dollars per month, was taking up too much time of another of the Defendants employees, Jonathon Clymer, who had been hired by the Defendant in October or November of 2003. Despite this conduct and behavior toward the client, which the

Plaintiff had brought into the firm, the Plaintiff continued to build the business of the Defendant and as an employee of the Defendant in an aggressive fashion. As a direct consequence of these actions the Plaintiff landed a $50,000 valuation project with Merrill Lynch. In June or July of 2004, the Plaintiff began to notice the increasing amount of disparaging treatment directed at him by Mr. Lakenbach. Specifically, Mr. Lakenbach was treated him differently than the recent hire, Mr. Clymer. Some examples of the disparaging treatment included the rejection of the Plaintiff request to an exception to the two-year exclusion of the company pension plan but granted this very request to Mr. Clymer.

25.     Despite the deterioration of the relationship the Plaintiff received in August of 2004 a performance review demonstrating that he was performing at levels that were both competent and indicated principle relationship or equitable position within the firm was attainable. A true and accurate copy of the August, 2004 review is attached is hereto and identified as Exhibit C.

26.     Soon after the Plaintiff received this evaluation, the product development projects started drying up. It was at that point that the Plaintiff suggested that the company build a core of smaller projects and companies to provide ongoing income. It became apparent at that point in time that expenses were becoming a major concern of Mr. Lakenbach who during the course of staff meetings began to make the primary topic of those meetings the $80,000.00 monthly expense requirement. In fact, when the actuaries, including the Plaintiff lobbied for a low-level actuary for the purpose of providing resources to companies to expand the Defendants market presence and ability to compete on smaller projects, Mr. Lakenbach stated that they did not have the money.

27.     More importantly, Mr. Lakenbach virtually ignored and for that matter paid very little attention to what the Plaintiff said was necessary to grow a variable annuity business.

Specifically, on repeated occasions, Mr. Lakenbach inquired of the Plaintiff whether he thought the marketing budget was sufficient from a marketing perspective to develop the area of business. Without exception, the Plaintiff repeatedly informed Mr. Lakenbach that the amount was not sufficient and that a significantly larger budget was necessary to make an impact upon that market.

28.    It was during this point in time that the Plaintiff began to realize that Mr. Lakenbachs previous intention when he accepted the position were now being abandoned. Instead, it became apparent that Mr. Lakenbach, in both the hiring and use of Mr. Clymer was focusing primarily and exclusively on developing the value/TRIP proprietary projects. In fact, it was as a direct consequence of this mindset that in early 2004 the Defendant lost a contract with Manulife to AON Consulting for two reasons. First, Mr. Lakenbach refused to allow the Plaintiff to work on the project and Manulife was concerned that the Defendant lacked the necessary Axis experience which was the pricing software utilized by Manulife.

29.    Upon information and belief, subsequent to August, 2004 Mr. Lakenbach was attempting to force the Plaintiffs resignation, by making unrealistic demands of the Plaintiff to generate additional business yet failing to provide proper funding and support. Despite this fact, the Plaintiff in the face of the lack of financial tools to grow the business repeatedly and aggressively sought to meet his goals as required and outlined in the August, 2004 review.

30.    The Plaintiffs attempts, however, were futile as it appeared that Mr. Lakenbach had made the decision to abandon his prior desire to expand into other markets and make the firm more of a full service firm.

31.    Upon information and belief, Mr. Lakenbach, engaged the Plaintiff in a confrontational fashion in an effort to force the Plaintiff to terminate his position with the Defendant.

32.     Despite this fact, the Plaintiff continued to operate and work in a diligent and aggressive fashion in achieving his goals. In fact, in a prior year based upon the Plaintiffs efforts he had received a bonus in the amount of $100,000.00 and fully expected that based upon his present efforts that bonus would have been at least met or exceeded.

33.     Upon information and belief, it is based upon the change of direction, and in an effort to escape paying compensation to the Plaintiff in the form of a bonus he had received in a prior year that in November of 2004, without the Plaintiffs knowledge, his laptop was scanned by the Defendant. In doing so, the Defendant confronted the Plaintiff with assertions that the scanning had recovered that the Plaintiff had been utilizing the laptop for personal use.

34.     During the entire course of his employment with the Defendant, the Plaintiff had always utilized his laptop for personal use. This was based upon the fact that the Plaintiff traveled extensively on behalf of the Defendant and was allowed to work at home.

35.     It is against this backdrop that, upon information and belief, Mr. Lakenbach approached the Plaintiff indicating that it would be in his best interest to offer a letter of resignation.

36.     Upon information and belief, the scanning was a pretextual reason by the Defendant in an effort to avoid payment of the bonus which would have been due the following month at year end, allow the Plaintiff to qualify for the Defendants pension plan and terminate the Plaintiffs employment with the Defendant without payment of any severance.

37.     Upon information and belief, the Defendant took these actions in bad faith and without justification.

38.   Once the Plaintiff had resigned his position with the Defendant, he began the act of seeking further employment.  In that regard, he was contacted and approached by representatives of Manulife with the prospect of performing a short-term project.

39.   Upon information and belief, Robert Leach, a representative of Manulife, as a courtesy contacted the Defendant and advised Mr. Lakenbach of Manulifes offer to the Plaintiff.

40.   In response, Mr. Lakenbach informed Manulife that the Plaintiff had a non-compete and pursuant to the non-compete he would be unable to accept any work from Manulife.

41.   As a consequence, the opportunity and offer to provide those services to Manulife was lost.

42.   That proposal and offer would have compensated the Plaintiff in the amount of $64,000.00.

43.   The Plaintiff did not solicit business and was approached by Manulife with the employment prospect.

**COUNT I**
**(Intentional Interference with Contractual/Advantageous Relations)**

44.   The Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1-43 of the Complaint as if expressly restated herein.

45.   Defendant was aware and knew of the potential for the contractual relationship to be created as between the Plaintiff and Manulife.

46.   The Defendant indicated to Manulife that it held an agreement with the Plaintiff, which negated Manulifes ability to enter into said relationship with the Plaintiff, which representations and contentions were false.

47.   The representations made by the Defendant to Manulife resulted in Manulife not going forward in its relationship with the Plaintiff.

48.     Based upon the actions of the Defendant, the opportunity as existed between the

        Plaintiff and Manulife was lost.

49.     As a result, the Plaintiff suffered damage.

**COUNT II**
**(M.G.L. c 93A)**

50.     The Plaintiff realleges and incorporates by reference the allegations contained in

        paragraphs 1-50 of the Complaint as if expressly restated herein.

51.     The parties are "parties" as defined by M.G.L. c. 93A § 2 and 11.

52.     The parties are engaged in "commerce" as defined by M.G.L. c. 93A§ 2 and 11.

53.     The Defendant by intentionally and maliciously interfering with the Plaintiffs ability

        to earn a living and compete in the market place, as more detailed above, constitutes

        an unfair and deceptive business practice.

54.     The Defendants conduct was knowing and willful.

55.     As a result of the Defendants conduct, the Plaintiff has suffered damages.

**COUNT III**
**(Declaratory Judgment)**

56.     The Plaintiff realleges and incorporates by reference the allegations contained in

        paragraphs 1-55 of the Complaint as if expressly restated herein.

57.     The Defendant has relied upon the language contained in an Intellectual Property

        Non-Compete Agreement attached hereto and identified as Exhibit B.

58.     The Plaintiff requests that this Court declare that under the terms of the agreement,

        the agreement void and in additions, is overly broad from a perspective of time,

        scope, geographical location, and consequently unenforceable.

**COUNT IV**
**(Injunctive Relief)**

59.     The Plaintiff realleges and incorporates by reference the allegations contained in

        paragraphs 1-58 of the Complaint as if expressly restated herein.

60.  There exists a likelihood of success that the Plaintiff will succeed on the merits of his claim.

61.  The balancing of harms weigh in favor of the Plaintiff in conjunction with the request made for injunctive relief.

62.  The plaintiff will suffer irreparable harm in the event the requested relief is not granted.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL TRIABLE ISSUES**

**WHEREFORE,** the Plaintiff respectfully requests that this Court:

1.  Enter Judgment in his favor and against the Defendant on Counts I-IV of the Complaint;

2.  Enter Judgment in favor of the Plaintiff on Count II and declare the agreement is unenforceable;

3.  Award the Plaintiff on Count II of the Complaint multiple damages and his costs, including reasonable attorneys fees;

4.  Enter an injunctive order restraining the Defendant interfering with the Plaintiffs ability to provide services as an actuary; and

5.  Grant such other and further relief as is meet and just.

Respectfully Submitted,
The Plaintiff,
By His Attorney,

John M. Wozniak, BBO#556441
Wozniak & Padula, P.C.
82 Cape Road
Mendon, MA 01756
(508) 478-3788

Dated:  February 1, 2005

# EXHIBIT A



### ACTUARIAL STRATEGIES Inc.

CARY LAKENBACH, FSA, MAAA, CLU
President

December 16, 2002


Mr. Charles Dana Tatro
49 George Street
Mendon, MA 10756

Dear Dana:

Dana, it has been a couple of months since we started getting to know each other. My colleagues and I have been very impressed with you. Your accumulated expertise and experience are unusually strong, in our view. Your references have spoken very highly of your contributions and work ethic. Because of this, and because we are highly optimistic that you will grow no less rapidly and broadly in the future, I am very pleased to extend this offer to you to join Actuarial Strategies, Inc.

