**Commonwealth of Massachusetts**
**WORCESTER SUPERIOR COURT**
**Case Summary**
**Civil Docket**

## WOCV2005-00185
## Tatro v Actuarial Strategies Inc

| | | | |
|---|---|---|---|
| **File Date** | 02/01/2005 | **Status** | Disposed: transfered to other court (dtrans) |
| **Status Date** | 02/10/2005 | **Session** | C - Civil C (16 Worcester) |
| **Origin** | 1 | **Case Type** | B99 - Misc tort |
| **Lead Case** | | **Track** | F |

| | | | | | |
|---|---|---|---|---|---|
| **Service** | 05/02/2005 | **Answer** | 07/01/2005 | **Rule12/19/20** | 07/01/2005 |
| **Rule 15** | 07/01/2005 | **Discovery** | 11/28/2005 | **Rule 56** | 12/28/2005 |
| **Final PTC** | 01/27/2006 | **Disposition** | 03/28/2006 | **Jury Trial** | Yes |

### PARTIES

**Plaintiff**
Charles Dana Tatro
49 George Street
Mendon, MA 01756
Active 02/01/2005

**Private Counsel 556441**
John M Wozniak
82 Cape Road
Mendon, MA 01756
Phone: 508-478-3788
Fax: 508-533-7405
Active 02/01/2005 Notify

**Defendant**
Actuarial Strategies Inc
Service pending 02/01/2005

**Private Counsel 639179**
John P McLaffety
Day Berry & Howard
260 Franklin Street
Boston, MA 02110
Phone: 617-345-4600
Fax: 617-439-4453
Active 02/07/2005 Notify

### ENTRIES

| Date | Paper | Text |
|---|---|---|
| 02/01/2005 | 1.0 | Complaint & civil action cover sheet filed and rule 29 statement-CJ |
| 02/01/2005 | | Origin 1, Type B99, Track F. |
| 02/01/2005 | | Filing fee paid in the amount of $240.00 including $15.00 surcharge and $20.00 security fee.($275.00) |
| 02/01/2005 | 2.0 | Affidavit of Charles Dana Tatro |
| 02/01/2005 | 3.0 | Plaintiff Charles Dana Tatro's MOTION for Injunction Relief |
| 02/01/2005 | 4.0 | Plaintiff Charles Dana Tatro's MOTION for Short Order of Notice |
| 02/01/2005 | 5.0 | Plaintiff Charles Dana Tatro's MOTION for appointment of special process server D.H. Kamins & Associates |
| 02/01/2005 | | MOTION (P#4) Allowed returnable 2/7/05 @ 2:00 P.M. in room 16 (Timothy S. Hillman, Justice). |
| 02/01/2005 | | MOTION (P#5) ALLOWED (Timothy S. Hillman, Justice)  Copy given in hand to counsel for plaintiff 2/1/05 |
| 02/07/2005 | 6.0 | Memorandum of Plff in support of motion for injunctive order |
| 02/07/2005 | | Atty John P McLaffety's notice of appearance for Actuarial Strategies Inc |
| 02/07/2005 | 7.0 | Notice for Removal to the United States District Court filed by Actuarial Strategies Inc |

**WORCESTER SUPERIOR COURT**
**Case Summary**
**Civil Docket**

## WOCV2005-00185
## Tatro v Actuarial Strategies Inc

| Date | Paper | Text |
|------|-------|------|
| 02/10/2005 | | Case REMOVED this date to US District Court of Massachusetts |

| | | | **EVENTS** | |
|------|---------|-------|--------|

| Date | Session | Event | Result |
|------|---------|-------|--------|
| 02/07/2005 | Civil C (16 Worcester) | Motion/Hearing: prel inj | Plaintiff did not appear |
| | | SON returnable on Ptfs. Moton of PI (#3) | |

A true copy by photostatic process
Attest:
Eugene G. Sullivan
Asst. Clerk

| CIVIL ACTION COVER SHEET | DOCKET NO.(S) 05-0185@ | Trial Court of Massachusetts Superior Court Department County: Worcester |
|---|---|---|

| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| Charles Dana Tatro | Actuarial Strategies, Inc. |

| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Wozniak & Padula P.C., John M. Wozniak 82 Cape Rd. Mendon, MA 01756 Board of Bar Overseers number: 556441 | ATTORNEY (If known) |
|---|---|

### Origin code and track designation

Place an x in one box only:

[X] 1. F01 Original Complaint
[ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
[ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)

[ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
[ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60) (X)
[ ] 6. E10 Summary Process Appeal (X)

### TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. B99 | TYPE OF ACTION (specify) Interference w/ Contract | TRACK (F) | IS THIS A JURY CASE? (X) Yes   ( ) No |
|---|---|---|---|

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
2. Total Doctor expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
3. Total chiropractic expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
4. Total physical therapy expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
5. Total other expenses (describe) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
                                                                            Subtotal $. . . . . . . . . . .
B. Documented lost wages and compensation to date . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
C. Documented property damages to date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
D. Reasonably anticipated future medical and hospital expenses . . . . . . . . . . . . . $. . . . . . . . . . .
E. Reasonably anticipated lost wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
F. Other documented items of damages (describe)
                                                                            $. . . . . . . . . . .
G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

                                                                            $. . . . . . . . . . .
                                                                   TOTAL $. . . . . . . . . . .

### CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):

The claims arise from the intentional interference with contractual relations and consequently, M.G.L. c. 93A

TOTAL $. 64,000.00

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record   John M. Wozniak   DATE: 2/1/05

AOTC-6 mtc005-11/99
A.O.S.C. 1-2000

A true copy by photo

Attest: _____ Asst. Clerk

## COMMONWEALTH OF MASSACHUSETTS

Worcester, ss

Superior Court
C.A.No.

| | |
|---|---|
| *Charles Dana Tatro* ) | |
| *Plaintiff,* ) | |
| *v.* ) | |
| ) | |
| *Actuarial Strategies, Inc.,* ) | |
| *Defendant.* ) | |

**FILED** 05-0185 C

FEB 0 1 2005

ATTEST:

*Frances a Ford*

CLERK

### PLAINTIFFS COMPLAINT, REQUEST FOR INJUNCTIVE RELIEF AND JURY DEMAND

### PARTIES

1. The plaintiff, Charles Dana Tatro (the "Plaintiff"), is an individual presently residing at 49 George Street, Mendon, Worcester County, Massachusetts.

2. The defendant, Actuarial Strategies, Inc. (the "Defendant") is a Connecticut Corporation with a regular and usual place of business located in Bloomfield, Connecticut.

### JURISDICTION

3. Jurisdiction over the Defendant is proper pursuant to the long-arm statute, M.G.L. c. 223 A § 3 as follows:

   a. The Defendant has transacted business in this Commonwealth;

   b. The Defendant has contracted to supply services or things in this Commonwealth; and/or

   c. The Defendant has caused tortuous injury by an act in this Commonwealth.

### FACTS

4. The Plaintiff has skills and training in the profession of an actuary. In fact, based upon skills, education and training, the Plaintiff is a Fellow of the Society of Actuaries.

5.    The Plaintiff began his career as an actuary employed by Manulife Financial, in the position of Actuary Vice President and Pricing Officer. The Plaintiff held that position with Manulife Financial, located in Boston, Massachusetts from 1993-2003.

6.    Following that period of employment, the Plaintiff joined Allmerica Financial, located in Worcester, Massachusetts in the capacity of Vice President and Chief Actuary and remained in that position for the years 2001-2003.

7.    In working with both companies, the Plaintiff gained skills and expertise in the areas of variable annuities amongst other things. It was this experience, background and the Plaintiff training that made him attractive to the Defendant.

8.    In fact, the Defendant had acquired the services of a professional recruiter and that representative approached the Plaintiff with the possibility of joining the Defendants Company.