Here are the details of this offer:

1. The position would be Consulting Actuary in our Bloomfield, CT office. You will report to me. Upon acceptance and satisfaction of the terms and conditions of this letter, your employment will begin on January 2, 2003.

2. The key requirements of this position will include the following:

- **Significant Client Management**.

   We look to you to participate in and/or lead product development projects, maintain and adhere to workplans for such projects, participate actively in the actual work effort, research issues as needed, routinely report on projects to clients as well as to your colleagues at Actuarial Strategies, and communicate and/or visit with clients as necessary to update them on work progress.

   I expect that over time you will visit with prospective clients, and enter into new relationships. We also expect you to be highly sensitive to the needs of current clients, including identifying issues which Actuarial Strategies could help them address.

One Northwestern Drive, Suite 103, Bloomfield, CT 06002-3400  •  Telephone: (860) 726-9292  •  Facsimile: (860) 726-9299
*www.actstrat.com*

Charles Dana Tatro
Page 2

- **High level maintenance and expansion of actuarial and marketing skills.**

  We need you to remain extremely current within the actuarial field, including but not limited to actuarial issues, tax laws, current market needs, competitor services and products, etc., as well as the marketing applications and needs which drive our business. You bring certain experiences to the table, in annuities particularly, that suggest we may be able to expand the breadth of our actuarial efforts beyond the current core product development business.

  - In particular we need you to develop a strong understanding of universal life and the marketplace it serves. Of course, this includes an intensive working knowledge of XXX and AXXX requirements.

  - We also want you to develop a comprehensive understanding of the 2001 CSO Table and the transition rules governing its use.

- **Identification, Researching, Selection, Planning, and Execution of New Business Opportunities.**

  A requirement of this position is again to keep an eye out for new business opportunities. We want to make sure that we are "ahead of the curve" so to speak and our key niche in the consulting world is to be two steps in front of the competition in all, but especially critical areas.

- **Common actuarial tool expertise.** Our pricing is done on both PTS and internal systems, including sophisticated Excel models. Extensive knowledge in the use of these vehicles is critical.

- **Offer guidance in the management, strategically and tactically, of our business.** I look forward to sharing opportunities, brainstorming issues and problem-solving, with you, and to receiving your input and guidance.

  I believe that significant cross-pollination can occur within our actuarial operation. Open discussions are critical to achieving this. Consistent internal communications are extremely vital to the success of our projects.

  Organization and maintaining accurate and dated material for each project you work on is essential and is required.

- Regular and periodic attendance at interoffice and professional meetings, for both business and marketing purposes, will be expected.

3. We are pleased to offer you an annual salary of **$170,000**.

Charles Dana Tatro
Page 3

4.  After continued successful six months of employment with Actuarial
    Strategies, a bonus of $8,000 will be paid to you. Your continued
    employment with Actuarial Strategies on such date is a prerequisite for such
    bonus.

5.  You may be eligible to receive a discretionary annual bonus based upon
    personal and Actuarial Strategies' performance. The amount, it any, of this
    bonus shall be in the absolute sole discretion of Actuarial Strategies. This
    bonus, if any, will be paid on or about December 31 of each year and your
    continued employment with Actuarial Strategies on such date is one
    prerequisite for such bonus.

6.  Actuarial Strategies currently maintains both a Money Purchase Pension
    Plan and a Profit Sharing Plan. Eligibility is January 1 or July 1 after two
    years of employment. The terms of these pension plans are currently under
    review. The purpose of the review is not benefit reduction.

7.  Vacation time is three weeks annually accrued at 1.25 days per month
    Vacation days are not permitted to be carried over to the following year. You
    will also receive two floating days to use as personal days.

8.  Actuarial Strategies offers a medical benefits package, to which it currently
    contributes 85% of the cost of coverage. This percentage can change any
    time.

9.  Actuarial Strategies will reimburse you for the reasonable costs of moving
    your family and household possessions to Connecticut, up to a maximum
    amount of $4,000. Any expense above the amount of $4,000 may or may
    not be paid.

10. This offer is contingent upon: 1) your providing documents to establish your
    identity and authorization to work in the United States as required by the
    Immigration Reform and Control Act of 1986 on your first day of
    employment; 2) your signing of the attached Non-Disclosure Agreement and
    Covenant Not to Compete; and 3) your signing of a receipt of the employee
    handbook, a copy of which is also attached.

11. I will want to discuss billing rate issues with you at an appropriate time.

Charles Dana Tatro
Page 4

A change in direction such as you are contemplating is a family affair, and the staff at Actuarial Strategies welcome and look forward to the opportunity to meet your wife and to try to address the many questions she may have. In particular, we would be pleased to have you as our guests in Bloomfield so that we can also meet her and she us.

Dana, there you have it. I hope you view the offer as attractive, and I look forward to your joining us. There is a great opportunity for you and Actuarial Strategies to fruitfully grow and prosper together.

I look forward to hearing from you.

Sincerely,

Cary Lakenbach

/cl


Accepted and agreed as of this ___20th___ day of December, 2002.


Charles Dana Tatro

# EXHIBIT B



Inc.

## Intellectual Property Agreement Covenant Not to Compete

As a condition and in consideration of my continued employment by Actuarial Strategies, Inc., or any of its successors or assigns (hereinafter referred to as the EMPLOYER), I, the EMPLOYEE named below, agree as follows:

1.    Unless the EMPLOYER has acquired specific authorization, I will not disclose to or use in my work with the EMPLOYER any proprietary information of others, including any of my prior employers.

2.    During the term of this Agreement and at all times thereafter, I will keep in confidence and will not publish, use or disclose to others, without the prior written consent of the EMPLOYER, any Trade Secrets or other confidential information related to the EMPLOYER or the EMPLOYER's business. As used herein, the phrase "Trade Secret"' is to be considered as used in accordance with the definition of Trade Secret found under Connecticut law in effect at the time of the execution of this Agreement. Without limiting this definition, and for information purposes only, a Trade Secret is the whole or any portion of any technical or non-technical information, including a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, financial plan, product plan or customer or supplier information that is actually or potentially valuable because it is not generally known to others and that is subject to reasonable efforts by the EMPLOYER to maintain its secrecy.

3.    Upon leaving the employ of the EMPLOYER, I will not take with me any written, printed or electronically stored Trade Secret or other confidential information or any other property of the EMPLOYER obtained by me as the result of my employment, or any reproductions thereof. All such property and all copies thereof shall be surrendered by me to the EMPLOYER on termination of employment or at any time on request by the EMPLOYER.

4.    I agree that all trade secrets, inventions, works of authorship (including illustrations, writings, software and computer programs), improvements, devices, designs, discoveries, practices, processes, methods, formulae, products and the like (hereinafter collectively called "INVENTIONS") and all other business or technical information created or conceived by me, either alone or with others, while employed by the EMPLOYER and related to the existing or contemplated business or research of the EMPLOYER or resulting from my work with the EMPLOYER, belong to the

EMPLOYER. Until proven otherwise, any INVENTION shall be presumed to have been conceived during such employment if within one (1) year after termination of such employment it is disclosed to others, or it is completed, or it has a patent application filed thereon.

5.    I will promptly disclose to the EMPLOYER all INVENTIONS, and any other information which belong to the EMPLOYER under paragraph 4 above; and I will assign to the EMPLOYER, or to others as directed by the EMPLOYER, all of my interest in such INVENTIONS, without charge, and I will execute any papers and do any acts which the EMPLOYER may consider necessary to secure to it any and all rights relating to such INVENTIONS, including all patents and copyrights (and renewals thereof) in any country.

6.    I recognize, further, that all records, reports, notes, compilations, or other recorded matter, and copies or reproductions thereof, relating to the EMPLOYER's operations, activities or business, made or received by me during any period of my employment with the EMPLOYER are and shall be the property of the EMPLOYER exclusively, and I will keep the same at all times subject to the EMPLOYER's control and will surrender the same at the termination of my employment, if not before.

7.    I attach hereto a complete list of all INVENTIONS that I have made or conceived prior to my employment by the EMPLOYER and I desire that the INVENTIONS shall be excluded from this Agreement.