9.    The Plaintiff was approached by Cary Lakenbach, the President of the Defendant to discuss his visions for the expansion of the Defendants business from a fundamentally single dimension firm to a multi-faceted full service firm. That meant expansion into the variable annuities market. At the time the Plaintiff was approached was Mr. Lakenbach, the Defendants business was primarily with respect to development and consulting in life insurance products and its proprietary product, TRIP.

10.   During the course of the Plaintiffs discussion with Mr. Lakenbach, he continually and repeatedly indicated there existed within the company strong partnership opportunities and a very generous policy of distributing profits.

11.   The proposals and representations made by Mr. Lakenbach appeared to be a positive opportunity for the Plaintiff. Despite its attraction, however, the Plaintiff had significant concerns, specifically, whether the Defendant held both the adequate resources to enter the desired markets and the real commitment to such an investment.

12.    It was based upon these concerns that although the Plaintiff accepted the offer of employment, he refused the $20,000.00 incentive to relocate his family from Mendon, Massachusetts to Connecticut.

13.    As previously indicated, the Plaintiff viewed the opportunity as having potential but saw shortcomings in the Defendants approach to entering the new markets and financial reliability.

14.    Despite these concerns, the Plaintiff did in fact accept the Defendants offer pursuant to the terms and conditions contained in the initial offer letter dated December 16, 2002. A true and accurate copy of the agreement is attached hereto and identified as Exhibit A.

15.    In addition to this acceptance letter, Mr. Lakenbach required the Plaintiff to execute an Intellectual Property Agreement Covenant Not to Compete. The Plaintiff at the time this document was placed before him, based upon the conversations he had with Mr. Lakenbach in conjunction with the initial interview, was led to believe that this agreement was entered into primarily and for the sole purpose of protecting the proprietary rights to products the Defendant had developed and patented. Specifically, it was the Plaintiffs belief that Mr. Lakenbach required the execution of the agreement to protect the proprietary TRIP product. Based upon this fact, the Plaintiff executed this agreement in conjunction with his acceptance of the position on December 20, 2002. A true and accurate copy of the Intellectual Property Agreement Covenant Not to Compete is attached hereto and identified as Exhibit B.

16.    That Intellectual Property Agreement Covenant Not to Compete stated in pertinent part the following:

    "8. I shall not, for a period of eighteen (18) months following the termination of my employment with the EMPLOYER, directly or indirectly:

(a) perform services, similar to those I have performed for the EMPLOYER for any person, persons, company, partnership or corporation whose business is competitive with the business being carried on by the EMPLOYER or with respect to such services, solicit any actual or active prospective customer of the EMPLOYER for whom I performed services while employed by the EMPLOYER during the twelve months preceding my termination of employment.

(b) nor call upon, divert or solicit any person, persons, company, partnership or corporation for the purpose of selling or marketing services or products competitive with the business being carried on by the EMPLOYER;"

17.    Initially, the employment began in a beneficial fashion.  The Plaintiff became involved in all aspects of his position, which included amongst other things, product development. In that regard, the Plaintiff attended an event sponsored and paid for by Ruark Insurance Advisors.  Although the Plaintiff attended this event, he had difficulty convincing Mr. Lakenbach to provide airfare, the only cost of attending. It was only upon the Plaintiff informing Mr. Lakenbach that he would pay it out of his own pocket that Mr. Lakenbach agreed that the Plaintiff could attend the meeting.

18.    In fact, while at this event, the Plaintiff developed his first client relationship with Merrill Lynch.  That development took place in June of 2003, approximately six months after his start date. At that time, the Plaintiff was approached in conjunction with his attempts to develop the Merrill Lynch account and informed by Mr. Lakenbach that he did not have a chance of acquiring any work with Merrill Lynch as his contact, Debbie Adler, the chief actuary with Merrill Lynch did not like Mr. Lakenbach. Despite this fact, the Plaintiff was able to succeed in securing Merrill Lynch as a contact.

19.     Additionally, in August of 2003, the Plaintiffs past employer, Manulife indicated that they needed actuarial help. That help included modifying a program that the Plaintiff has originally designed while employed by them. It was at that time, that the Defendant began to act in a fashion indicative of bad faith toward the Plaintiff. Specifically, unlike any other letters of engagement, the Defendant modified the engagement letter with Manulife to include a provision stating Manulife could not solicit people for hire from the Defendant.

20.     Upon information and belief, this modification was made to the engagement letter for the sole purpose of closing any opportunities for the Plaintiff to either accept any future beneficial position with Manulife and/or any work for them outside the scope of his employment with the Defendant whatsoever.

21.     Despite that fact, the Plaintiff continued to work hard for the Defendant in attempts for securing new clientele and expansion into the variable annuity markets.

22.     As a consequence of his hard work, that in October or November of 2003 the Plaintiff was promoted to Vice President and Consulting Actuary in charge of variable annuities. In conjunction with that promotion, the Plaintiff received a $13,000.00 a year raise and was allowed to work three days at home and 2 days in the office.

23.     At the time the promotion was received, the Plaintiff was not required to resign the Intellectual Property Agreement.

24.     During the time subsequent to this promotion, the Plaintiff continued to aggressively expend efforts in a fashion, which he believed, was expected of him by the Defendant. Despite that fact, Mr. Lakenbach repeatedly complained that the Manulife business, at this time was earning approximately twenty to thirty thousand dollars per month, was taking up too much time of another of the Defendants employees, Jonathon Clymer, who had been hired by the Defendant in October or November of 2003. Despite this conduct and behavior toward the client, which the

Plaintiff had brought into the firm, the Plaintiff continued to build the business of the Defendant and as an employee of the Defendant in an aggressive fashion. As a direct consequence of these actions the Plaintiff landed a $50,000 valuation project with Merrill Lynch. In June or July of 2004, the Plaintiff began to notice the increasing amount of disparaging treatment directed at him by Mr. Lakenbach. Specifically, Mr. Lakenbach was treated him differently than the recent hire, Mr. Clymer. Some examples of the disparaging treatment included the rejection of the Plaintiff request to an exception to the two-year exclusion of the company pension plan but granted this very request to Mr. Clymer.

25.    Despite the deterioration of the relationship the Plaintiff received in August of 2004 a performance review demonstrating that he was performing at levels that were both competent and indicated principle relationship or equitable position within the firm was attainable. A true and accurate copy of the August, 2004 review is attached is hereto and identified as Exhibit C.

26.    Soon after the Plaintiff received this evaluation, the product development projects started drying up. It was at that point that the Plaintiff suggested that the company build a core of smaller projects and companies to provide ongoing income. It became apparent at that point in time that expenses were becoming a major concern of Mr. Lakenbach who during the course of staff meetings began to make the primary topic of those meetings the $80,000.00 monthly expense requirement. In fact, when the actuaries, including the Plaintiff lobbied for a low-level actuary for the purpose of providing resources to companies to expand the Defendants market presence and ability to compete on smaller projects, Mr. Lakenbach stated that they did not have the money.

27.    More importantly, Mr. Lakenbach virtually ignored and for that matter paid very little attention to what the Plaintiff said was necessary to grow a variable annuity business.

Specifically, on repeated occasions, Mr. Lakenbach inquired of the Plaintiff whether he thought the marketing budget was sufficient from a marketing perspective to develop the area of business. Without exception, the Plaintiff repeatedly informed Mr. Lakenbach that the amount was not sufficient and that a significantly larger budget was necessary to make an impact upon that market.

28.     It was during this point in time that the Plaintiff began to realize that Mr. Lakenbachs previous intention when he accepted the position were now being abandoned. Instead, it became apparent that Mr. Lakenbach, in both the hiring and use of Mr. Clymer was focusing primarily and exclusively on developing the value/TRIP proprietary projects. In fact, it was as a direct consequence of this mindset that in early 2004 the Defendant lost a contract with Manulife to AON Consulting for two reasons. First, Mr. Lakenbach refused to allow the Plaintiff to work on the project and Manulife was concerned that the Defendant lacked the necessary Axis experience which was the pricing software utilized by Manulife.