8.    I shall not, for a period of eighteen (18) months following the termination of my employment with the EMPLOYER, directly or indirectly:

(a)    perform services, similar to those I have performed for the EMPLOYER for any person, persons, company, partnership or corporation whose business is competitive with the business being carried on by the EMPLOYER or with respect to such services, solicit any actual or active prospective customer of the EMPLOYER for whom I performed services while employed by the EMPLOYER during the twelve months preceding my termination of employment;

(b)    nor call upon, divert or solicit any person, persons, company, partnership or corporation for the purpose of selling or marketing services or products competitive with the business being carried on by the EMPLOYER;

(c)    nor employ or attempt to employ or assist anyone else to employ any person who is at such time, or at any time during the preceding year, was an employee of or consultant to the EMPLOYER, provided that this clause shall not restrict employment of a third party vendor who supplies generic services to the industry. As used in this section, the verb "employ" shall include its variations, for example, retain, engage or conduct business with.

9.    This Agreement shall be construed in accordance with and governed for all purposes by the laws of the State of Connecticut. The parties have entered into this Agreement in the belief that its provisions are valid, reasonable and enforceable. However, if any one or more of the provisions contained in this Agreement shall, under existing or hereafter enunciated law, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. If, moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to time, duration, geographical scope, activity or subject, it shall be construed, by limited and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

This Agreement supersedes all prior oral or written agreements and is effective with respect to the subject matter hereof subsequent to the date executed.

I acknowledge receipt of an executed copy of this Agreement.

This Agreement is executed this ___20TH___ day of __December__, 20_22_ at ___Mendon___, __MA__
              city                    state

Actuarial Strategies, Inc.

BY _Cary Lakenbach_

Print Name _CARY LAKENBACH_

Title _President_

EMPLOYEE

Signature _____

Print Name _Dana Tetro_

Residence _49 George St_

City _Mendon_

State _MA_

Page 3 of 3

# EXHIBIT C



I.  SKILL/KNOWLEDGE/UNDERSTANDING

II.  DRIVE FOR RESULTS

III.  DECISION MAKING

IV.  COMMITMENT TO EXCELLENCE

V.  MARKETING EFFECTIVENESS

VI.  CLIENT RELATIONSHIP BUILDING

VII.  INTERNAL RELATIONSHIP BUILDING

VIII.  VISION AND DIRECTION

IX.  BUSINESS FOCUS & FLEXIBILITY

As a general statement I was very impressed with the thoroughness of your initial ASI document, your insights about where you had expertise and talent, and where you'd like to take your career.  I have referred to that document in developing this one.

Further, I am hopeful that we can continue to build and expand upon our relationship.

## 1.  SKILL & KNOWLEDGE (PRODUCTS, FINANCIAL ISSUES)

- I believe you have provided excellent guidance to companies (Equitable, Merrill Lynch, Manulife, and Country) on product and financial issues.
- You have provided needed rigor and discipline to our PTS pricing system.
- You have brought strong dose of annuity knowledge to the firm, including:
  - o  RSLN2 MODELS.
  - o  C3 – P2 understanding.
- You have been instrumental in driving life GMWB vehicle project
- You have interacted well in technically oriented discussions with clients.
- You are very skilled at managing meetings and keeping them focused. This is a skill worth emulating by me and others.

      o  How you provide guidance to others is worth discussing.  (e.g., meeting agendas.)
- Your report writing is high quality.

## 2.  DRIVE FOR RESULTS

- You are indeed a driven individual.
- At times your desire for results reveals a certain abrasiveness.
    - o  Example:  GMWB discussion.  In the meeting I had commented about what I felt I needed to do to understand the issues.  (This was in discussion of CL review of an initial write-up.)  You felt I had wasted time from the last meeting.  Yet, when all was said and done, significant additional analysis was brought to bear and you ultimately indicated to me that we had achieved a much better document as a result.

## 3.  DECISION MAKING.

- I believe your decision making instincts, certainly with respect to decisions made in project work, are in general very good.
- We made a horrendous faux-pas with Equitable insofar as our discussions with them on GMWB were concerned.
    - o  The following is clear to me at this time.
    - o  We had not done sufficient research and analysis to suggest an idea should belong to us.
    - o  The information we had previously shared with them about GMWB was pretty modest.
    - o  We managed to offend them, royally.
    - o  I'm not sure we really thought out clearly whether the positives in sharing our concerns outweighed potential negatives.
    - o  In retrospect, we should have acted differently.

## 4. COMMITMENT TO EXCELLENCE

- Your commitment to product excellence, systems integrity and financial integrity is laudable.

## 5. MARKETING EFFECTIVENESS

- You have achieved some notable successes in marketing to date, especially with Manulife and Merrill Lynch. This includes repeat business.
- We have interacted well when meeting together with clients and prospects. I am pleased at this and expect it will continue.
- Actuarial Strategies needs a much greater contribution from you on the marketing side. It is difficult to articulate just what a dollar amount should be, but if we wish to grow in terms of personnel and industry impact, the company must lessen its reliance on me to bring in business.
  - o I am concerned that the year to date direct marketing effort has been insufficient.
    - Marketing Letters/other communications.
    - Direct meetings with companies.
  - o What do you feel you need in order to expand your efforts in this area?
  - o Without precisely answering the target revenue question, I think a goal of $500,000 annual revenue is achievable.

## 6. CLIENT RELATIONSHIP BUILDING

- In many respects your interaction with clients has been at a very superior level. This is certainly true with client relationships you have created.
- At times I have heard you speak disparagingly of certain clients (Debra Ayres comes to mind.) Whether warranted or not, they are the people who butter our bread so to speak. This may not be the best business practice.
  - o There's a related issue, which over the years has always bothered me. If a person speaks negatively of another in my presence, what does he say about me when I'm not there?
- In the strongest sense possible, we are each the other's client. How we interact is critical to our continued relationship and to the success of our firm. My view is that this relationship, which I want to continue, needs attention. Let me offer some observations.
  - o We speak to each other in body signals. I will almost always say hello when I come into the office and leave it. All too often, if you

- are at your computer, you won't even respond or turn around. It communicates a message.
  - ○ There are times when you demonstrate in my view a certain rigidity. As an example, a few weeks ago, you were interacting with me on the Atherton situation. We had on a couple of occasions already pushed off the meeting. It was a Wednesday, I believe, May 5th, you were working from home, and we were supposed to discuss the issue in the morning. It turned out that you needed to get something done for Merrill Lynch, so I said okay, let's do it at 1:30, which we agreed to do, but then I realized later I had a lunch outside the office, so I left you a message saying let's talk at 2:00. However, at 2:00 I wound up getting in a client call for around 15 minutes. When I called you weren't there, so I left a message saying to call me back, but I'd be getting a haircut at 3:30. For what it's worth you wound up speaking to Rita just after 3:30, saying you had other things to do.
  - ○ Similar instances of timing have occurred.
  - ○ How do we address these kinds of issues in a way that meet both our needs?
- Another concern. One has to do with the conduct of meetings. We have gone through periods where we have not had regularly scheduled meetings, a criticism I accept. When I decided to reinstitute them, you showed up with an agenda for the meeting. This happened a couple of times.
  - ○ Your direct (to me) agenda input would have been welcomed.
  - ○ What you did is something that simply isn't done in a business.
- One of the issues of concern to me is your work at home.
  - ○ As a general statement, I believe you work well from home. I do not have any objection to your continuing to work from home. I recognize that your wanting to spend time with kids and Frannie is important to you and wish to accommodate that wherever possible.
  - ○ What I believe has happened, however, is that you communicate the times you will work from home and that's that. At least that's the way it appears.
  - ○ What I think needs to happen is that expected home time be shared in advance, and in such a way that there is flexibility. I am more than willing to demonstrate parallel flexibility, and believe I more than have, but there should be discussion on this.
    - ▪ An example is the interview with Jim Wiseman. It would have been in the best interests of the company for you to have been in the office.

○ One of the challenges in working from home, as I recall it from my AFS days, is that the trip to the office is viewed as a trip, so that the desire to visit companies may be lessened (i.e., one is already traveling two days a week.)

○ I'd like us to consider a structure where the two of us meet once a week, whether it's a meeting or an extended lunch, to discuss high level issues, ideas, problems, opportunities. Such a dialogue would improve the chances of maintaining open communications and a healthy relationship.

## 7. INTERNAL RELATIONSHIP BUILDING

- I'm not sure whether the results are in yet on this question.
- Generally when I have asked you questions the answer has been provided forthrightly. At times, the response has been somewhat short.
- I am not sure whether the situation with Brian Lowry was handled optimally. Although in his case there isn't much question that the right decision was made last month, I felt we could have mentored him better, provided him with directions better. I don't know whether the distance issue added to his challenges.
- Your guidance on this issue is appreciated.
- Beyond that I don't believe referring to Harold and Ed as Harry and Eddie is appropriate in the work environment.