29.     Upon information and belief, subsequent to August, 2004 Mr. Lakenbach was attempting to force the Plaintiffs resignation, by making unrealistic demands of the Plaintiff to generate additional business yet failing to provide proper funding and support. Despite this fact, the Plaintiff in the face of the lack of financial tools to grow the business repeatedly and aggressively sought to meet his goals as required and outlined in the August, 2004 review.

30.     The Plaintiffs attempts, however, were futile as it appeared that Mr. Lakenbach had made the decision to abandon his prior desire to expand into other markets and make the firm more of a full service firm.

31.     Upon information and belief, Mr. Lakenbach, engaged the Plaintiff in a confrontational fashion in an effort to force the Plaintiff to terminate his position with the Defendant.

32.     Despite this fact, the Plaintiff continued to operate and work in a diligent and aggressive fashion in achieving his goals. In fact, in a prior year based upon the Plaintiffs efforts he had received a bonus in the amount of $100,000.00 and fully expected that based upon his present efforts that bonus would have been at least met or exceeded.

33.     Upon information and belief, it is based upon the change of direction, and in an effort to escape paying compensation to the Plaintiff in the form of a bonus he had received in a prior year that in November of 2004, without the Plaintiffs knowledge, his laptop was scanned by the Defendant. In doing so, the Defendant confronted the Plaintiff with assertions that the scanning had recovered that the Plaintiff had been utilizing the laptop for personal use.

34.     During the entire course of his employment with the Defendant, the Plaintiff had always utilized his laptop for personal use. This was based upon the fact that the Plaintiff traveled extensively on behalf of the Defendant and was allowed to work at home.

35.     It is against this backdrop that, upon information and belief, Mr. Lakenbach approached the Plaintiff indicating that it would be in his best interest to offer a letter of resignation.

36.     Upon information and belief, the scanning was a pretextual reason by the Defendant in an effort to avoid payment of the bonus which would have been due the following month at year end, allow the Plaintiff to qualify for the Defendants pension plan and terminate the Plaintiffs employment with the Defendant without payment of any severance.

37.     Upon information and belief, the Defendant took these actions in bad faith and without justification.

48.   Based upon the actions of the Defendant, the opportunity as existed between the
      Plaintiff and Manulife was lost.

49.   As a result, the Plaintiff suffered damage.

## COUNT II
### (M.G.L. c 93A)

50.   The Plaintiff realleges and incorporates by reference the allegations contained in
      paragraphs 1-50 of the Complaint as if expressly restated herein.

51.   The parties are "parties" as defined by M.G.L. c. 93A § 2 and 11.

52.   The parties are engaged in "commerce" as defined by M.G.L. c. 93A§ 2 and 11.

53.   The Defendant by intentionally and maliciously interfering with the Plaintiffs ability
      to earn a living and compete in the market place, as more detailed above, constitutes
      an unfair and deceptive business practice.

54.   The Defendants conduct was knowing and willful.

55.   As a result of the Defendants conduct, the Plaintiff has suffered damages.

## COUNT III
### (Declaratory Judgment)

56.   The Plaintiff realleges and incorporates by reference the allegations contained in
      paragraphs 1-55 of the Complaint as if expressly restated herein.

57.   The Defendant has relied upon the language contained in an Intellectual Property
      Non-Compete Agreement attached hereto and identified as Exhibit B.

58.   The Plaintiff requests that this Court declare that under the terms of the agreement,
      the agreement void and in additions, is overly broad from a perspective of time,
      scope, geographical location, and consequently unenforceable.

## COUNT IV
### (Injunctive Relief)

59.   The Plaintiff realleges and incorporates by reference the allegations contained in
      paragraphs 1-58 of the Complaint as if expressly restated herein.

60.   There exists a likelihood of success that the Plaintiff will succeed on the merits of his claim.

61.   The balancing of harms weigh in favor of the Plaintiff in conjunction with the request made for injunctive relief.

62.   The plaintiff will suffer irreparable harm in the event the requested relief is not granted.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL TRIABLE ISSUES**

**WHEREFORE,** the Plaintiff respectfully requests that this Court:

1.   Enter Judgment in his favor and against the Defendant on Counts I-IV of the Complaint;

2.   Enter Judgment in favor of the Plaintiff on Count II and declare the agreement is unenforceable;

3.   Award the Plaintiff on Count II of the Complaint multiple damages and his costs, including reasonable attorneys fees;

4.   Enter an injunctive order restraining the Defendant interfering with the Plaintiffs ability to provide services as an actuary; and

5.   Grant such other and further relief as is meet and just.

Respectfully Submitted,
The Plaintiff,
By His Attorney,

John M. Wozniak, BBO#556441
Wozniak & Padula, P.C.
82 Cape Road
Mendon, MA 01756
(508) 478-3788

Dated:  February 1, 2005

A true copy by photostatic process
Attest:
Asst. Clerk

COMMONWEALTH OF MASSACHUSETTS

Worcester, ss

Superior Court
C.A. No.

05-0189 C

| | |
|---|---|
| *Charles Dana Tatro*     ) |  |
| *Plaintiff,*     ) | |
| *v.*     ) | FEB 0 1 2005 |
|     ) | ATTEST |
| *Actuarial Strategies, Inc.,*     ) | |
| *Defendant.*     ) | CLERK |

## AFFIDAVIT OF CHARLES DANA TATRO

I, Charles Dana Tatro, being duly sworn, hereby depose and state as follows:

1.  I am the plaintiff in the above-captioned action and have personal knowledge of the facts contained in this Affidavit.

2.  I am a Fellow of the Society of Actuaries (SOA). An actuary is a business professional who analyzes the financial consequences of risk, especially those of concern to insurance and pension programs. SOA members work in life insurance, retirement systems, health benefit systems, financial and investment management and other emerging areas of practice. The majority of actuaries work within the insurance industry, although a growing number of actuaries work in other fields.

3.  I was an executive at Manulife Financial and Allmerica Financial. I had approximately 12 years of experience in life insurance companies prior to joining the defendant. My main area of expertise is Variable Annuity Product Development, Risk Management and Valuation. A true and accurate copy of the resume of Dana Tatro is attached hereto and identified as Exhibit A.

4.  I was initially approached by a professional recruiter working with Actuarial Strategies, Inc. to replace a prior employee as a consulting actuary. The Defendant was primarily engaged in product development consulting with respect to life insurance products. In support of the life insurance market, the Defendant developed

a propriety life insurance product TRIP. The Defendant would approach companies with new product ideas in an attempt to secure a project developing the product for them.

5.      During the interview process, I was required to provide the Defendant with a business plan on how I could enhance their existing life insurance product development business, market services to potential clients and develop and market innovative variable annuity products.  I also provided the Defendant with a contact list of insurance professional whom I knew and would contact if I joined the firm.   The Defendant was concern with my ability to build upon their existing business and develop new opportunities.  I as far as I know, no other employee hired by the Defendant after me was required to provide such information.

6.      During the interview, the Defendant, through the company's President, Cary Lakenbach, discussed partnership opportunities, work ethic, number of hours worked and his view on distributing profits.  Although Mr. Lakenbach discussed these issues, he would not put anything in writing at the time of the employment offer.

7.      The actuarial consulting business can be fundamentally broken down into two categories.   First the proprietary ideas and concepts and secondly, the general actuarial services.  At the time of my hire the Defendant generated primary and almost exclusive business was in the area of propriety products.  In fact the proposal and opportunity was for me to develop and create business for the company in the variable annuities area.  It was on this basis, I was offered the position of Consulting Actuary based upon my insurance market knowledge, past employment history, Variable Annuity Experience and PTS software knowledge.   Although, my position involved substantial support of the existing life insurance product development operation, over time, I was to provide and build a variable annuity knowledge base

and develop innovative variable annuity products to compliment and expand the Defendants business.