## 8. VISION AND DIRECTION

- I think your presentation skills in a small group setting (e.g., with a client) are strong and getting even better.
- You have demonstrated a proficiency in keeping up to date with current actuarial developments. I am very pleased with that.
- In your Actuarial Strategies work you have demonstrated a creativity that is quite positive.
- You have participated in and continue to participate in industry task forces and trade show committees. That's excellent, both for your exposure and the company's.

- I believe that a principal relationship is within your reach. In order to achieve it the following are necessary conditions:

  - A solid and mutually accessible relationship (with me.) I welcome your feedback and guidance and collegiality and want it to be mutual.
  - Increased marketing activity.
  - Increased revenue generation.
  - Maintenance of strong internal relationships.
  - Continued and increased thinking from company perspectives.

I am hopeful we will have a successful resolution here.

## 9. BUSINESS FOCUS / FLEXIBILITY

- Your focus is generally speaking admirable.
- As noted there are times when the flexibility level could be greater. This should not be viewed as referring to situations where you single-mindedly zero in, or perhaps the phase is get into a zone, on a critical effort in order to get it done. I admire and respect your ability to do that.

COMMONWEALTH OF MASSACHUSETTS

Worcester, ss

Superior Court
C.A. No.

|  |  |
|---|---|
| *Charles Dana Tatro* | ) |
| *Plaintiff,* | ) |
| *v.* | ) |
|  | ) |
| *Actuarial Strategies, Inc.,* | ) |
| *Defendant.* | ) |
|  | ) |

**FILED**

FEB 0 1 2005

ATTEST:

_____
CLERK

05-0185c

## AFFIDAVIT OF CHARLES DANA TATRO

I, Charles Dana Tatro, being duly sworn, hereby depose and state as follows:

1. I am the plaintiff in the above-captioned action and have personal knowledge of the facts contained in this Affidavit.

2. I am a Fellow of the Society of Actuaries (SOA). An actuary is a business professional who analyzes the financial consequences of risk, especially those of concern to insurance and pension programs. SOA members work in life insurance, retirement systems, health benefit systems, financial and investment management and other emerging areas of practice. The majority of actuaries work within the insurance industry, although a growing number of actuaries work in other fields.

3. I was an executive at Manulife Financial and Allmerica Financial. I had approximately 12 years of experience in life insurance companies prior to joining the defendant. My main area of expertise is Variable Annuity Product Development, Risk Management and Valuation. A true and accurate copy of the resume of Dana Tatro is attached hereto and identified as Exhibit A.

4. I was initially approached by a professional recruiter working with Actuarial Strategies, Inc. to replace a prior employee as a consulting actuary. The Defendant was primarily engaged in product development consulting with respect to life insurance products. In support of the life insurance market, the Defendant developed

a propriety life insurance product TRIP. The Defendant would approach companies with new product ideas in an attempt to secure a project developing the product for them.

5.    During the interview process, I was required to provide the Defendant with a business plan on how I could enhance their existing life insurance product development business, market services to potential clients and develop and market innovative variable annuity products. I also provided the Defendant with a contact list of insurance professional whom I knew and would contact if I joined the firm. The Defendant was concern with my ability to build upon their existing business and develop new opportunities. I as far as I know, no other employee hired by the Defendant after me was required to provide such information.

6.    During the interview, the Defendant, through the company's President, Cary Lakenbach, discussed partnership opportunities, work ethic, number of hours worked and his view on distributing profits. Although Mr. Lakenbach discussed these issues, he would not put anything in writing at the time of the employment offer.

7.    The actuarial consulting business can be fundamentally broken down into two categories. First the proprietary ideas and concepts and secondly, the general actuarial services. At the time of my hire the Defendant generated primary and almost exclusive business was in the area of propriety products. In fact the proposal and opportunity was for me to develop and create business for the company in the variable annuities area. It was on this basis, I was offered the position of Consulting Actuary based upon my insurance market knowledge, past employment history, Variable Annuity Experience and PTS software knowledge. Although, my position involved substantial support of the existing life insurance product development operation, over time, I was to provide and build a variable annuity knowledge base

and develop innovative variable annuity products to compliment and expand the Defendants business.

8.     At the time I accepted the offer of employment from the Defendant, I was living in Mendon, Massachusetts with my family. Although the opportunity of being employed by the Defendant held a great deal of attraction, I was not comfortable enough with the prospects to relocate my family to Connecticut as requested by Cary Lakenbach. In fact, I turned down a $20,000.00 incentive to move my family.

9.     Simply stated, although I viewed the opportunity with the Defendant as having potential, I was unsure of the Defendant's commitment to entering the Variable Annuity market, based on the amount of information I was required to provide during the interview process.

10.    Despite these concerns, I did accept the job with the Defendant pursuant to the terms and conditions as contained in the initial offer as stated in the letter dated December 16, 2002 and executed by me in Mendon, Massachusetts, December 20, 2002. A true and accurate copy of the agreement is attached hereto and identified as Exhibit B.

11.    In addition to the agreement, Cary Lakenbach required the execution of an Intellectual Property Agreement Covenant Not To Compete. It was my impression, based upon conversations I had with Cary Lakenbach in conjunction with the initial interviewing process and the agreement itself that this agreement was entered into primarily and for the sole purpose of protecting proprietary rights to products the Defendant had developed and patented. Based upon this fact, I executed this agreement in conjunction with my acceptance of the position on December 20, 2002. A true and accurate copy of the Intellectual Property Agreement Covenant Not To Compete is attached hereto and identified as Exhibit C.

12.    In conjunction with my employment with the Defendant I was provided a laptop computer for the purpose of performing my work and was allowed to retain use of this laptop during times of travel or at home.

13.    Initially, the opportunity as initially represented appeared to develop.  Specifically, I worked on a number of projects both with the President, Cary Lakenbach and independently.  The projects included;

    a.  Reviewing a Variable Annuity Product for Country Life in January and February 2003.

    b.  Providing pricing support on the Defendants proprietary product TRIP sold to RBC Liberty in February to approximately May 2003.

    c.  Cleaning and producing documentation on the Defendants PTS software modifications for the proprietary product TRIP.

    d.  Re-producing a stochastic generator based on published Society of Actuaries formulas and documents.

14.    In addition to working on certain projects I provided significant brainstorming, marketing and product development on the Defendants proprietary product TRIP.  I also began to seek out prospective clients.  This was an expected aspect of my employment with the firm one which was in the form of a requirement, not optional.  As previously mentioned, Cary Lakenbach required me to provide a list of insurance professionals I knew prior to joining the firm.  The list would serve as my initial contact list.

15.    It was my firm belief that, based upon my experience with Allmerica and Manulife, the Defendant hired me for the purpose of adding a different dimension to the firm.  Based upon that fact that I pursued client development and in that regard I attended an event sponsored by and paid for by Ruark Insurance Advisors, a consulting firm I had developed a relationship with during my employment with Manulife Financial

and Allmerica Financial. Initially, the Defendant was reluctant to allow me to attend the meeting. He stated the cost to provide airfare, the only cost of attending the meeting, was a significant expenditure and did not see the marketing value in attending the meeting. Only when I informed Cary Lakenbach that I would pay it out of my own pocket, did he agreed I could go to this meeting and paid for the airfare.

16.     While at the conference, I developed my first client relationship with Merrill Lynch. That development took place in June of 2003 approximately six months after my start date. Merrill Lynch was looking for someone with significant variable annuity background to assist them with some small projects. My background was exactly what they needed and although they knew of Defendant, to the best of my knowledge, they had not done business with the Defendant.

17.     At the time I approached this project I was informed by Cary Lakenbach I wouldn't have a chance at any work with Merrill Lynch as he informed me that Debbie Adler the chief actuary with Merrill Lynch, did not like him. Despite this fact, I successfully on behalf of the Defendant secured a small project.

18.     Additionally, in August of 2003, my past employer, Manulife, indicated that they needed actuarial help. That help included modifying a program that I had originally designed while employed by them. The project included a significant offsite time requirement and providing onsite support to Manulife Financial. Mr. Lackenbach did not want to provide the onsite support necessary to the project. I convinced Mr. Lakenbach that we needed to provide onsite services if we wanted to secure the contract.

19.     It was at that time that my suspicions and fears of the Defendants lack of commitment to developing the Variable Annuity market started to increase. Manulife is a premier variable annuity company and this contract was an "in" into their variable annuity area.

20.  Not only did the defendant not want to provide the resources required to secure the contract, he modified the Defendant's standard engagement letter to include a section stating that Manulife could not solicit people for hire from Actuarial Strategies, Inc. At that point until separation from the Defendant, I had never seen such a modification made to any other engagement letter. I suspect that this modification was made solely for my detriment in an attempt to restrain me from working for Manulife in the future.

21.  Although I successfully secured the Manulife project, Cary Lakenbach was not happy with me spending so much time working for Manulife. I was providing Manulife with 50 to 60 hours per week, and average of 2 days a week in their office. He wanted me to focus on developing new innovative products including the next generation of TRIP.