8.  At the time I accepted the offer of employment from the Defendant, I was living in Mendon, Massachusetts with my family. Although the opportunity of being employed by the Defendant held a great deal of attraction, I was not comfortable enough with the prospects to relocate my family to Connecticut as requested by Cary Lakenbach. In fact, I turned down a $20,000.00 incentive to move my family.

9.  Simply stated, although I viewed the opportunity with the Defendant as having potential, I was unsure of the Defendant's commitment to entering the Variable Annuity market, based on the amount of information I was required to provide during the interview process.

10. Despite these concerns, I did accept the job with the Defendant pursuant to the terms and conditions as contained in the initial offer as stated in the letter dated December 16, 2002 and executed by me in Mendon, Massachusetts, December 20, 2002. A true and accurate copy of the agreement is attached hereto and identified as Exhibit B.

11. In addition to the agreement, Cary Lakenbach required the execution of an Intellectual Property Agreement Covenant Not To Compete. It was my impression, based upon conversations I had with Cary Lakenbach in conjunction with the initial interviewing process and the agreement itself that this agreement was entered into primarily and for the sole purpose of protecting proprietary rights to products the Defendant had developed and patented. Based upon this fact, I executed this agreement in conjunction with my acceptance of the position on December 20, 2002. A true and accurate copy of the Intellectual Property Agreement Covenant Not To Compete is attached hereto and identified as Exhibit C.

12.    In conjunction with my employment with the Defendant I was provided a laptop computer for the purpose of performing my work and was allowed to retain use of this laptop during times of travel or at home.

13.    Initially, the opportunity as initially represented appeared to develop. Specifically, I worked on a number of projects both with the President, Cary Lakenbach and independently. The projects included;

    a.  Reviewing a Variable Annuity Product for Country Life in January and February 2003.

    b.  Providing pricing support on the Defendants proprietary product TRIP sold to RBC Liberty in February to approximately May 2003.

    c.  Cleaning and producing documentation on the Defendants PTS software modifications for the proprietary product TRIP.

    d.  Re-producing a stochastic generator based on published Society of Actuaries formulas and documents.

14.    In addition to working on certain projects I provided significant brainstorming, marketing and product development on the Defendants proprietary product TRIP. I also began to seek out prospective clients. This was an expected aspect of my employment with the firm one which was in the form of a requirement, not optional. As previously mentioned, Cary Lakenbach required me to provide a list of insurance professionals I knew prior to joining the firm. The list would serve as my initial contact list.

15.    It was my firm belief that, based upon my experience with Allmerica and Manulife, the Defendant hired me for the purpose of adding a different dimension to the firm. Based upon that fact that I pursued client development and in that regard I attended an event sponsored by and paid for by Ruark Insurance Advisors, a consulting firm I had developed a relationship with during my employment with Manulife Financial

and Allmerica Financial. Initially, the Defendant was reluctant to allow me to attend the meeting. He stated the cost to provide airfare, the only cost of attending the meeting, was a significant expenditure and did not see the marketing value in attending the meeting. Only when I informed Cary Lakenbach that I would pay it out of my own pocket, did he agreed I could go to this meeting and paid for the airfare.

16.    While at the conference, I developed my first client relationship with Merrill Lynch. That development took place in June of 2003 approximately six months after my start date. Merrill Lynch was looking for someone with significant variable annuity background to assist them with some small projects. My background was exactly what they needed and although they knew of Defendant, to the best of my knowledge, they had not done business with the Defendant.

17.    At the time I approached this project I was informed by Cary Lakenbach I wouldn't have a chance at any work with Merrill Lynch as he informed me that Debbie Adler the chief actuary with Merrill Lynch, did not like him. Despite this fact, I successfully on behalf of the Defendant secured a small project.

18.    Additionally, in August of 2003, my past employer, Manulife, indicated that they needed actuarial help. That help included modifying a program that I had originally designed while employed by them. The project included a significant offsite time requirement and providing onsite support to Manulife Financial. Mr. Lackenbach did not want to provide the onsite support necessary to the project. I convinced Mr. Lakenbach that we needed to provide onsite services if we wanted to secure the contract.

19.    It was at that time that my suspicions and fears of the Defendants lack of commitment to developing the Variable Annuity market started to increase. Manulife is a premier variable annuity company and this contract was an "in" into their variable annuity area.

20.     Not only did the defendant not want to provide the resources required to secure the contract, he modified the Defendant's standard engagement letter to include a section stating that Manulife could not solicit people for hire from Actuarial Strategies, Inc. At that point until separation from the Defendant, I had never seen such a modification made to any other engagement letter. I suspect that this modification was made solely for my detriment in an attempt to restrain me from working for Manulife in the future.

21.     Although I successfully secured the Manulife project, Cary Lakenbach was not happy with me spending so much time working for Manulife. I was providing Manulife with 50 to 60 hours per week, and average of 2 days a week in their office. He wanted me to focus on developing new innovative products including the next generation of TRIP.

22.     Consequently, Cary Lakenbach hired Jonathon Clymer in October or November of 2003. Mr. Clymer took over the Manulife account and continued on that consulting contract for the next six to seven months.

23.     In October or November of 2003, I was promoted to Vice President and Consulting Actuary in charge of variable annuities for the Defendant. I received a $13,000.00 raise and was allowed to work 3 days at home and 2 days in the office. At that time, I was not required to execute the Intellectual Property Agreement Covenant Not To Compete.

24.     At that time, I began work on a $1.5M TRIP project with AXA Financial. I provided pricing analysis, design support and project management. This project continued into April or May 2004.

25.     During the subsequent months, the issue of the number of hours worked for Manulife and the onsite requirement continued to be an issue for Cary Lackenbach and Jonathan Clymer. Specifically, even though the Manulife project at that time was

providing revenues to the Defendant in the approximate amount of $20,000.00 to $30,000.00 per month, Mr. Clymer and Cary Lakenbach were repeatedly complaining that Mr. Clymer was spending too much time on Manulife and not developing other contacts or able to work on other projects.   Moreover, Mr. Clymer did not like traveling to Manulife to provide onsite support of the project.  As a consequence, The Defendant had Manulife provide a laptop to allow Jonathan Clymer to work from the Connecticut office.

26.     In June 2004 I traveled with Cary Lakenbach promoting the TRIP product and life insurance services.  The travel arrangements and clients were not shared with me until a week or two prior to the travel.  As a result, I did not have enough time to set up meetings for the purpose of marketing variable annuities.

27.     In August of 2004 I received a performance review.  The review demonstrated that I was performing at levels that were both competent and indicated principle relationship or equitable position within the firm was attainable.  In that review, Cary Lakenbach stated he wanted a $500,000 revenue commitment from me. A true and accurate copy of the August, 2004 review is attached hereto and identified as Exhibit D.

28.     Soon after this performance evaluation, life insurance product development projects starting drying up and the Variable Annuity projects were not developing due to the time commitment I was required to provide to the proprietary product TRIP and life insurance market.   It was at that point that Cary Lakenbach asked me to develop a business plan for the variable annuity business.

29.     In the business plan, I outlined the Defendants strengths and weaknesses in the variable annuity market. At that time and to this day, significantly larger consulting firms dominate the variable annuity market.   These firms provide new software solutions and risk mitigation strategies to variable annuity carriers. As a result, all the

new variable annuity product development was being awarded to these firms. I informed Cary Lakenbach that we could not compete in these areas due to our size and that we needed to build a core of smaller projects, based on providing technical resources, to provide on going income in the variable annuity market. In support of this recommendation I compiled a list of potential clients and the services we could provide along with the resource requirements.

30.    These suggestions to develop the variable annuity market were rejected. Monthly expenses began becoming a major concern of Cary Lakenbach and were discussed openly in the weekly staff meetings. When the actuaries, including myself, lobbied for a low-level actuary to be able to provide resources to companies to expand our market presence and ability to compete on smaller projects, Cary Lakenbach stated he did not have the money.