22.  Consequently, Cary Lakenbach hired Jonathon Clymer in October or November of 2003. Mr. Clymer took over the Manulife account and continued on that consulting contract for the next six to seven months.

23.  In October or November of 2003, I was promoted to Vice President and Consulting Actuary in charge of variable annuities for the Defendant. I received a $13,000.00 raise and was allowed to work 3 days at home and 2 days in the office. At that time, I was not required to execute the Intellectual Property Agreement Covenant Not To Compete.

24.  At that time, I began work on a $1.5M TRIP project with AXA Financial. I provided pricing analysis, design support and project management. This project continued into April or May 2004.

25.  During the subsequent months, the issue of the number of hours worked for Manulife and the onsite requirement continued to be an issue for Cary Lackenbach and Jonathan Clymer. Specifically, even though the Manulife project at that time was

providing revenues to the Defendant in the approximate amount of $20,000.00 to $30,000.00 per month, Mr. Clymer and Cary Lakenbach were repeatedly complaining that Mr. Clymer was spending too much time on Manulife and not developing other contacts or able to work on other projects. Moreover, Mr. Clymer did not like traveling to Manulife to provide onsite support of the project. As a consequence, The Defendant had Manulife provide a laptop to allow Jonathan Clymer to work from the Connecticut office.

26.    In June 2004 I traveled with Cary Lakenbach promoting the TRIP product and life insurance services. The travel arrangements and clients were not shared with me until a week or two prior to the travel. As a result, I did not have enough time to set up meetings for the purpose of marketing variable annuities.

27.    In August of 2004 I received a performance review. The review demonstrated that I was performing at levels that were both competent and indicated principle relationship or equitable position within the firm was attainable. In that review, Cary Lakenbach stated he wanted a $500,000 revenue commitment from me. A true and accurate copy of the August, 2004 review is attached hereto and identified as Exhibit D.

28.    Soon after this performance evaluation, life insurance product development projects starting drying up and the Variable Annuity projects were not developing due to the time commitment I was required to provide to the proprietary product TRIP and life insurance market. It was at that point that Cary Lakenbach asked me to develop a business plan for the variable annuity business.

29.    In the business plan, I outlined the Defendants strengths and weaknesses in the variable annuity market. At that time and to this day, significantly larger consulting firms dominate the variable annuity market. These firms provide new software solutions and risk mitigation strategies to variable annuity carriers. As a result, all the

new variable annuity product development was being awarded to these firms. I informed Cary Lakenbach that we could not compete in these areas due to our size and that we needed to build a core of smaller projects, based on providing technical resources, to provide on going income in the variable annuity market. In support of this recommendation I compiled a list of potential clients and the services we could provide along with the resource requirements.

30.   These suggestions to develop the variable annuity market were rejected. Monthly expenses began becoming a major concern of Cary Lakenbach and were discussed openly in the weekly staff meetings. When the actuaries, including myself, lobbied for a low-level actuary to be able to provide resources to companies to expand our market presence and ability to compete on smaller projects, Cary Lakenbach stated he did not have the money.

31.   Moreover, Cary Lakenbach virtually ignored or for that matter paid very little attention to what I said was necessary to grow a variable annuity business. Specifically, on repeated occasions Cary Lakenbach asked me whether I thought the marketing budget was sufficient to develop that area of business and the remainder of the business. Without exception, I repeatedly stated that it was not the case and that a significantly larger budget and resource commitment was necessary to make impact upon that market.

32.   In October 2004 Cary Lakenbach hired a Vice President and Consulting Actuary named Jim Weisman on a part time basis. Jim Weisman was a life insurance expert, primarily with fixed product expertise. It was at this time that I began to realize that Cary Lakenbachs intentions of developing a variable annuity business when I accepted the position were now being abandoned. Instead, it became apparent that Cary Lakenbach was focusing primarily on Value/Trip proprietary projects and the life insurance product development market.

33. During October, we traveled substantially to develop client relationships. The main focus of the travel was to promote life insurance product development and TRIP.

34. Quite frankly, it was subsequent to my August, 2004 review that it became clear that Cary Lakenbach was attempting to force my resignation. In that regard, demands were made upon me to generate additional business to meet the $500,000 target, however proper funding and support as outlined in my business plan were not provided.

35. Despite this fact, I continually and aggressively sought to meet my goals required as outlined in my August, 2004 review. These attempts, however, were futile as it appeared that not only had Cary Lakenbach changed directions with respect to the future of the Defendant in pursuit of business but also personality conflicts arose between us.

36. It is against this backdrop that the first time since the Defendant had employed me, my laptop was scanned without my knowledge. Quite frankly, this laptop and the internet service utilized on it was used by me for a number of reasons, including personal ones. Specifically, the internet service was used by my whole family based upon my hours both at home and on the road.

37. Based upon this fact, it was not surprising that the scanning of my laptop disclosed this use.

38. I firmly believe that this scanning of my laptop was an effort to create a pretext to forcing me to resign from my position. In fact, the Defendant utilized materials on the laptop together with its personal use of the laptop to afford me what was characterized as an easy out. That easy out came in the form of a resignation that I tendered to the Defendant. The Defendant accepted that resignation November 5, 2004. At that time the Defendant once again reminded me of the Intellectual Property Agreement Covenant Not to Compete. A true and accurate copy of the letter

accepting my letter of resignation dated November 11, 2004 is attached hereto and identified as Exhibit E.

39.     Although I tendered my resignation, I did so not out of the fear that somehow the use of the laptop would be disclosed in an attempt to embarrass me, but instead I choose to leave the Defendants employment upon its failure to meet the prior representations made to me concerning my position and opportunity with the company. Moreover, I suspect that the timing of the scanning of the laptop was more than coincidental as it occurred within a month of when I would have received my year-end bonus, which in the prior year had been in the amount of $100,000.00 and my qualifying for the company's pension plan.

40.     At no point in time did I believe that I would be unable to earn a living in a profession, which I had labored to become educated and trained over years. I had the firm belief as indicated by the document, which is in itself titled Intellectual Property Agreement Covenant Not to Compete that I would only be required not to disclose proprietary information of the Defendant.

41.     Despite that fact, the Defendant has now interfered with my ability to earn an income and support my family as an actuary. Specifically, despite the fact that I was employed by Manulife and Manulife was not a client of the Defendant prior to my employment with the Defendant, the Defendant has indicated to Manulife what it contends to be a non-compete restraining me from working for the company.

42.     The Defendant has made these representations to Manulife despite the fact that it was I who was solicited by Manulife for temporary employment to provide resources to the company. At no point in time did I ever solicit any business from any entity or customer of the Defendant. In fact, Manulife initially contacted me through an email from Bob Leach, Vice President of product development. The email subject indicates that it came directly from the Society of Actuaries web based directory of actuaries.

This indicates that Bob Leach did not have any of my contact information and was required to look me up on the Society's website. A true and accurate copy of the email, dated January, 2005 is attached hereto and identified as Exhibit F.

43. It is the conduct of the Defendant as described that has greatly hindered my ability to make a living and support my family. It is my present understanding that the Defendant will not allow me to work as an actuary in any entity anywhere for the period of eighteen months.

44. Simply stated, this broad interpretation of the agreement of the Defendant, if allowed to proceed will cause me harm, which will be irreparable.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 27 DAY OF JANUARY, 2005:

Charles Dana Tatro

# EXHIBIT A

FILED

FEB

ATTEST:

FILED

FEB 0 1 2005

ATTEST:

CLERK

49 George St
Mendon, MA 01756

Home: (508) 634 2087
Mobile: (508) 254-5829

# Charles Dana Tatro FSA, MAAA

**Experience**       2003– 2004          Actuarial Strategies                Bloomfield, CT
### Vice President & Consulting Actuary

- Responsible for VA and VUL marketing activities
- Generated $600K of business in 2004
- Developed and maintained relationships with new and existing clients
- Developed innovative VA and VUL designs
- Worked closely with marketing groups of major insurance companies and brokerage firms to determine suitable products for their distribution
- Developed pricing and reserving models for VUL, VA and UL products
- Developed RSLN2 generator and stochastic model for use with equity guarantees, FAS 133, C3 P2, SOP 03-1, and hedging analysis
- Analyzed capital solutions such as hedging programs, securitization and cat cover for VA guarantees and life products
- Developed marketing platform and systems for securitization of AXXX and XXX reserves
- Managed Staff on 1

2001 - 2003          Allmerica Financial                Worcester, MA
### Vice President and Chief Actuary

- Responsible for Life and P&C pricing and reserve review
- Member of Executive Committee responsible for the review and approval of all Allmerica initiatives
- Developed enterprise risk management group and risk monitoring platform
- Responsible for capital management and capital financing
- Indirectly managed actuarial staff for life and P&C
- worked closely with ratings agencies and regulators

1993 – 2003          Manulife Financial                Boston, MA
### AVP and Pricing Officer, U.S Annuities

- VA pricing and design, including equity guarantees
- Assisted in the implementation of MCCSR for seg fund guarantees for annuity business
- working closely with WoodLogan in the development of annuity products
- member of U.S ALCO
- working closely with systems, administration and filing areas in the implementation of annuity products
- Managed reinsurance programs and risk management for U.S Annuity

Division
- development of new business plan
- Managed staff of 4

**Education**      1987 - 1991      University of Connecticut      Storrs, CT
- B.S. Actuarial Science.

# EXHIBIT B



ACTUARIAL
STRATEGIES Inc.