31.    Moreover, Cary Lakenbach virtually ignored or for that matter paid very little attention to what I said was necessary to grow a variable annuity business. Specifically, on repeated occasions Cary Lakenbach asked me whether I thought the marketing budget was sufficient to develop that area of business and the remainder of the business. Without exception, I repeatedly stated that it was not the case and that a significantly larger budget and resource commitment was necessary to make impact upon that market.

32.    In October 2004 Cary Lakenbach hired a Vice President and Consulting Actuary named Jim Weisman on a part time basis. Jim Weisman was a life insurance expert, primarily with fixed product expertise. It was at this time that I began to realize that Cary Lakenbachs intentions of developing a variable annuity business when I accepted the position were now being abandoned. Instead, it became apparent that Cary Lakenbach was focusing primarily on Value/Trip proprietary projects and the life insurance product development market.

33.  During October, we traveled substantially to develop client relationships. The main focus of the travel was to promote life insurance product development and TRIP.

34.  Quite frankly, it was subsequent to my August, 2004 review that it became clear that Cary Lakenbach was attempting to force my resignation. In that regard, demands were made upon me to generate additional business to meet the $500,000 target, however proper funding and support as outlined in my business plan were not provided.

35.  Despite this fact, I continually and aggressively sought to meet my goals required as outlined in my August, 2004 review. These attempts, however, were futile as it appeared that not only had Cary Lakenbach changed directions with respect to the future of the Defendant in pursuit of business but also personality conflicts arose between us.

36.  It is against this backdrop that the first time since the Defendant had employed me, my laptop was scanned without my knowledge. Quite frankly, this laptop and the internet service utilized on it was used by me for a number of reasons, including personal ones. Specifically, the internet service was used by my whole family based upon my hours both at home and on the road.

37.  Based upon this fact, it was not surprising that the scanning of my laptop disclosed this use.

38.  I firmly believe that this scanning of my laptop was an effort to create a pretext to forcing me to resign from my position. In fact, the Defendant utilized materials on the laptop together with its personal use of the laptop to afford me what was characterized as an easy out. That easy out came in the form of a resignation that I tendered to the Defendant. The Defendant accepted that resignation November 5, 2004. At that time the Defendant once again reminded me of the Intellectual Property Agreement Covenant Not to Compete. A true and accurate copy of the letter

accepting my letter of resignation dated November 11, 2004 is attached hereto and identified as Exhibit E.

39.    Although I tendered my resignation, I did so not out of the fear that somehow the use of the laptop would be disclosed in an attempt to embarrass me, but instead I choose to leave the Defendants employment upon its failure to meet the prior representations made to me concerning my position and opportunity with the company. Moreover, I suspect that the timing of the scanning of the laptop was more than coincidental as it occurred within a month of when I would have received my year-end bonus, which in the prior year had been in the amount of $100,000.00 and my qualifying for the company's pension plan.

40.    At no point in time did I believe that I would be unable to earn a living in a profession, which I had labored to become educated and trained over years. I had the firm belief as indicated by the document, which is in itself titled Intellectual Property Agreement Covenant Not to Compete that I would only be required not to disclose proprietary information of the Defendant.

41.    Despite that fact, the Defendant has now interfered with my ability to earn an income and support my family as an actuary. Specifically, despite the fact that I was employed by Manulife and Manulife was not a client of the Defendant prior to my employment with the Defendant, the Defendant has indicated to Manulife what it contends to be a non-compete restraining me from working for the company.

42.    The Defendant has made these representations to Manulife despite the fact that it was I who was solicited by Manulife for temporary employment to provide resources to the company. At no point in time did I ever solicit any business from any entity or customer of the Defendant. In fact, Manulife initially contacted me through an email from Bob Leach, Vice President of product development. The email subject indicates that it came directly from the Society of Actuaries web based directory of actuaries.

This indicates that Bob Leach did not have any of my contact information and was required to look me up on the Society's website. A true and accurate copy of the email, dated January, 2005 is attached hereto and identified as Exhibit F.

43. It is the conduct of the Defendant as described that has greatly hindered my ability to make a living and support my family. It is my present understanding that the Defendant will not allow me to work as an actuary in any entity anywhere for the period of eighteen months.

44. Simply stated, this broad interpretation of the agreement of the Defendant, if allowed to proceed will cause me harm, which will be irreparable.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 27 DAY OF JANUARY, 2005:

Charles Dana Tatro

A true copy by photostatic process
Attest:
Asst. Clerk

COMMONWEALTH OF MASSACHUSETTS

Worcester, ss

Superior Court
C.A.No.     05-0185 C

| | |
|---|---|
| ***Charles Dana Tatro*** | ) |
| *Plaintiff,* | ) |
| *v.* | ) |
| | ) |
| ***Actuarial Strategies, Inc.,*** | ) |
| *Defendant.* | ) |
| | ) |

## <u>MOTION FOR INJUNCTIVE RELIEF</u>

The Plaintiff, Charles Dana Tatro (hereinafter "Plaintiff"), hereby moves this Court pursuant to M.R.C.P. 65, for the entry of an injunction against the Defendant, restraining and enjoining the Defendant from interfering with Plaintiff ability to obtain future employment and explore future business opportunities.

In support of this motion, the Plaintiff states that he has a likelihood of success on the merits in this case, the balance of harms weighs in his favor and he will suffer irreparable harm in the event this relief is not granted. In further support of this motion, the Plaintiff relies upon those facts and reasons set forth Plaintiffs Memorandum of Law in Support of Motion for Injunctive Relief, Affidavit of Charles Dana Tatro, and Verified Complaint and Jury Demand.

**WHEREFORE,** the Plaintiff respectfully requests that this Court enter an injunction restraining the Defendant from interfering with the Plaintiff ability to obtain future employment and explore future business opportunities and grant such other and further relief as is meet and just.

Respectfully Submitted,
The Plaintiff,
By His Attorney,

John M. Wozniak (BBO#556441)
Wozniak & Padula, P.C.
82 Cape Road, Rte. 140
Mendon, MA 01756
(508) 478-3788

Dated: February 1, 2005

A true copy by photostatic process
Attest
Eugene J. Sullivan
Asst. Clerk

COMMONWEALTH OF MASSACHUSETTS

Worcester, ss

Superior Court
C.A.No.

05-0185

05-0185C

| | |
|---|---|
| *Charles Dana Tatro* | ) |
| *Plaintiff,* | ) |
| *v.* | ) |
| | ) |
| *Actuarial Strategies, Inc.,* | ) |
| *Defendant.* | ) |
| | ) |

### PLAINTIFF'S EX PARTE MOTION FOR A SHORT ORDER OF NOTICE

The Plaintiff in this matter, Charles Dana Tatro (hereinafter "Plaintiff"), by and through

his attorney, John M. Wozniak, hereby moves this Honorable Court for a short order of notice on

Plaintiff's Motion for Injunctive Relief.

**WHEREFORE**, the Plaintiff respectfully requests that this Court grant his Motion for a

Short Order of Notice.

Respectfully Submitted,
The Plaintiff,
By His Attorney,

John M. Wozniak (BBO#556441)
Wozniak & Padula, P.C.
82 Cape Road, Rte. 140
Mendon, MA 01756
(508) 478-3788

Dated: February 1, 2005

A true copy by photostatic process
Attest:
Asst. Clerk

\COMMONWEALTH OF MASSACHUSETTS

Worcester, ss

Superior Court
C.A. No. 9810-90

05-0185 0

| | |
|---|---|
| *Charles Dana Tatro* | ) |
| *Plaintiff,* | ) |
| *v.* | ) |
| | ) |
| *Actuarial Strategies, Inc.,* | ) |
| *Defendant.* | ) |

5/

## PLAINTIFF'S EX PARTE MOTION FOR THE APPOINTMENT OF A SPECIAL PROCESS SERVER

The plaintiff, Charles Dana Tatro, (hereinafter "Plaintiff") hereby moves this Court for an order appointing D.H. Kamins & Associates, P.O. Box 557 Hopkinton, Massachusetts, a disinterested person as special process server, pursuant to Mass.R.Civ.P. 4, to serve any and all documents in conjunction with this matter.