CARY LAKENBACH, FSA, MAAA, CLU
President

December 16, 2002

Mr. Charles Dana Tatro
49 George Street
Mendon, MA 10756

Dear Dana:

Dana, it has been a couple of months since we started getting to know each other. My colleagues and I have been very impressed with you. Your accumulated expertise and experience are unusually strong, in our view. Your references have spoken very highly of your contributions and work ethic. Because of this, and because we are highly optimistic that you will grow no less rapidly and broadly in the future, I am very pleased to extend this offer to you to join Actuarial Strategies, Inc.

Here are the details of this offer:

1. The position would be Consulting Actuary in our Bloomfield, CT office. You will report to me. Upon acceptance and satisfaction of the terms and conditions of this letter, your employment will begin on January 2, 2003.

2. The key requirements of this position will include the following:

• **Significant Client Management.**

We look to you to participate in and/or lead product development projects, maintain and adhere to workplans for such projects, participate actively in the actual work effort, research issues as needed, routinely report on projects to clients as well as to your colleagues at Actuarial Strategies, and communicate and/or visit with clients as necessary to update them on work progress.

I expect that over time you will visit with prospective clients, and enter into new relationships. We also expect you to be highly sensitive to the needs of current clients, including identifying issues which Actuarial Strategies could help them address.

Charles Dana Tatro.
Page 2

- **High level maintenance and expansion of actuarial and marketing skills.**

  We need you to remain extremely current within the actuarial field, including but not limited to actuarial issues, tax laws, current market needs, competitor services and products, etc., as well as the marketing applications and needs which drive our business. You bring certain experiences to the table, in annuities particularly, that suggest we may be able to expand the breadth of our actuarial efforts beyond the current core product development business.

  - In particular we need you to develop a strong understanding of universal life and the marketplace it serves. Of course, this includes an intensive working knowledge of XXX and AXXX requirements.

  - We also want you to develop a comprehensive understanding of the 2001 CSO Table and the transition rules governing its use.

- **Identification, Researching, Selection, Planning, and Execution of New Business Opportunities.**

  A requirement of this position is again to keep an eye out for new business opportunities. We want to make sure that we are "ahead of the curve" so to speak and our key niche in the consulting world is to be two steps in front of the competition in all, but especially critical areas.

- **Common actuarial tool expertise.** Our pricing is done on both PTS and internal systems, including sophisticated Excel models. Extensive knowledge in the use of these vehicles is critical.

- **Offer guidance in the management, strategically and tactically, of our business.** I look forward to sharing opportunities, brainstorming issues and problem-solving, with you, and to receiving your input and guidance.

  I believe that significant cross-pollination can occur within our actuarial operation. Open discussions are critical to achieving this. Consistent internal communications are extremely vital to the success of our projects.

  Organization and maintaining accurate and dated material for each project you work on is essential and is required.

- Regular and periodic attendance at interoffice and professional meetings, for both business and marketing purposes, will be expected.

3. We are pleased to offer you an annual salary of **$170,000.**

Actuarial Strategies, Inc. 12-16-02

Charles Dana Tatro
Page 3

4. After continued successful six months of employment with Actuarial Strategies, a bonus of $8,000 will be paid to you. Your continued employment with Actuarial Strategies on such date is a prerequisite for such bonus.

5. You may be eligible to receive a discretionary annual bonus based upon personal and Actuarial Strategies' performance. The amount, it any, of this bonus shall be in the absolute sole discretion of Actuarial Strategies. This bonus, if any, will be paid on or about December 31 of each year and your continued employment with Actuarial Strategies on such date is one prerequisite for such bonus.

6. Actuarial Strategies currently maintains both a Money Purchase Pension Plan and a Profit Sharing Plan. Eligibility is January 1 or July 1 after two years of employment. The terms of these pension plans are currently under review. The purpose of the review is not benefit reduction.

7. Vacation time is three weeks annually accrued at 1.25 days per month Vacation days are not permitted to be carried over to the following year. You will also receive two floating days to use as personal days.

8. Actuarial Strategies offers a medical benefits package, to which it currently contributes 85% of the cost of coverage. This percentage can change any time.

9. Actuarial Strategies will reimburse you for the reasonable costs of moving your family and household possessions to Connecticut, up to a maximum amount of $4,000. Any expense above the amount of $4,000 may or may not be paid.

10. This offer is contingent upon: 1) your providing documents to establish your identity and authorization to work in the United States as required by the Immigration Reform and Control Act of 1986 on your first day of employment; 2) your signing of the attached Non-Disclosure Agreement and Covenant Not to Compete; and 3) your signing of a receipt of the employee handbook, a copy of which is also attached.

11. I will want to discuss billing rate issues with you at an appropriate time.

Charles Dana Tatro
Page 4

A change in direction such as you are contemplating is a family affair, and the staff at Actuarial Strategies welcome and look forward to the opportunity to meet your wife and to try to address the many questions she may have. In particular, we would be pleased to have you as our guests in Bloomfield so that we can also meet her and she us.

Dana, there you have it. I hope you view the offer as attractive, and I look forward to your joining us. There is a great opportunity for you and Actuarial Strategies to fruitfully grow and prosper together.

I look forward to hearing from you.

Sincerely,

Cary Lakenbach

/cl

Accepted and agreed as of this _____ day of December, 2002.

Charles Dana Tatro

# EXHIBIT C



## Intellectual Property Agreement Covenant Not to Compete

As a condition and in consideration of my continued employment by Actuarial Strategies, Inc., or any of its successors or assigns (hereinafter referred to as the EMPLOYER), I, the EMPLOYEE named below, agree as follows:

1.      Unless the EMPLOYER has acquired specific authorization, I will not disclose to or use in my work with the EMPLOYER any proprietary information of others, including any of my prior employers.

2.      During the term of this Agreement and at all times thereafter, I will keep in confidence and will not publish, use or disclose to others, without the prior written consent of the EMPLOYER, any Trade Secrets or other confidential Information related to the EMPLOYER or the EMPLOYER's business. As used herein, the phrase "Trade Secret"' is to be considered as used in accordance with the definition of Trade Secret found under Connecticut law in effect at the time of the execution of this Agreement. Without limiting this definition, and for information purposes only, a Trade Secret is the whole or any portion of any technical or non-technical information, including a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, financial plan, product plan or customer or supplier information that is actually or potentially valuable because it is not generally known to others and that is subject to reasonable efforts by the EMPLOYER to maintain its secrecy.

3.      Upon leaving the employ of the EMPLOYER, I will not take with me any written, printed or electronically stored Trade Secret or other confidential information or any other property of the EMPLOYER obtained by me as the result of my employment, or any reproductions thereof. All such property and all copies thereof shall be surrendered by me to the EMPLOYER on termination of employment or at any time on request by the EMPLOYER.

4.      I agree that all trade secrets, inventions, works of authorship (including illustrations, writings, software and computer programs), improvements, devices, designs, discoveries, practices, processes, methods, formulae, products and the like (hereinafter collectively called "INVENTIONS") and all other business or technical information created or conceived by me, either alone or with others, while employed by the EMPLOYER and related to the existing or contemplated business or research of the EMPLOYER or resulting from my work with the EMPLOYER, belong to the

EMPLOYER. Until proven otherwise, any INVENTION shall be presumed to have been conceived during such employment if within one (1) year after termination of such employment it is disclosed to others, or it is completed, or it has a patent application filed thereon.

5.    I will promptly disclose to the EMPLOYER all INVENTIONS, and any other information which belong to the EMPLOYER under paragraph 4 above; and I will assign to the EMPLOYER, or to others as directed by the EMPLOYER, all of my interest in such INVENTIONS, without charge, and I will execute any papers and do any acts which the EMPLOYER may consider necessary to secure to it any and all rights relating to such INVENTIONS, including all patents and copyrights (and renewals thereof) in any country.

6.    I recognize, further, that all records, reports, notes, compilations, or other recorded matter, and copies or reproductions thereof, relating to the EMPLOYER's operations, activities or business, made or received by me during any period of my employment with the EMPLOYER are and shall be the property of the EMPLOYER exclusively, and I will keep the same at all times subject to the EMPLOYER's control and will surrender the same at the termination of my employment, if not before.