In support of this Motion, the Plaintiff states that the appointment of D.H. Kamins is necessary to effectuate proper service with the necessary pleadings.

WHEREFORE, the Plaintiff respectfully requests this Court enter an order appointing D.H. Kamins & Associates, P.O. Box 557 Hopkinton, Massachusetts as a Special Process Server pursuant to Mass.R.Civ.P 4 and grant such other and further relief as is meet and just.

Respectfully Submitted,
The Plaintiff,
By Its Attorney,

John M. Wozniak BBO#556441
Wozniak & Padula, P.C.
82 Cape Road
Mendon, MA 01756
(508) 478-3788

Dated: February 1, 2005

A true copy by photostatic process
Attest: *Eugene D. Sullivan*
Asst. Clerk

COMMONWEALTH OF MASSACHUSETTS

Worcester, ss

Superior Court
C.A.No. 05-0185C

**FILED**

FEB 0 7 2005

ATEST _____ a Fox
                            CLERK

| | |
|---|---|
| ***Charles Dana Tatro*** ) | |
| *Plaintiff,* ) | |
| *v.* ) | |
| ) | |
| ***Actuarial Strategies, Inc.,*** ) | |
| *Defendant.* ) | |



## PLAINTIFFS MEMORANDUM OF LAW IN SUPPORT OF MOTION
## FOR INJUNCTIVE ORDER

The plaintiff, Charles Dana Tatro (the "Plaintiff"), hereby submits this Memorandum of

Law in Support of the Motion for Injunctive Order in the above-captioned matter.

I.    FACTS

This case has its origins as a result of the defendants, Actuarial Strategies, Inc's (the

"Defendant") interpretation and actions taken by it based upon an agreement executed by the

Plaintiff in the course of his employment with the Defendant.

The Plaintiff initially became acquainted with the Defendant through its President, Cary

Lakenbach. See Affidavit of Charles Dana Tatro, ¶ 4-6 (hereinafter referred to as "Tatro Aff").

At the time the Plaintiff was being approached, he had approximately twelve years of

experience as an actuary in the capacity as an executive for Manulife Financial and Allmerica.

See Tatro Aff ¶ 3. At the time he was approached, the Plaintiff believed and understood that the

Defendant sought his services based upon his experience particularly in the area of variable

annuities. See Tatro Aff ¶ 5, 6 and 7. Stated in a summary fashion, the Plaintiff was led to

believe by Mr. Lakenbach that the employment opportunity with the Defendant was based upon

its desire to expand into the area of variable annuities, which were not being pursued

aggressively by the Defendant at that time. Tatro Aff ¶ 4-8.

In considering the proposal of the Defendant, the Plaintiff had some reservations.

Namely, the Plaintiff remained unsure as to the Defendants true commitment in entering the

variable annuity market. Tatro Aff ¶ 9. These concerns were based upon Mr. Lakenbachs extensive questioning of the Plaintiff during the interview process and the requirement that the Plaintiff provide the volume of information which he believed should have been known to Mr. Lakenbach if he had the experience and background he purported to have. Tatro Aff ¶ 9.

Despite these reservations, the Plaintiff did in fact accept a position with the Defendant pursuant to the terms and conditions as contained in the initial offer dated December 16, 2002 and executed in Mendon, Massachusetts on December 20, 2002. See Tatro Aff ¶10. Additionally, the Plaintiff executed, at the request of Mr. Lakenbach an agreement entitled Intellectual Property Agreement Covenant Not to Compete. Tatro Aff ¶ 11. It was the Plaintiffs impression based upon both conversations he had with Mr. Lakenbach in conjunction with the initial interviewing process, together with the agreement itself that it was being entered into primarily and for the sole purpose of protecting proprietary rights to products the Defendant had developed and patented. Id. It was based solely upon this understanding and interpretation of both the agreement and Mr. Lakenbachs desire requiring the execution of said agreement that the Plaintiff executed the agreement. Tatro Aff ¶ 11.

In conjunction with his employment, the Plaintiff was provided a laptop for the purposes of performing his work and was allowed to retain use of the laptop during times he was traveling or at home. Tatro Aff ¶12.

The opportunities as initially represented by Mr. Lakenbach appeared to develop. Tatro Aff ¶ 13. Specifically, the Plaintiff worked on a number of projects both with Mr. Lakenbach and independently, which included but were not limited to, reviewing a variable annuity product for Country life in January or February of 2003; providing pricing support on the Defendants proprietary product TRIP sold to RBC Liberty in February to approximately May of 2003; cleaning and producing documentation on the Defendants PTS software modifications for the proprietary product TRIP; and reproducing a stochastic  generated based on published society of actuaries formulas and documents. Tatro Aff ¶ 13. In addition to working on these projects, the

Plaintiff focused on seeking out prospective clients and developing that facet of the Defendants business in the area of the variable annuities market. Tatro Aff ¶ 14-15. It is based upon this fact that the Plaintiff successfully acquired work on behalf of the Defendant from his past employer Manulife. Tatro Aff ¶ 15-16.

Specifically, in August of 2003, Manulife indicated that they needed actuarial help, which included modifying the program that the Plaintiff had originally designed while employed by them. Tatro Aff ¶ 18. This project required a significant amount of off site time providing support to Manulifes financial department, something Mr. Lakenbach was apparently unwilling to provide. Tatro Aff ¶ 18. Despite this fact, the Plaintiff convinced Mr. Lakenbach that such onsite services were necessary in the event the company wanted to secure the contract with Manulife. Tatro Aff ¶ 18.

It was at that time that the Plaintiffs suspicions and fears of the Defendants lack of commitment to developing the variable annuity market of its business began to increase. Tatro Aff ¶ 19. Despite the fact that Manulife was a premier variable annuity company and this contract was their "in" into the variable annuity market, Mr. Lakenbach continually resisted efforts to spend to the necessary resources to properly support to endeavor. Tatro Aff ¶ 20-22.

Despite this fact, in October or November of 2003 the Plaintiff was promoted to Vice President and Consulting Actuary in charge of variable annuity for the Defendant. At that time, he received a $13,000.00 raise and was further allowed to work three days at his home and only two days in the office. Moreover, the Plaintiff was not required to execute again the Intellectual Property Agreement Covenant Not to Compete. Tatro Aff ¶ 23.

In spite of the positive review and promotion, cracks in the foundation of prior representations concerning the Defendants desire to aggressively enter the variable annuities market began to become more apparent. Tatro Aff ¶ 23-26. Specifically, shortly after the Plaintiffs performance evaluation, Mr. Lakenbach requested that the Plaintiff develop a business plan for the variable annuity business. Tatro Aff ¶ 28. In doing so, the Plaintiff outlined the

Defendants strengths and weaknesses in the variable annuities market. Tatro Aff ¶ 29. In doing so, the Plaintiff advised Mr. Lakenbach that the Defendant needed to build a core of smaller projects based upon providing technical resources, to provide ongoing income in the variable annuity market. In support of this recommendation the Plaintiff complied a list of potential clients and the services the Defendant could provided along with the resource requirements. Tatro Aff ¶ 29.