7.    I attach hereto a complete list of all INVENTIONS that I have made or conceived prior to my employment by the EMPLOYER and I desire that the INVENTIONS shall be excluded from this Agreement.

8.    I shall not, for a period of eighteen (18) months following the termination of my employment with the EMPLOYER, directly or indirectly:

(a)    perform services, similar to those I have performed for the EMPLOYER for any person, persons, company, partnership or corporation whose business is competitive with the business being carried on by the EMPLOYER or with respect to such services, solicit any actual or active prospective customer of the EMPLOYER for whom I performed services while employed by the EMPLOYER during the twelve months preceding my termination of employment;

(b)    nor call upon, divert or solicit any person, persons, company, partnership or corporation for the purpose of selling or marketing services or products competitive with the business being carried on by the EMPLOYER;

(c)    nor employ or attempt to employ or assist anyone else to employ any person who is at such time, or at any time during the preceding year, was an employee of or consultant to the EMPLOYER, provided that this clause shall not restrict employment of a third party vendor who supplies generic services to the industry. As used in this section, the verb "employ" shall include its variations, for example, retain, engage or conduct business with.

9.    This Agreement shall be construed in accordance with and governed for all purposes by the laws of the State of Connecticut. The parties have entered into this Agreement in the belief that its provisions are valid, reasonable and enforceable. However, if any one or more of the provisions contained in this Agreement shall, under existing or hereafter enunciated law, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. If, moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to time, duration, geographical scope, activity or subject, it shall be construed, by limited and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

This Agreement supersedes all prior oral or written agreements and is effective with respect to the subject matter hereof subsequent to the date executed.

I acknowledge receipt of an executed copy of this Agreement.

This Agreement is executed this __20th__ day of __December__, 20_22_ at __Mendon__, __MA__.
       city            state

Actuarial Strategies, Inc.

BY _Cary Lakenbach_

Print Name __CARY LAKENBACH__

Title __President__

EMPLOYEE

Signature _____

Print Name __Dana Tatro__

Residence __49 George St__

City __Mendon__

State __Ma__

# EXHIBIT D

FILED

FEB 0 1 2005

ATTEST:

CLERK



I.    SKILL/KNOWLEDGE/UNDERSTANDING

II.    DRIVE FOR RESULTS

III.    DECISION MAKING

IV.    COMMITMENT TO EXCELLENCE

V.    MARKETING EFFECTIVENESS

VI.    CLIENT RELATIONSHIP BUILDING

VII.    INTERNAL RELATIONSHIP BUILDING

VIII.    VISION AND DIRECTION

IX.    BUSINESS FOCUS & FLEXIBILITY

As a general statement I was very impressed with the thoroughness of your initial ASI document, your insights about where you had expertise and talent, and where you'd like to take your career. I have referred to that document in developing this one.

Further, I am hopeful that we can continue to build and expand upon our relationship.

## 1. SKILL & KNOWLEDGE (PRODUCTS, FINANCIAL ISSUES)

- I believe you have provided excellent guidance to companies (Equitable, Merrill Lynch, Manulife, and Country) on product and financial issues.
- You have provided needed rigor and discipline to our PTS pricing system.
- You have brought strong dose of annuity knowledge to the firm, including:
  - RSLN2 MODELS.
  - C3 – P2 understanding.
- You have been instrumental in driving life GMWB vehicle project
- You have interacted well in technically oriented discussions with clients.
- You are very skilled at managing meetings and keeping them focused. This is a skill worth emulating by me and others.

       ○ How you provide guidance to others is worth discussing.  (e.g., meeting agendas.)
- Your report writing is high quality.

## 2.  DRIVE FOR RESULTS

- You are indeed a driven individual.
- At times your desire for results reveals a certain abrasiveness.
  - ○ Example: GMWB discussion.  In the meeting I had commented about what I felt I needed to do to understand the issues.  (This was in discussion of CL review of an initial write-up.)  You felt I had wasted time from the last meeting.  Yet, when all was said and done, significant additional analysis was brought to bear and you ultimately indicated to me that we had achieved a much better document as a result.

## 3.  DECISION MAKING.

- I believe your decision making instincts, certainly with respect to decisions made in project work, are in general very good.
- We made a horrendous faux-pas with Equitable insofar as our discussions with them on GMWB were concerned.
  - ○ The following is clear to me at this time.
  - ○ We had not done sufficient research and analysis to suggest an idea should belong to us.
  - ○ The information we had previously shared with them about GMWB was pretty modest.
  - ○ We managed to offend them, royally.
  - ○ I'm not sure we really thought out clearly whether the positives in sharing our concerns outweighed potential negatives.
  - ○ In retrospect, we should have acted differently.

4. **COMMITMENT TO EXCELLENCE**

- Your commitment to product excellence, systems integrity and financial integrity is laudable.

5. **MARKETING EFFECTIVENESS**

- You have achieved some notable successes in marketing to date, especially with Manulife and Merrill Lynch. This includes repeat business.
- We have interacted well when meeting together with clients and prospects. I am pleased at this and expect it will continue.
- Actuarial Strategies needs a much greater contribution from you on the marketing side. It is difficult to articulate just what a dollar amount should be, but if we wish to grow in terms of personnel and industry impact, the company must lessen its reliance on me to bring in business.
  - o I am concerned that the year to date direct marketing effort has been insufficient.
    - ■ Marketing Letters/other communications.
    - ■ Direct meetings with companies.
  - o What do you feel you need in order to expand your efforts in this area?
  - o Without precisely answering the target revenue question, I think a goal of $500,000 annual revenue is achievable.

6. **CLIENT RELATIONSHIP BUILDING**

- In many respects your interaction with clients has been at a very superior level. This is certainly true with client relationships you have created.
- At times I have heard you speak disparagingly of certain clients (Debra Ayres comes to mind.) Whether warranted or not, they are the people who butter our bread so to speak. This may not be the best business practice.
  - o There's a related issue, which over the years has always bothered me. If a person speaks negatively of another in my presence, what does he say about me when I'm not there?
- In the strongest sense possible, we are each the other's client. How we interact is critical to our continued relationship and to the success of our firm. My view is that this relationship, which I want to continue, needs attention. Let me offer some observations.
  - o We speak to each other in body signals. I will almost always say hello when I come into the office and leave it. All too often, if you

are at your computer, you won't even respond or turn around. It communicates a message.

- o There are times when you demonstrate in my view a certain rigidity. As an example, a few weeks ago, you were interacting with me on the Atherton situation. We had on a couple of occasions already pushed off the meeting. It was a Wednesday, I believe, May 5th, you were working from home, and we were supposed to discuss the issue in the morning. It turned out that you needed to get something done for Merrill Lynch, so I said okay, let's do it at 1:30, which we agreed to do, but then I realized later I had a lunch outside the office, so I left you a message saying let's talk at 2:00. However, at 2:00 I wound up getting in a client call for around 15 minutes. When I called you weren't there, so I left a message saying to call me back, but I'd be getting a haircut at 3:30. For what it's worth you wound up speaking to Rita just after 3:30, saying you had other things to do.
- o Similar instances of timing have occurred.
- o How do we address these kinds of issues in a way that meet both our needs?

- Another concern. One has to do with the conduct of meetings. We have gone through periods where we have not had regularly scheduled meetings, a criticism I accept. When I decided to reinstitute them, you showed up with an agenda for the meeting. This happened a couple of times.
  - o Your direct (to me) agenda input would have been welcomed.
  - o What you did is something that simply isn't done in a business.
- One of the issues of concern to me is your work at home.
  - o As a general statement, I believe you work well from home. I do not have any objection to your continuing to work from home. I recognize that your wanting to spend time with kids and Frannie is important to you and wish to accommodate that wherever possible.
  - o What I believe has happened, however, is that you communicate the times you will work from home and that's that. At least that's the way it appears.
  - o What I think needs to happen is that expected home time be shared in advance, and in such a way that there is flexibility. I am more than willing to demonstrate parallel flexibility, and believe I more than have, but there should be discussion on this.
    - An example is the interview with Jim Wiseman. It would have been in the best interests of the company for you to have been in the office.

- One of the challenges in working from home, as I recall it from my AFS days, is that the trip to the office is viewed as a trip, so that the desire to visit companies may be lessened (i.e., one is already traveling two days a week.)
- I'd like us to consider a structure where the two of us meet once a week, whether it's a meeting or an extended lunch, to discuss high level issues, ideas, problems, opportunities. Such a dialogue would improve the chances of maintaining open communications and a healthy relationship.

## 7. INTERNAL RELATIONSHIP BUILDING

- I'm not sure whether the results are in yet on this question.
- Generally when I have asked you questions the answer has been provided forthrightly. At times, the response has been somewhat short.
- I am not sure whether the situation with Brian Lowry was handled optimally. Although in his case there isn't much question that the right decision was made last month, I felt we could have mentored him better, provided him with directions better. I don't know whether the distance issue added to his challenges.
- Your guidance on this issue is appreciated.
- Beyond that I don't believe referring to Harold and Ed as Harry and Eddie is appropriate in the work environment.