The Plaintiffs suggestions, however, were rejected. Moreover, monthly expenses began to become a major concern to Mr. Lakenbach and were discussed openly in the weekly staff meetings. Efforts by the actuary's with the company for a low-level actuary to be able to provide resources to company's to expand the Defendants market presence and ability to compete on smaller projects were also rejected based upon Mr. Lakenbachs representation that the company simply did not have the money. Tatro Aff ¶ 30. This downward spiral concerning Mr. Lakenbachs desire to expand into the variable annuity market continued and in October of 2004, Mr. Lakenbach hired a Vice President and Consulting Actuary named Jim Wiseman on a part time basis. At the time, Mr. Wiseman was a life insurance expert, primarily with fixed product expertise. This hire by Mr. Lakenbach made the realization by the Plaintiff more clear that the Defendants intentions of developing a variable annuity business a premise upon which the Plaintiff had accepted his position was now being abandoned. Instead, it became apparent Mr. Lakenbach was primarily focused on VALUE/TRIP a propriety project and the life insurance product development market. Tatro Aff ¶ 32.

Prior to this time, however, the Plaintiff became aware that Mr. Lakenbach was attempting to force his resignation through unrealistic demands to generate additional business to meet the target without providing him the proper resources and funding as outlined in his business plan. Tatro Aff ¶ 34. Despite this fact, the Plaintiff continually and aggressively sought to meet his goals as required in his August, 2004 review. These efforts were proven to be futile. It was during this time that the Plaintiff was informed by Mr. Lakenbach that his laptop had been

scanned without his knowledge. Subsequently, the Plaintiff was confronted with allegations of improper use and informed that it would be utilized as the basis for his termination, together with his failure to meet the targeted goals. Tatro Aff ¶ 36.

The scanning of the Plaintiff laptop, and the information gained as a result of that scanning was not a surprise to the Plaintiff as he had used the laptop for personal use while on the road and working out of his home. Tatro Aff ¶ 37-38.

It became apparent to the Plaintiff that this scanning of his laptop and the accompanying confrontation that took place between himself and Mr. Lakenbach, was being utilized as a pretextual reason to force his resignation. In doing so, it was clear to the Plaintiff that the Defendant wanted to avoid both paying his yearend bonus, which for the prior year had been in the amount of $100,000.00, and the Plaintiffs qualifying for the company's pension plan. Tatro Aff ¶ 39. At that time, the Plaintiff knew the Defendant had no desire or intention of pursuing the prior plans as had been the basis for his accepting the position and consequently tendered his resignation. Tatro Aff ¶ 39.

In doing so, the Plaintiff did not believe he would be unable to earn a living in the profession as an actuary, which he had labored and trained for over a significant period of years. Tatro Aff ¶ 40. Specifically, the Plaintiff believed that the document he had earlier executed entitled the Intellectual Property Agreement Covenant not to Compete only required that he not disclose the proprietary information of the Defendant, specifically, the products TRIP/VALUE.

Despite that fact, the Defendant advised Manulife that the Plaintiff could not accept employment of a contract based upon the agreement. As a direct consequence of this conduct on the part of the Defendant, the Plaintiff lost this opportunity.

II.    ARGUMENT:

A.    **THE PLAINTIFF HAS MET HIS BURDEN AND THE REQUESTED
INJUNCTIVE RELIEF SHOULD ISSUE**

In order to determine whether a preliminary injunction should issue, the Court should initially evaluate a moving parties claim of injury and the chance of success of the lawsuit on the merits. Packaging Industries Group, Inc. v. Cheney, 308 Mass. 609, 619 (1980). [1] Here, the Plaintiff has a recognized claim of injury as he is unable to pursue employment and business opportunities as a result of the Defendants interference through the interpretation and enforcement o the provisions of the Intellectual Property Agreement Covenant Not to Compete (hereinafter referred to as the "Agreement").

In analyzing the risk of a party's claim of injury, the Cheney Court requires that the risk of irreparable harm to the moving party be weighed against the risk of irreparable harm to the non-moving party. Cheney, 308 Mass. 609 at 617. The risk in this case of irreparable harm to the Plaintiff is apparent. The Defendant has already through it actions, interfered with one opportunity and continued conduct of this sort will foreclose the Plaintiffs ability to pursue his chosen profession and support his family.

1. The Agreement Has A Narrow Application.

The Defendants interpretation of the Agreement is far beyond its extremely narrow application. Specifically, the Agreement was intended and can be interpreted to protect only the propriety and intellectual property of the Defendant.

"The intent of the parties is to be ascertained by a fair and reasonable construction of the written words and the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied for the subject matter of the contract."

---

[1] The Plaintiff acknowledges that the contract at issue has a choice of law provision requiring the application of Connecticut law. In contrast, however, the employment agreement between the parties does not contain such a provision and was executed in the Commonwealth of Massachusetts. This issue is not significant as both statutes have similar standards.

Trans-Clean Corp v. Alton Truman Terrell, 21 Conn. L. Rptr. 420 (1998)(Citations Omitted.)
"Ordinarily the question of contract interpretation is a question of fact. However, where is there
is definitive contract language, a determination of what the parties intended by the contractual
commitments is a question of law." Id. "When only one interpretation of a contract is possible,
the Court need not look outside the four corners of the contract." Id. "In addition, the
circumstances surrounding the making of the contract, for purposes which the parties sought to
accomplish in their motive cannot prove an intent contrary to the plain meaning of the language
used." "Finally, the Court should not torture words to impart ambiguity for same." Id. "In
construing an agreement, all of the relevant provisions of the agreement must be interpreted as a
whole." Id.

The contract in this case in its very title identifies and confirms the intent consistent with that
understanding of the Plaintiff at the time it was executed. Specifically, as the Plaintiff was led to
believe, this agreement was for the purposes of protecting the proprietary information of the
Defendant.   Namely, the Defendant in conjunction with this business was utilizing two
proprietary products, TRIP/VALUE.   This fact is evident by virtue of the nature of the
Agreement, its express wording and even its title, which is unequivocal.

2. Even If the Agreement Was Valid, the Defendants Breach Would Serve As a Viable and
Valid Defense.

As applied to contracts in the Commonwealth of Massachusetts, the state of Connecticut
likewise recognizes the breach by a party of a contract as a defense to the enforcement of its
terms. Specifically, the "breach of an employment contract by an employer is a recognized
defense to the enforcement of a non-compete agreement." Merryfield Animal Hospital v.
McKay, Superior Court, Judicial District of New Haven at New Haven, Docket No.
CV020464586s (July 31, 2002)(Citing Heritage Benefits Consultants, Inc v. Cole, Superior
Court, Judicial District of Waterbury, Docket No. CV00162270(February 23, 2001)).

The facts in this case aptly demonstrate that at conception of the Plaintiff employment certain representations were made by the Defendants representatives inducing him to accept the position. These facts further demonstrate quite clearly that the expressed intention of the Defendant dramatically changed in the latter part of 2004. As a consequence of this change, the Plaintiff was placed in the untenable position of attempting to meet performance mandates without resources. In essence, while failing to provide adequate resources to create a viable support system, and the tools of marketing in the form of financial resources, the Defendant continually demanded that the Plaintiff maintain unrealistic goals. Despite these attempts to force the Plaintiffs failure, in the face of fast approaching dates for a significant bonus to be paid to the Plaintiff and qualification for the company's pension plan, the Defendant reverted to a pretextual basis in the form of unauthorized computer use as a further attempt to force the Plaintiff to resign.

In both regards, either viewed as a whole or separately, neither provided a valid basis for forcing the Plaintiff resignation. It is without contravention that the true motive was in the Defendants desire to avoid the contractual obligation to the Plaintiff and the accompanying financial ramifications. Based upon this fact, the enforceability of any agreement would be defensible.

3. The Agreement Is Overly Broad And Unreasonable And Must Be Held Invalid.

The Agreement as interpreted by the Defendant would be overly broad and unreasonable.