## 8. VISION AND DIRECTION

- I think your presentation skills in a small group setting (e.g., with a client) are strong and getting even better.
- You have demonstrated a proficiency in keeping up to date with current actuarial developments. I am very pleased with that.
- In your Actuarial Strategies work you have demonstrated a creativity that is quite positive.
- You have participated in and continue to participate in industry task forces and trade show committees. That's excellent, both for your exposure and the company's.

- I believe that a principal relationship is within your reach. In order to achieve it the following are necessary conditions:

  - A solid and mutually accessible relationship (with me.) I welcome your feedback and guidance and collegiality and want it to be mutual.
  - Increased marketing activity. }#$ ⟶
  - Increased revenue generation. }#$
  - Maintenance of strong internal relationships.
  - Continued and/increased thinking from company perspectives. /

I am hopeful we will have a successful resolution here.

## 9. BUSINESS FOCUS / FLEXIBILITY

- Your focus is generally speaking admirable.
- As noted there are times when the flexibility level could be greater. This should not be viewed as referring to situations where you single-mindedly zero in, or perhaps the phase is get into a zone, on a critical effort in order to get it done. I admire and respect your ability to do that.

# EXHIBIT E



CARY LAKENBACH, FSA, MAAA, CLU
President

November 11, 2004

**VIA OVERNIGHT DELIVERY**

Mr. Dana Tatro
49 George Street
Mendon, MA 01756

Re:    **Acceptance of Letter of Resignation**
       **Intellectual Property Agreement - Covenant Not to Compete**
       **Unemployment Information**
       **COBRA Insurance Information**

Dear Dana:

Your resignation from the position of Vice President & Consulting Actuary at Actuarial Strategies, Inc. effective November 5, 2004, is accepted.

Your final paycheck was sent overnight via Federal Express on November 5, 2004 which included 6.5 days of additional vacation time.

We do have possession of the Company laptop you used, but we do not have the power cord that belongs with it. Please forward that to us as soon as possible. We will be boxing up your possessions in Bloomfield and mailing them to you.

We have enclosed an unemployment package for you. You will be receiving a COBRA letter which will explain the continuation of medical benefits if you so choose.

Because your employment with Actuarial Strategies has ended, I am writing to remind you of your obligations under the Intellectual Property Agreement – Covenant Not to Compete that you signed. I have attached a copy of your agreement for your benefit and review because it is unclear whether you have retained a copy. I also am writing to inform you that we are prepared to pursue any and all appropriate remedies to prevent any breach of the Agreement.

Please make sure that any new employer is aware of your obligations under this Agreement. Should you have any further questions or concerns, please do not hesitate to contact me

I thank you for your efforts and contributions during your time with us, and I wish you all the best for the future.

Sincerely,

Cary Lakenbach

CL/rm

Enclosures

One Northwestern Drive, Suite 103, Bloomfield, CT 06002-3400 • Telephone: (860) 726-9292 • Facsimile: (860) 726-9299

# EXHIBIT F

FILED

FEB 0 1 2005

ATTEST:

CLERK

-------------- Forwarded Message: --------------
From: rleach@jhancock.com
To: charlesdanatatro@comcast.net
Subject: Society of Actuaries Member Directory
Date: Mon, 3 Jan 2005 22:36:17 +0000

Dana: I heard that you are no longer with Actuarial Strategies. I hope
that you're doing OK with that.

We recently lost a couple of actuaries in our fixed annuity pricing area,
and will need some help to see this group through until we can get
permanent replacements in place. I'd like to see if you might be
interested in a temporary assignment (maybe 2 months) to help keep us
afloat until we can find some permanent replacements. I tried calling the
number you have listed in soa.org, but couldn't get through. Please give
me a call so we can discuss.

Hope you had a happy holiday season!

Bob Leach
Vice President--Product Development
John Hancock Annuities
601 Congress Street
Boston, MA 02210
rleach@jhancock.com
Phone: 617-663-3600
Fax: 617-663-3150


1/18/2005

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY)

    Charles Dana Tatro v. Actuarial Strategies, Inc.

2.  CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL COVER
    SHEET. (SEE LOCAL RULE 40.1(A)(1)).

        _____   I.      160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

        _____   II.     195, 368, 400, 440, 441-444, 540, 550 625, 710, 720, 730,
                          740, 790, 791, 820, 830, 840, 850, 890, 892-894, 895, 950.

           X      III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315,
                          320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385,
                          450, 891.

        _____   IV.     220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
                          690, 810, 861-865, 870, 871, 875, 900.

        _____   V.      150, 152, 153.

3.  TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(E)).

    N/A

4.  HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS COURT?

    NO

5.  DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE PUBLIC
    INTEREST?  NO

    IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY? (SEE 28 USC 2403)   N/A

6.  IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE 28 USC
    2284?  NO

7.  DO ALL PARTIES IN THIS ACTION RESIDE IN THE CENTRAL SECTION OF THE DISTRICT OF MASSACHUSETTS (WORCESTER
    COUNTY) - (SEE LOCAL RULE 40.1(C)).     NO   OR IN THE WESTERN SECTION (BERKSHIRE, FRANKLIN, HAMPDEN OR
    HAMPSHIRE COUNTIES)? - (SEE LOCAL RULE 40.1(D)).     NO

8.  DO ALL OF THE PARTIES RESIDING IN MASSACHUSETTS RESIDE IN THE CENTRAL AND/OR WESTERN SECTIONS OF THE
    DISTRICT?     YES  (a) IF YES, IN WHICH SECTION DOES THE PLAINTIFF RESIDE?  Central

9.  IN WHICH SECTION DO THE ONLY PARTIES RESIDING IN MASSACHUSETTS RESIDE?  Central

10. IF ANY OF THE PARTIES ARE THE UNITED STATES, COMMONWEALTH OF MASSACHUSETTS, OR ANY GOVERNMENTAL AGENCY
    OF THE U.S.A. OR THE COMMONWEALTH, DO ALL OTHER PARTIES RESIDE IN THE CENTRAL SECTION   N/A   OR WESTERN
    SECTION   N/A

(PLEASE TYPE OR PRINT)
ATTORNEYS NAME   John P. McLafferty

ADDRESS   Day, Berry & Howard LLP, 260 Franklin St., Boston, MA 02110

TELEPHONE NO.   617-345-4600

(Category.frm - 09/92)

JS 44
(REV. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
Charles Dana Tatro

**DEFENDANTS**
Actuarial Strategies, Inc.

52

2005 FEB -4

IS DISTRIBUTING COURT

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Worcester
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(C)** ATTORNEYS (FIRM NAME, ADDRESS AND TELEPHONE NUMBER)
John M. Wozniak (BBO # 556441)
Wozniak & Padula, PC
82 Cape Road, Mendon, MA 01756
508-478-3788

ATTORNEYS (IF KNOWN)
John P. McLafferty  (BBO #639179)
Day, Berry & Howard LLP
260 Franklin Street, Boston, MA 02110-3179
617-345-4600

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
  Plaintiff

☐ 3 Federal Question
  (U.S. Government Not a Party)

☐ 2 U.S. Government
  Defendant

☒ 4 Diversity
  (Indicate Citizenship of Parties
  in item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                  AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | Of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product Liability | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting | ☐ 865 RSI ( 405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Equipment | ☐ 443 Housing/ | **HABEAS CORPUS** | | | Under Equal Access to Justice |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | or Defendant | State Statutes |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS — Third Party | ☐ 890 Other Statutory Actions |
| | | ☐ 550 Civil Rights | Security Act | 26 USC 7609 | |
| | | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 Original
  Proceeding

☒ 2 Removed from
  State Court

☐ 3 Remanded from
  Appellate Court

☐ 4 Reinstated or
  Reopened

☐ 5 Transferred from
  another district
  (specify)

☐ 6 Multidistrict
  Litigation

☐ 7 Appeal to District
  Judge from
  Magistrate
  Judgment

**VI. CAUSE OF ACTION** (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUES UNLESS DIVERSITY)

28 U.S.C. § 1332.  Plaintiff alleges that Defendant wrongfully interfered with his advantageous or contractual business relations and committed unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A.

**VII. REQUESTED IN
COMPLAINT:**
CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $ >

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ YES    ☐ NO

**VIII. RELATED CASE(S)
IF ANY** (See instructions)
JUDGE _____    DOCKET NUMBER _____

DATE
February 4, 2005

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

JS 44 Reverse
(Rev. 3/99)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44
Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of the Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.    (a) Plaintiffs - Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant codes takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.    Residence (citizenship) or Principal Parties**. This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.    Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District.(5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.    Cause of Action.** Report the civil statue directly related to the cause of action and give a brief description of the cause.

**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.** This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.