In Connecticut, a covenant that restricts the activities of an employment following termination of his employment is only valid and enforceable if those restraints are reasonable. See Scott v. General Iron and Welding Co., 171 Conn. 132, 137 (1976). "The five factors to be considered in evaluating the reasonableness of a restrictive covenant ancillary to an employment agreement are: (1) The length of time the restriction operates; (2) The geographic area covered; (3) The fairness of the protection afforded to the employer; (4) The extent to the restraint on the employees opportunity to pursue his application; and (5) The extent of interference with the

publics interest." See Robert S. Weiss & Assoc., Inc. v. Wiederlight, 208 Conn. 525, 529 footnote 2 (1988). "This five prong test as set forth in the case of Scott v. General Iron and Welding Co., is in the disjunctive, rather than the conjunctive; therefore, a finding of unreasonableness on any one of the criteria is enough to render the covenant unenforceable." See New Haven Tobacco Co. v. Pirelli, 18 Conn. App. 531,534 (1989).

The covenant at issue in this case, is not confined geographically. Instead, it is unrestrictive in the geographic scope estopping the Plaintiff from pursuing a broad range of opportunities in his chosen profession. This lack of any jurisdictional boundary stands in stark contrast to the general premise as stated in Connecticut law that the "application of a restrictive covenant must be confined to a geographic area that is reasonable in view of the particular situation." See Scott v. General Iron and Welding Co., 371 Conn. At 138.  "A restrictive covenant which protects an employer in areas which he does not do business or is unlikely to do business is unreasonable with respect to the area." Id.

The Plaintiff in this case was barred from accepting an employment opportunity with his past employer, Manulife which is located in the Commonwealth of Massachusetts. The Defendant in this case is located in Connecticut. There can be no doubt that this restriction is simply not enforceable in such an all-exclusive and unrestricted fashion.

Moreover, the interpretation of the restrictive covenant by the Defendant is overly broad by virtue of what the Defendant seeks to protect. Specifically, in this case, the Defendant interfered with any opportunity, not that the Plaintiff sought, but which was presented to him by Manulife. In that regard, the opportunity presented to the Plaintiff utilized none of the proprietary information of the Defendant but simply his skills as an actuary learned over the years of both education and experience.

"Depending on the nature of the business, a customer list may be a trade secret, and an employee may be restrained from using the list if he acquired it in confidence from his employer. There is no trade secret, however, if the customer name can be readily ascertained through

ordinary business channels or reference sources." See Robert S. Weiss & Assoc., Inc. v. Wielderlight, 208 Conn at 538. "A restrictive covenant which protects the employer in areas which it does not do business or is unlikely to do business is unreasonable with respect to area" See Scott v. General Iron and Welding Co., 171 Conn at 137 (Citation Omitted).

"Agreements by which an employee undertakes not to enter a competing business or employment on leaving his employers service are reasonably necessary for the protection of the employers business. Under such agreements, parties can obtain employment on certain terms which prevent them, on leaving that employment, for making use of knowledge which they acquired during that employment to the detriment of their employer." Id. (Citation Omitted). "When the character of the business and the nature of the employment are such that the employer requires protection for his established business against competitive activities by one who has become familiar with it through employment therein, restrictions are valid when they appear to be reasonably necessary for the fair protection of the employers business or rights and do not unreasonably restrict the rights of the employee, due regard being had to the subject matter of the contract and the circumstances and conditions under which it is to be performed." Id.

"In assessing the reasonableness of a covenant not to compete in the employment context, each case must be assessed on the totality of its circumstances... except that a stricter test of reasonableness is generally applied in the employment-covenant cases then in the sale-covenant cases. Courts consider the ... reasonableness of the covenants restrictions as to the scope of the activity which is prohibited." See Custard Insurance Adjustors v. Nardi, Superior Court, Judicial District of Ansonia-Milford at Milford, Docket No. CV980061967 (April 20, 2000).

The facts in this case demonstrate an attempt by the Defendant to enforce the restrictive covenant in what can only be considered an unreasonable fashion. In fact, the opportunity, which has been proposed, is one for a past employer of the Plaintiff. This opportunity sought no proprietary information, or any information for that matter the Plaintiff obtained from his employment with the Defendant but instead sought those skills and experience, which the

Plaintiff brought to the Defendant. The inability of the Plaintiff to hold employment even from a past employer negates his ability to become employed by any party.

"In order to be valid and binding a covenant which restricts the activities of an employee following the termination of his employment must be partial and restricted in its operation 'in respect to either time or place ... and must be reasonable-that is, it should afford only a fair protection to the interest of the party in whose favor it is made. It must no be so large in its operation as to interfere with the interests of the public." See Scott v. General Iron and Welding Co., 171, Conn 132 (1976)(Citations Omitted). These interests are in addition to the employee himself who "also must be protected, and a restricted covenant is unenforceable if by its terms the employee is precluded from pursuing his occupation and thus prevented from supporting himself and his family." May v. Young, 125 Conn. 15(1975).

The Plaintiff in this case is presently unable to pursue those opportunities available based upon information and experience he has gained both through education and employment. There is no intention or allegation that the Plaintiff intends to use any of the proprietary products (TRIP/VALUE), of the Defendant. To the contrary, the Plaintiff in this case continues to seek opportunities in the variable annuity market, a portion of the market for which he was employed for years prior to becoming affiliated with the Defendant. In contrast, the Defendant, has conducted itself in a fashion, which clearly evidences its inability and/or unwillingness to enter into these market areas. Simply stated, the Defendants position is not so much to protect itself so as it is to restrain the Plaintiff from entering into the marketplace. As a consequence, the Agreement cannot be held to be valid in the form as contended by the Defendant.

III.    CONCLUSION

The Plaintiffs Motion for Injunctive Relief should be allowed.

Respectfully Submitted,
The Plaintiff,
By His Attorney,


_____
John M. Wozniak (BBO#556441)
Wozniak & Padula, P.C.
82 Cape Road, Rte. 140
Mendon, MA 01756
(508) 478-3788

Dated:  February 1, 2005

A true copy by photostatic process

Attest: *Eugene G. Sullivan*
Asst. Clerk

# COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 05-00185 C

|  |  |
|---|---|
| CHARLES DANA TATRO, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| ACTUARIAL STRATEGIES, INC., | ) |
| | ) |
| Defendant. | ) |

**FILED**

FEB 0 7 2005

ATTEST:

_____ CLERK

## <u>NOTICE OF APPEARANCE</u>

Kindly enter the appearance of John P. McLafferty, on behalf of the Defendant, Actuarial

Strategies, Inc., in connection with the above-captioned action.

Respectfully submitted,
ACTUARIAL STRATEGIES, INC.,
Defendant,

By its attorneys,

_____
John P. McLafferty (BBO # 639179)
DAY, BERRY & HOWARD LLP
260 Franklin Street
Boston, Massachusetts 02110-3179
(617) 345-4600

DATED: February 4, 2005

A true copy by photostatic process
Attest: _____
Ass't Clerk

# COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 05-00185 C

|  |  |
|---|---|
| CHARLES DANA TATRO, | ) |
| Plaintiff, | ) |
| v. | ) |
| ACTUARIAL STRATEGIES, INC., | ) |
| Defendant. | ) |

# FILED

FEB 0 7 2005

ATTEST:

_Fiona G. Joy_
CLERK

## NOTICE OF FILING OF NOTICE OF REMOVAL
## TO UNITED STATES DISTRICT COURT

Pursuant to 28 U.S.C. § 1446(d), Defendant hereby gives notice that, on February 4, 2005, it filed a Notice of Removal in the United States District Court for the District of Massachusetts, removing the above-captioned action from this Court to the United States District Court for the District of Massachusetts, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. An originally certified copy of Defendant's Notice of Removal is attached hereto as **Exhibit A**.

Respectfully submitted,
ACTUARIAL STRATEGIES, INC.,
Defendant,

By its attorneys,

John P. McLafferty (BBO # 639179)
DAY, BERRY & HOWARD LLP
260 Franklin Street
Boston, Massachusetts 02110-3179
(617) 345-4600

DATED: February 4, 2005

A true copy by photostatic process
Attest: _Eugene G. Sullivan_
Asst. Clerk