UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARLES DANA TATRO, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 4:05-cv-40024-FDS |
| v. | ) |
| | ) |
| ACTUARIAL STRATEGIES, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DEFENDANT'S OPPOSITION TO
## PLAINTIFF'S MOTION FOR INJUNCTIVE ORDER

Pursuant to Local Rule 7.1, the Defendant, Actuarial Strategies, Inc. (hereinafter, "ASI") respectfully opposes Plaintiff's Motion for Injunctive Relief (hereinafter "Plaintiff's Motion"). Through his Motion, the Plaintiff, a former Actuarial Services' employee, seeks to enjoin ASI from enforcing a covenant not to compete agreement into which he and ASI freely entered.  If ASI is denied the right to enforce this covenant, Plaintiff and his future employers can unfairly compete against ASI by using ASI's own highly confidential and proprietary products and information.  In a field so completely dependent on intellectual property, that eventuality could devastate ASI's business and would effectively rob ASI of the time, effort and money it invested in developing these protectible interests.

Plaintiff offers inadequate justification for the extraordinary relief he seeks.  Specifically, as discussed more fully below, Plaintiff has not established: a) that his alleged harm outweighs the harm that ASI will suffer if the Court grants the preliminary injunction; b) that he will suffer

immediate and irreparable harm as a result of ASI's actions; nor c) that he is likely to succeed on the merits of his case. For these reasons, Plaintiff's Motion must be denied.[1]

## I.      FACTUAL BACKGROUND

ASI is an actuarial consulting firm located in Bloomfield, Connecticut. (C. Lakenbach Affidavit, ¶ 5, attached hereto as Exh. 1.) Cary Lakenbach, President of ASI, started the company and remains one of only five ASI employees. (Exh. 1, ¶¶ 5, 7.) ASI is unique amongst such firms because it focuses on developing innovative new products for insurance companies and financial services institutions. (Exh. 1, ¶ 7.) More specifically, ASI is a creative product development enterprise that identifies market opportunities, and structures products to take advantage of these opportunities. (Exh. 1, ¶ 7.) In short, ASI assists its clients in designing products for their distribution channels. (See Exh. 1, ¶ 7.)

ASI's most significant, innovative product is its Total Retirement Income Program (hereinafter, "TRIP"). (See Exh. 1, ¶ 8.) TRIP is a proprietary product of ASI that simplifies the application and underwriting process for life insurance policies so that such policies may be more easily sold by a broad range of financial services professionals. (Exh. 1, ¶ 8.) ASI is in the process of seeking a patent for TRIP. (Exh. 1, ¶ 8.) ASI also has proprietary marketing strategies and customer lists. (Exh. 1, ¶¶ 16-17.)

In December 2002, Mr. Lakenbach offered Plaintiff a position as a Consulting Actuary. (See 12/20/02 Employment Contract, attached hereto as Exh. 2.) Mr. Lakenbach envisioned that Defendant would eventually become a principal of ASI, and would evolve into a successful rainmaker for the company. (Exh. 1, ¶ 10.) Accordingly, in his capacity as a Consulting

---

[1] Plaintiff's Motion should also be denied because it fails to comply with Local Rule of Civil Procedure 7.1(A)(2), which provides that "[n]o motion shall be filed unless counsel certify that they have conferred and have attempted in good faith to resolve or narrow the issue." No such certification was filed with Plaintiff's Motion. The Court should thus reject Plaintiff's Motion without consideration.

Actuary, Plaintiff was to have myriad responsibilities ranging from client management, to execution of new business opportunities, to offering advice on ASI's business management. (Exh. 2.)  Plaintiff's starting salary was $170,000. (Exh. 1, ¶ 12.)  He was also eligible to receive significant discretionary bonuses.  (Exh. 1, ¶ 12.)

      Plaintiff accepted this offer and executed his employment contract on December 20, 2002.  (Exh. 2.)  Because of the broad scope of his job responsibilities, and his pervasive access to ASI's proprietary information, Plaintiff's employment was conditional upon his execution of the Covenant Not to Compete (the "Covenant").  (See 12/20/02 Covenant Not To Compete, attached hereto as Exh. 3.)  The Covenant was executed on December 20, 2002, the same day that Plaintiff formally accepted ASI's offer of employment.  (Exh. 3.)  By signing the Covenant, Plaintiff agreed, in part, that:

> I shall not, for a period of eighteen (18) months following the termination of my employment with [ASI], directly or indirectly:
>
> (a)  perform services, similar to those I have performed for [ASI] for any person, persons, company, partnership or corporation whose business is competitive with the business being carried on by [ASI] or with respect to such services, solicit any actual or active prospective customer of [ASI] for whom I performed services while employed by [ASI] during the twelve months preceding my termination of employment….
>
> (b)  nor call upon, divert or solicit any person, persons, company, partnership or corporation for the purpose of selling or marketing services or products competitive with the business being carried on by [ASI];

(Exh. 3, ¶ 8.)  The Covenant further provides that if any provision of the Covenant is held to be "excessively broad as to time, duration, geographical scope, activity or subject, it shall be construed, by limited [*sic*] and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear."  (Exh. 3, ¶ 9.)

Plaintiff's employment officially began on January 6, 2003. (Exh. 1, ¶ 9.) Shortly thereafter his responsibilities required that he gain access to ASI's most proprietary and confidential information, including ASI's marketing plans and strategies, ASI's customer lists, and details regarding products such as TRIP. (Exh. 1, ¶¶ 9, 13.) ASI afforded Plaintiff such access because it believed that the company was protected by the terms of the Covenant. (Exh. 1, ¶ 13.)

Over the course of his employment with ASI, Plaintiff assumed the title of Vice President and Consulting Actuary. (See Exh. 1, ¶ 14.) Plaintiff also became an Officer and senior executive of ASI. (See Exh. 1, ¶ 14.) In these capacities, ASI afforded Plaintiff unfettered access to information about ASI's products (including TRIP), services, customers, pricing policies, marketing plans and strategies, product development techniques and plans, personnel, salaries and performance information, and business plans. (See Exh. 1, ¶ 14.)

Over time, Plaintiff's abrasive personality and questionable productivity became apparent. (Exh. 1, ¶ 19.) Questions about Plaintiff's productivity caused Rita McCarty, ASI's Director of Operations, to scan the laptop that ASI had provided Plaintiff to perform his job functions. (Exh.1, ¶ 20; R. McCarty Affidavit, ¶ 7, attached hereto as Exh. 4.) In doing so, Ms. McCarty uncovered Plaintiff's disturbing proclivity for viewing and downloading pornographic materials. (Exh. 1, ¶ 20; Exh. 4, ¶¶ 8-9.) ASI soon determined that, dating back to at least early 2004, Plaintiff had spent countless hours using his ASI laptop to visit pornographic websites while working both from home and from ASI's Bloomfield facility. (Exh. 4, ¶ 8.)

ASI considered this conduct morally repugnant. (Exh. 1, ¶ 20-21.) More importantly, Plaintiff's conduct violated ASI's Policy Guidelines on E-mail and the Internet System (hereinafter, "ASI's Internet Policy"), which provides, in part, that "the transmittal, retrieval or

storage of information that is discriminatory or harassing, obscene, pornographic or X-rated is

not permitted." (<u>See</u> ASI's Internet Policy, p. 27, attached hereto as Exh. 5.)  ASI's Internet

Policy also states that "[f]ailure to comply with this policy may result in disciplinary action up to

and including termination." (Exh. 5.)  Accordingly, consistent with ASI policy, Mr. Lakenbach

informed Plaintiff that he would be terminated effective November 5, 2004, unless he voluntarily

resigned before that time. (Exh. 1, ¶ 21.)

 Plaintiff gratefully accepted the opportunity to resign. (Exh. 1, p. 21.)  Indeed, upon

doing so, Plaintiff admitted to having a "problem" and apologized for his abhorrent behavior.

(Exh. 1, p. 21.)  Plaintiff later sent an e-mail to Mr. Lakenbach, repeating his apology and

thanking Mr. Lakenbach for providing him with the opportunity to exit ASI gracefully. (Exh. 1,

p. 22.)

 In late 2003, ASI was scheduled to have begun a project for Merrill Lynch.  After

Plaintiff left ASI's employ in November 2003, however, this business opportunity disappeared

suddenly and without explanation. (Exh. 1, ¶ 23.)  ASI presumed, but has not proved, that

Plaintiff usurped this business opportunity. (Exh. 1, ¶ 23.)

 Later, in January 2005, ASI lost a project for Manulife Financial (hereinafter,

"Manulife"), a former employer of Plaintiff's and a client of ASI's. (Exh. 1, ¶ 25-26.)  Manulife

had approached Mr. Lakenbach regarding a short-term project and indicated that it wanted to

work with Jonathan Clymer, the ASI employee who had performed 95% of ASI's work for

Manulife.[2] (Exh. 1, ¶ 18, 25.)  ASI and Manulife began negotiating the terms of this

engagement. (Exh. 1, ¶ 25.)  When Manulife suddenly informed Mr. Lakenbach that ASI would

---

  [2] Plaintiff had been responsible for bringing Manulife in as an ASI customer, but as evidenced by
the amount of work performed by Mr. Clymer, played little role in providing services to Manulife or
otherwise maintaining that client relationship. (Exh. 1, ¶ 18.)

not be receiving this project, Mr. Lakenbach inquired further; Manulife soon admitted that it had

decided to hire Plaintiff directly in lieu of dealing with ASI.  (Exh. 1, ¶ 26.)  ASI considered this

a violation of the express terms of the Covenant, and informed Manulife of Plaintiff's conflict.

(Exh. 1, ¶ 27.)

## II.    ARGUMENT

It is well settled that "a preliminary injunction is a drastic and extraordinary remedy that

is not to be routinely granted."  Holmes Prods. Corp. v. Catalina Lighting, Inc., 67 F. Supp. 2d

10, 12 (D. Mass., 1999)(quoting Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568

(Fed.Cir.1993)).  This Court may only grant a preliminary injunction "where the moving party

establishes: (1) that it will suffer irreparable injury if the injunction is not granted; (2) that such

injury outweighs any harm that the opposing party would suffer if the injunction were granted;

(3) that there is a likelihood that the moving party will succeed on the merits at trial; and (4) that

the public interest will not be adversely affected if the injunction is granted." Roll Sys. v. Shupe,

1998 U.S. Dist. LEXIS 3142 (D. Mass. 1998)(citing Jackson v. Fair, 846 F.2d 811, 814-15 (1st

Cir. 1988)).  These four factors must be "considered together and are interrelated in that the

strength of one factor may offset the weakness of another and vice versa."  McLaughlin v.

Boston Sch. Comm., 938 F. Supp. 1001, 1011 (D. Mass. 1996).

### A.    ASI Will Suffer Greater Harm if Plaintiff's Motion is Granted Than Plaintiff Will if His Motion is Denied.

To succeed on his Motion for Preliminary Order, Plaintiff "must show that issuing an

injunction will burden [ASI] less than denying an injunction would burden [Plaintiff]."  Westfield

High Sch. L.I.F.E. Club v. City of Westfield, 249 F. Supp. 2d 98, 128 (D. Mass. 2003).  Here,

Plaintiff's motion completely fails to address the harm that will befall ASI if Plaintiff's Motion is

granted.  A balancing of the hardships reveals that, if the Court grants this Motion and enjoins ASI from enforcing the Covenant, ASI stands to lose the intellectual property that serves as the very foundation of its business.  In contrast, even if the Court denies his Motion, Plaintiff will still be able to pursue a career as an actuary.

As a firm of consulting actuaries, ASI's value to its customers is derived almost completely from its intellectual property.  (Exh. 1, ¶¶ 7, 13.)  Without the limitations imposed by the Covenant, Plaintiff can compete against ASI by using ASI's proprietary products, information, and strategies—intellectual property that ASI has spent substantial amounts of time, effort and expense in developing.  More specifically, if this Motion is granted and ASI is enjoined from enforcing the Covenant, ASI would be unable to protect three critical interests:

1) **Proprietary and other products.**  Plaintiff had substantial access to, and information about, ASI's proprietary life insurance products, particularly TRIP.  (Exh. 1, ¶ 15.) Undoubtedly, Plaintiff's intricate knowledge of TRIP and ASI's other methodologies with respect to life insurance products, would be highly attractive to competing actuarial consulting firms.  (Exh. 1, ¶ 15.)  If Plaintiff provides ASI's competitors with any proprietary information relating to TRIP, the very foundation of ASI's value to its clients would be devastated.[3]  This knowledge would allow a competing actuarial consulting firm to compete with ASI without having to develop its own proprietary products, and could affect ASI's patent application for TRIP.  Such competition is demonstrably unfair.

In addition, ASI utilizes its market research and specific knowledge of insurance industry products to assist its clients in developing non-proprietary products for which there is

---

[3] TRIP has accounted for at least fifty percent of ASI's revenues over the past two years.  (Exh. 1, ¶ 15.)

market demand. (Exh. 1, ¶ 7.)  Plaintiff cannot be permitted to take such products to one of ASI's competitors, or to otherwise use his knowledge of such products to compete against ASI directly.

        **2)**    **ASI's Customer Lists.**  Plaintiff had complete access to ASI's customer lists. (Exh. 1, ¶ 16.)  The consulting actuary field is not one that caters to a large client base; as such, it was imperative that ASI establish its own list of revenue-generating customers.  To that end, ASI invested years of effort and substantial funds to build its customer lists.  (Exh. 1, ¶ 16.)  If Plaintiff is allowed to leave ASI and provide services to a competing actuarial consulting firm, he would be able to leverage ASI's customer relationships and compete unfairly with ASI.

        **3)**    **ASI's Strategic Marketing Plans and Strategies.**  Plaintiff had complete access to, and understanding of, ASI's strategic marketing plans and strategies. (Exh. 1, ¶ 17.)  Indeed, Plaintiff assisted in developing ASI's marketing strategies, identified target clients, and helped determine which products should be pitched to which clients. (Exh. 1, ¶ 17.)  Plaintiff was similarly familiar with ASI's global strategies and long term marketing plans.  (Exh. 1, ¶ 17.)  If Plaintiff is unencumbered by the Covenant, he would be able to leverage his knowledge of ASI's marketing plans and strategies and engage in unfair competition.

        If ASI is unable to enforce the Covenant to protect these three interests—each vital to the continued profitability of ASI—the harm to ASI would be immeasurable.[4]  Competitors, having expended none of their own time, effort or expense to develop similar proprietary products and information, would be able to undercut ASI's prices.  In short, if ASI was to lose control over

---

[4] Plaintiff alludes, without factual support, to the fact that ASI's confidential, proprietary products and information are publicly known or ascertainable.  This is simply not the case. In the complete absence of evidence to the contrary, ASI's confidential marketing strategies, customer lists and proprietary products must be considered legitimate, protectible interests.  See, e.g., Marcam Corp. v. Orchard, 885 F. Supp. 294, 297 (D. Mass. 1995).

TRIP, its marketing plans and strategies, and its customers lists, ASI's entire business could be derailed.

In contrast, Plaintiff's harm is minimal. The Covenant does *not* preclude Plaintiff from earning a living as an actuary—it merely prevents him, for 18 months, from competing with ASI as a consulting actuary. (Exh. 1, ¶ 30; Exh. 3, ¶ 8(a).) ASI is not in competition with insurance companies, who regularly employ actuaries. Indeed, Plaintiff himself was previously employed as a Vice President and Chief Actuary for Allmerica Financial, an insurance company in Worcester, Massachusetts. (See Plaintiff's Résumé, attached hereto as Exh. 6.) Nothing in the Covenant now prevents him from seeking a similar position at another insurance company. Plaintiff can seek employment with *any entity* that does not provide competing consulting actuarial services.

While it is true that the Covenant restricts Plaintiff's ability to work for a competing firm of consulting actuaries, the "consequence of *every* covenant not to compete…is that the covenantor is deprived of a possible means of earning his living…." See Marine Contractors Co. v. Hurley, 365 Mass. 280, 289, 310 N.E.2d 915, 921 (1974)(emphasis added); see also Hilb v. Pawlich, No. CV940705183, 1995 Conn. Super. LEXIS 506, at *21-22 (Conn. Super. Ct. Feb. 16, 1995)(enforcing covenant not to compete, and noting that employee's "fortunes will suffer but that hardly can be used as a reason to void the legal effect of [a covenant] he willingly entered into with [his employer]"). Nevertheless, such covenants are still enforceable. Weseley Software Dev. Corp. v. Burdette, 977 F. Supp. 137, 144 (D. Conn. 1996)("A restrictive covenant not to compete may be enforceable if the restraint is reasonable under the circumstances"); All Stainless, Inc. v. Colby, 364 Mass. 773, 778, 308 N.E.2d 481, 485 (Mass. 1974))("A covenant

not to compete contained in a contract for personal services will be enforced if it is reasonable, based on all the circumstances").

Considering the severe harm that ASI faces if it is enjoined from enforcing the Covenant, and the minimal harm that may befall Plaintiff, the balance of the hardships favors ASI. Accordingly, the Court must deny Plaintiff's Motion.

**B.      Plaintiff Has Not Established that He Will be Subjected to Immediate Irreparable Harm if the Preliminary Injunction Is Not Granted.**

This Court has held that the "extraordinary remedy of a preliminary injunction will not issue until this Court is convinced that plaintiff will suffer immediate and irreparable harm by its denial." GA Enterprises, Inc. v. Leisure Living Communities, Inc., 355 F. Supp. 947, 948 (D. Mass. 1973). Here, Plaintiff alleges that he will suffer irreparable harm because ASI's attempt to enforce the Covenant has rendered him "unable to pursue employment and business opportunities." Because the Covenant does not prevent Plaintiff from earning a living as an actuary, Plaintiff cannot show that he will suffer irreparable harm if his Motion is denied.

Plaintiff attempts to point to evidence that ASI is preventing him from working as an actuary do not avail him. For example, the Plaintiff alleges that he was denied a short-term opportunity to work for Manulife even though that opportunity "sought no proprietary information." (Plaintiff's Memorandum of Law in Support of Motion for Injunctive Order (hereinafter, "Plaintiff's Memorandum"), ¶ II.A.3.) However, Plaintiff himself values the lost Manulife opportunity at $64,000. (Compl., ¶ 42.) This lost opportunity—measurable by a specific amount of damages—is not the type of harm which a preliminary injunction is designed to prevent. See Fid. Summer St. Trust v. Toronto Dominion (Tex.), Inc., No. 02-11285-GAO, 2002 U.S. Dist. LEXIS 15276, at *18 (D. Mass. 2002)("When monetary damages can serve as an

adequate remedy later on, a preliminary injunction usually is inappropriate"); Auburn News Co. v. Providence Journal Co., 659 F.2d 273, 277 (1st Cir. 1981) (holding that preliminary injunction was not warranted where monetary damages would be an adequate remedy). Accordingly, the lost Manulife opportunity does not constitute irreparable harm.

Plaintiff's claim that the Covenant prevents him from earning a living is misleading. As discussed above, the Covenant merely prevents him, for 18 months, from *competing* with ASI as a consulting actuary; accordingly, the Covenant permits Plaintiff to serve as an actuary for an insurance company or other similar entity not in direct competition with ASI. (Exh. 1, ¶ 30.) ASI has never interfered with any attempt by Plaintiff to serve as an actuary for a company that does not directly compete with ASI, and ASI has no intent to do so. (Exh. 1, ¶ 30.) Thus, because Plaintiff can make a living within his chosen profession, the Court cannot find that Plaintiff will suffer irreparable harm if his Motion is denied.

### C.      Plaintiff Has Not Demonstrated That He Is Likely to Succeed on the Merits of His Case.

The plaintiff's ability to prove a likelihood of success on the merits is a critical factor in the preliminary injunction context. Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993). Plaintiffs that are "unable to establish that they will probably succeed on the merits will not be granted preliminary injunctive relief." Roll Sys., 1998 U.S. Dist. LEXIS 3142, at *4. Here, it is unlikely that Plaintiff will succeed in invalidating the Covenant. Indeed, Connecticut courts[5] have consistently demonstrated a willingness to enforce covenants not to compete that enjoin or restrain competitive employment because doing so reflects the "conscious choices both the

---

[5] Plaintiff has admitted that the Covenant's choice of law provision requires the application of Connecticut law. (See Plaintiff's Memorandum.) Indeed, Plaintiff's memorandum cites exclusively to Connecticut law in its analysis of the likelihood of success on the merits.

employer and employee made when the covenant was executed." See 3M v. Francavilla, 191 F. Supp. 2d 270, 279 (D. Conn. 2002).

In the present case, under the applicable Connecticut law, Plaintiff cannot establish that he will "probably succeed on the merits." Id. As a result, the Court must deny Plaintiff's Motion.

### 1.    Plaintiff's Interpretation of the Covenant is Not Credible on the Face of the Contract.

As Plaintiff himself notes, the intent of the parties must be ascertained based upon the plain language of the contract. See DeCarlo & Doll, Inc. v. Dilozir, 45 Conn. App. 633, 648, 698 A.2d 318 (1997). Further, where there is "definitive contract language, a determination of what the parties intended by the contractual commitments is a question of law." Trans-Clean Corp. v. Terrell, No. CV970348039S, 1998 Conn. Super. LEXIS 717, at *11 (Conn. Super. Ct. Mar. 17, 1998). However, Plaintiff illogically contends that, regardless of whether the Covenant is valid in and of itself, the Covenant does not prevent Plaintiff from seeking employment at a business competitive with ASI. (See Plaintiff's Memorandum, ¶ II.A.1.) Because Plaintiff's interpretation is inconsistent with the express terms of the Covenant, Plaintiff is not likely to succeed on the merits of this argument.

The language of the Covenant clearly affects Plaintiff's right to gain employment with a competitor of ASI's. Nevertheless, because the Covenant is titled "Intellectual Property Agreement Covenant Not to Compete," Plaintiff contends that only his right to use proprietary information is restricted. This argument has no merit. As Paragraph 8 of the Covenant expressly states, for a period of eighteen months Plaintiff cannot:

> *perform services*, similar to those [Plaintiff performed at ASI] for any…company, partnership or corporation whose business is competitive with the business being carried on by [ASI] or with respect to such services, solicit any actual or active

prospective customer of [ASI] for whom [Plaintiff] performed services while employed by [ASI] during the twelve months preceding my termination of employment.

(Exh. 3, ¶ 8 (emphasis added).)  In the simplest of terms, Paragraph 8(a) affects Plaintiff's right to "perform services" for a competing business entity, and not merely his right to use proprietary information.  Indeed, Paragraph 8 of the Covenant does not even mention proprietary information.

The mere title of the Covenant cannot be afforded more weight than the express language of the Covenant itself.[6]  The Covenant unambiguously limits Plaintiff's ability to gain employment from ASI's competitors, and no court could conclude otherwise.  Accordingly, Plaintiff is not likely to succeed on the merits of his case based on his faulty interpretation of the Covenant's express terms.

    **2.**    **Plaintiff's Violation of the Covenant Is not Excused by Any Alleged Breach of Contract By ASI.**

Plaintiff's Memorandum claims that ASI breached its employment contract with Plaintiff, and thus cannot enforce the terms of the Covenant.  (See Plaintiff's Memorandum, ¶ II.A.2.)  Without citing to any breached contractual provision, Plaintiff claims that ASI established "unrealistic goals" for Plaintiff and that when he failed to reach those goals, ASI used the pretext of "unauthorized computer use" to force his resignation and thereby "avoid [ASI's] contractual obligation to the Plaintiff…."  (See Plaintiff's Memorandum, ¶ II.A.2.)  However, Plaintiff cites to no evidentiary support in support of this position, and conveniently fails to explain that Plaintiff's unauthorized computer use involved the viewing and downloading of pornographic

---

[6] Paragraph II.A.1 of Plaintiff's Memorandum suggests that ASI "led [Plaintiff] to believe" that the purpose of the Covenant was solely to protect against the misappropriation of proprietary information.  ASI categorically denies that it ever did so.  (Exh. 1, ¶29.)

-13-

materials. Because Plaintiff cannot prove that ASI breached its contract with Plaintiff, Plaintiff is not likely to succeed on the merits of this argument.

Plaintiff has failed to point to a contractual provision that ASI has breached. Rather, Plaintiff appears to assert that ASI's termination of Plaintiff constitutes a breach of contract. Even assuming that the act of terminating Plaintiff can constitute a breach of contract, there is no question that ASI was entitled to terminate Plaintiff. This is so because Plaintiff *knowingly* violated ASI's Internet Policy by using his ASI laptop to view and download hardcore pornographic materials both while at ASI's Bloomfield facility and at home.[7] (Exh. 1, ¶ 21; Exh. 5, p. 27.) Plaintiff ASI's Internet Policy explicitly entitles ASI to terminate any employee who breaches said policy. (Exh. 5.) Plaintiff himself implicitly acknowledged ASI's right to terminate him for his transgression by thanking Mr. Lakenbach for having the "decency" to allow him to resign rather than be terminated. (Exh. 1, ¶¶ 22.)

In light of the above, there is no support for Plaintiff's argument that ASI breached its contract with Plaintiff by terminating him. Having also failed to point to any specific contractual provision that ASI has breached, Plaintiff cannot succeed in arguing that he is legally excused from his obligations under the Covenant.

### 3.    The Covenant is Not Overly Broad or Unreasonable, and so Must be Upheld.

Connecticut courts consider five factors in determining the reasonableness and enforceability of a covenant not to compete: "(1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent

---

[7] Upon accepting employment at ASI, Plaintiff signed a copy of ASI's Internet Policy. (Exh. 5.)

of interference with the public's interests." <u>Weiss v. Wiederlight</u>, 208 Conn. 525, 546 A.2d 216, 219 n.2 (1988). In the context of the confidential and proprietary information and products that ASI must protect, see Paragraph II.A, *supra*, an analysis of these five factors reflects the enforceability of the Covenant. Because the Covenant is reasonable and enforceable, Plaintiff is unlikely to succeed on the merits of his case.

First, despite Plaintiff's claims to the contrary, the Covenant does not restrict Plaintiff for an unreasonably long period of time. The Covenant provides for an eighteen month non-compete period. (Exh. 3, ¶ 8.) Connecticut courts have held that similar periods are enforceable. <u>See, e.g., id.</u> (affirming trial court's decision that 18 months covenant not to compete was reasonable under the circumstances). Indeed, the District Court of Connecticut, applying Connecticut law, has enforced covenants not to compete that prohibit a former employee "from working for a conflicting employer for a two-year period following the termination of his employment." <u>3M v. Francavilla</u>, 191 F. Supp. 2d 270, 280 (D. Conn. 2002)(holding that two year covenant not to compete is enforceable in part because employer "clearly has a legitimate business interest in seeking that the defendant does not disclose its confidential and proprietary information to a competitor"). Similarly, because ASI must protect its confidential and proprietary information and products, the 18 month duration of the Covenant is not overbroad. <u>See</u> <u>id.</u>; <u>see also</u> <u>Continental Group, Inc. v. Kinsley</u>, 422 F. Supp. 838, 844-45 (D. Conn. 1976) (enforcing 18 month covenant by enjoining former employee from employment with direct competitor of his former employer).

Second, the mere fact that the provision lacks a geographic scope *does not* preclude its validity, as Plaintiff suggests. Indeed, in <u>3M</u>, the court upheld a covenant not to compete that had a world-wide geographical scope. <u>Id.</u> The court reasoned that it was "tailored to protect [the

employer] only in the geographic areas where it does business."  Id.  Similarly here, the

Covenant only restricts Plaintiff from gaining employment at a company whose "business is

competitive with" ASI.  (Exh. 3, ¶ 8(a).)  Thus here, as in 3M, the breadth of the Covenant's

geographic scope is not overly broad because it only protects against unfair competition in

locations where ASI competes.  See 3M, 191 F. Supp. 2d at 280; see also Weiss, 546 A.2d at 220-

21 (holding that a covenant not to compete that lacked an express geographical scope was

enforceable where by its own terms it only protected employer in areas where employer did

business).

        Third, the protection afforded to ASI by the Covenant is entirely fair.  "When the

character of the business and the nature of employment are such that the employer requires

protection for his established business against competitive activities by one who has become

familiar with it through employment therein, restrictions are valid when they appear to be

reasonably necessary for the fair protection of the employer's business or rights." 3M, 191 F.

Supp. 2d at 280-81.  As detailed at length above, ASI has invested substantial amounts of time,

effort and money into its confidential and proprietary products (including TRIP), as well into

developing its confidential customer lists and marketing plans and strategies.  This investment

warrants protection.  See id. at 276, 281 (protecting, in part, employer's methods and capabilities

for manufacturing certain products, employer's proprietary methods, and employer's  customers

lists); May v. Young, 125 Conn. 1, 7, 2 A.2d 385, 388 (1938)(holding that a covenant not to

compete is especially appropriate "if the employment involves the imparting of trade secrets,

methods or systems and contacts and associations with clients or customers…").

        Considering Plaintiff's access to ASI's confidential and proprietary information and

products, and his ability to use such intellectual property to unfairly compete against the

company, ASI can *only* protect its interests by restraining Plaintiff from gaining employment at a consulting actuary firm competitive with ASI. See 3M, 191 F. Supp. 2d at 280-81 (holding that enjoining plaintiff for two years from working for a competitor was a fair protection for the employer); Branson Ultrasonics Corp. v. Stratman, 921 F. Supp. 909, 913-14 (D. Conn. 1996) ("When…a high degree of similarity between an employee's former and current employment makes it likely that the former employer's trade secrets and other confidential information will be used and disclosed by the employee…a covenant not to compete is *necessary* to protect against such use and disclosure")(emphasis added). Consistent with this precedent, the protection accorded to ASI by the Covenant is fair. See id.

Fourth, despite Plaintiff's protestations to the contrary, the Covenant does not preclude Plaintiff from pursuing his profession. The Covenant only prevents Plaintiff from gaining employment at a consulting actuary firm competitive with ASI. Plaintiff is not precluded from working as an actuary for any entity that does not provide consulting actuary services in direct competition with ASI. (Exh 1., ¶ 30.) Plaintiff can thus earn a living as an actuary with, for example, an insurance company—just as he did prior to joining ASI. See 3M, 191 F. Supp. 2d at 281 (holding that the covenant was enforceable in part because it did not "attempt to prohibit the defendant from working for an organization that is not a competitor…"); Scott v. General Iron & Welding Co., 171 Conn. 132, 140, 368 A.2d 111, 116 (1976)(holding that covenant not to compete restricting employee from one type of position within his chosen profession was not an undue restriction on employee's ability to earn a living.)[8]

---

[8] ASI notes that Plaintiff makes no argument that ASI's enforcement of the Covenant interferes with the public's interests. ASI thus does not address that factor here, other than to state that it is not aware of any public interest harmed by the Covenant.

In light of the above, and in consideration of the critical interests that the Covenant protects, the Covenant is both reasonable and enforceable. Thus, the Plaintiff cannot establish that he is likely to succeed on the merits of his claim.

####    4.    Even if Plaintiff Is Able to Prove that the Covenant is Overbroad, Connecticut Law Would Allow the Court to "Blue Pencil" the Covenant and Enforce the Revised Terms Thereof.

In Connecticut, courts have the equitable power to revise the scope of a covenant not to compete when the parties demonstrate an intent to make the terms of the covenant severable. Thus here, even if the Court rules that the Covenant is overbroad, the Court can revise the Covenant and enforce the revised terms.

The Court's right to revise, or "blue pencil", a covenant not to compete "depends primarily upon the intent of the parties as determined by a fair construction of the language they used." Gartner Group, Inc. v. Mewes, No. CV910118332S, 1992 Conn. Super. LEXIS 38, at *10-11 (Conn. Super. Ct. Jan. 3, 1992)(citing Beit v. Beit, 135 Conn. 195, 63 A.2d 161 (1948)). In the present case, the Covenant expressly provides, in part, that if:

> any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to time, duration, geographical scope, activity or subject, it shall be construed, by limited and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

(Exh. 3, ¶ 9.)

In Gartner Group, the court held that language virtually identical to the above did reflect the parties' intent that the terms of the covenant be severable. Gartner Group, 1992 Conn. Super. LEXIS 38, at *10-11. It thus follows that this Court will hold the Covenant to be severable as well. See id.; see also Group Concepts, Inc. v. Barberino, No. CV030286221, 2004 Conn. Super. LEXIS 1036, at *3, 14-15 (Conn. Super. Ct. Apr. 16, 2004).

Once a covenant is held to be severable, the court can re-define the scope of the covenant by altering any of the terms therein, including geographical or temporal scope. See Grayling Assocs. v. Villota, No. CV040833521, 2004 Conn. Super. LEXIS 1859, at *4 n.2 (Conn. Super. Ct. July 12, 2004)("Under the so-called 'blue-pencil rule' the court may modify a restrictive covenant to make its terms reasonable").  Consequently, even if the Covenant *is* deemed overbroad, this Court will have the authority to limit the scope of the Covenant and enforce the revised terms.  See id.; see also Webcraft Technologies, Inc. v. McCaw, 674 F. Supp. 1039, 1047 (S.D.N.Y. 1987) (explaining that in "appropriate circumstances, courts may 'blue pencil' an over broad restrictive covenant to enforce only its reasonable provisions.")

Because of this Court's authority to blue pencil the Covenant, Plaintiff cannot establish that he is likely to succeed on the merits of his case.  It is simply impossible for him to predict whether this Court will ultimately enforce all, or some part of, the Covenant.

## III.    CONCLUSION

For the foregoing reasons, ASI respectfully requests the Court deny Plaintiff's Motion for Injunctive Order.

Dated: February 28, 2005

DEFENDANT, ACTUARIAL STRATEGIES, INC.

By /s/ John P. McLafferty_____
    John P. McLafferty (BBO# 639179)
    Glenn W. Dowd, *pro hac vice*
    Day, Berry & Howard LLP
    260 Franklin Street
    Boston, Massachusetts 02110
    (617) 345-4600
    Its Attorneys

-19-

## CERTIFICATE OF SERVICE

I, John P. McLafferty, hereby certify that on the 28th day of February, 2005, I served a true and correct copy of the foregoing via overnight upon Plaintiff's counsel, John M. Wozniak, Esq., Wozniak & Padula, P.C., 82 Cape Road, Route 140, Mendon, MA 01756.


_____/s/ John P. McLafferty_____
John P. McLafferty

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARLES DANA TATRO,<br><br>               Plaintiff,<br>v.<br><br>ACTUARIAL STRATEGIES, INC.,<br><br>               Defendant. | )<br>)<br>)<br>)  Civil Action No. 4:05-cv-40024-FDS<br>)<br>)<br>)<br>)<br>)<br>) |

## **AFFIDAVIT OF CARY LAKENBACH**

I, Cary Lakenbach, state the following upon my own information and belief:

1.      I am the President of Actuarial Strategies Inc, and as such I am authorized to provide this affidavit on behalf of Actuarial Strategies Inc.

2.      I am over 18 years of age and I believe in the obligation of an oath.

3.      Unless otherwise stated herein, I have personal knowledge of the facts attested to in this affidavit.

4.      I have worked as a practicing actuary since 1973. I passed the last of my ten actuarial certification examinations in November 1977.

5.      I worked as an actuary at Covenant Life Insurance Company, Connecticut Mutual Insurance Company, and American Financial Systems. I started Actuarial Strategies, Inc. ("ASI") in 1991. At first, I was the only employee of ASI, and ASI's business was run from my home. I established an office for ASI in Bloomfield, Connecticut in 1996. We moved to our current location in August 2001, and ASI's operations are still conducted from this location today.

6.    ASI has a total of five employees including myself. ASI has had gross revenues of approximately $1,400,000 per year.

7.    ASI is an Actuarial Consulting Firm, but does not operate like most Actuarial Consulting Firms.  One part of its efforts involves the development of products for insurance companies and financial services institutions. I consider ASI to be a creative product development enterprise.  On some occasions, ASI identifies market opportunities, and structures our products to take advantage of these opportunities. In other occasions, because of our knowledge of products, markets, and distribution channels, ASI develops products that aren't necessarily unique.  (The latter has been a much more significant part of our business over the years.)  In the final analysis, ASI helps companies design products for their distribution channels.

8.    One such innovative product is ASI's Total Retirement Income Program (commonly referred to as "TRIP").  TRIP is a proprietary product of ASI that simplifies the application and underwriting process for life insurance policies so that such policies may be more easily sold by a broad range of financial services professionals.  ASI is in the process of seeking a patent for TRIP.

9.    I first met Mr. Tatro in October 2002 when he was presented to me as a candidate by a recruiting firm.  Mr. Tatro had been employed by Allmerica Financial, but was looking for new employment due to Allmerica's financial condition, and its decision to de-emphasize life insurance and annuity products.  I was impressed by Mr. Tatro and decided to pursue an employment relationship with him.  Mr. Tatro's employment with ASI began on January 6, 2003.

10.   I did not envision Mr. Tatro becoming a regular "rank and file" employee, but rather hoped he would develop into a significant leadership presence at ASI.  I also believed that

Mr. Tatro had the potential to become a principal (or part owner) of ASI.  It was also my stated

intention that Mr. Tatro become a significant business developer (or "rainmaker") for ASI, and

we discussed this during the interview process.  I incorporated this business development

concept into the offer letter that I prepared for Mr. Tatro in November 2002.

11.    Mr. Tatro executed and returned to me an offer letter dated December 16, 2002,

and signed on December 20, 2002, and then an Intellectual Property Agreement Covenant Not to

Compete (the "Non-Compete Agreement") on that same date.  True and accurate copies of these

documents are attached hereto as Exhibits A and B, respectively.  I made it clear to Mr. Tatro

that he would not be hired unless he signed the Non-Compete Agreement, which was a condition

of his employment.

12.    Mr. Tatro's salary was $170,000 per year when he began work at ASI in January

2003.  Further, he received a promised employment bonus of $8,000 six months after he

commenced employment with us.  In addition, Mr. Tatro was eligible for discretionary bonuses.

At the end of 2003, Mr. Tatro was paid a bonus of $100,000.

13.    I needed to share proprietary, confidential information with Mr. Tatro to allow

him to operate effectively in his new position and to develop new business. I openly shared this

information with Mr. Tatro, in large part, because he had executed the Non-Compete Agreement.

I made a great deal of this information available to Mr. Tatro, including extensive details

regarding ASI's proprietary products (such as TRIP).  I also exposed Mr. Tatro to details of

ASI's existing and past customer relationships, and marketing plans and strategies.

14.    During his tenure at ASI, Mr. Tatro took the title of Vice President and

Consulting Actuary.  In this position, Mr. Tatro was granted unfettered access to ASI's most

sensitive, confidential and proprietary information, including, among other things, information

about ASI's products (including TRIP), services, customers, pricing policies, marketing plans and strategies, product development techniques and plans, personnel, salaries and performance information, and business plans. As a Vice President, Mr. Tatro was also an Officer and senior executive of ASI.

15.     As noted above, Mr. Tatro was provided with substantial access to, and information about TRIP, ASI's proprietary life insurance product. In fact, Mr. Tatro was charged with developing a hybrid product based upon TRIP that included certain annuity features, such as guaranteed benefits. This hybrid product was to take advantage of Mr. Tatro's substantial experience with similar vehicles in annuity products. In addition, Mr. Tatro was charged with running pricing models for TRIP. Mr. Tatro's knowledge of TRIP, and ASI's methodologies with respect to life insurance products, would be highly attractive to other actuarial consulting firms. The release of any proprietary information relating to TRIP would be devastating to ASI, since TRIP has accounted for at least fifty percent of ASI's revenues over the past two years. Mr. Tatro's knowledge of TRIP, if shared with a competing actuarial consulting firm, would allow that firm to compete unfairly with ASI. Mr. Tatro's knowledge of other ASI offerings would also have a significant impact on our business if used in a consulting capacity.

16.     Mr. Tatro also had full access to ASI's customer lists. In fact, I did a number of customer solicitations with Mr. Tatro. Mr. Tatro also attended four to five conferences each year that he worked at ASI, and ASI absorbed all the expenses associated with these conferences. If Mr. Tatro were allowed to leave ASI and provide services to a competing actuarial consulting firm, he would be allowed to leverage ASI's customer relationships and compete unfairly with ASI.

17.    As noted above, Mr. Tatro had complete access to ASI's strategic marketing plans and strategies. In this regard, Mr. Tatro participated with me in strategic marketing sessions, during which we developed marketing strategies, and identified target clients and the products to be pitched to various clients. These strategies were formulated and refined at weekly staff meetings that Mr. Tatro attended. Mr. Tatro also attended periodic strategy meetings where more global strategies and long term marketing plans were discussed. If Mr. Tatro were allowed to compete with ASI by providing services to another actuarial consulting firm, he could leverage his knowledge of ASI's marketing plans and strategies and engage in unfair competition.

18.    In 2003, Mr. Tatro secured two client relationships for ASI: Manulife Financial and Merrill Lynch. Although Mr. Tatro was instrumental in securing the work from Manulife, he did not do all the work engendered by that engagement. In fact, ninety five percent of billable hours charged on these Manulife matters from the time Jonathan Clymer was hired, in October 2003, were performed by Jonathan Clymer, another consulting actuary employed by ASI. Mr. Tatro himself performed much of the Merrill Lynch work he secured.

19.    Over the course of Mr. Tatro's employment, I had developed concerns about his difficulties in interacting with both me and his co-workers. In June 2004, I started becoming particularly concerned with Mr. Tatro's lack of productivity.

20.    Mr. Tatro often worked from his home, and was provided with an ASI-owned laptop computer. In October 2004, Rita McCarty, ASI's Director of Operations, had Mr. Tatro's computer reviewed by an external computer consultant. This review was done without my prior knowledge. During the course of this review, it was discovered that Mr. Tatro had been using his ASI laptop during work hours to download and view pornography. I was alarmed and

repulsed by the extent and the nature of the pornography that Ms. McCarty informed me that Mr. Tatro had placed and retained on this company-owned laptop computer.

21.    In November 2004, I confronted Mr. Tatro about the pornography on ASI's laptop computer. I explained that his behavior was both repugnant and a violation of ASI's policies. Mr. Tatro did not deny placing pornography on the laptop computer, and made no effort to justify his behavior. In fact, Mr. Tatro said "Yes, I have a problem." He also told me that he was sorry for his actions, and asked whether I would consider placing him on probation for one month. I told Mr. Tatro that this would not be possible, and explained that his employment with ASI would end effective as of Friday, November 5, 2004. I gave Mr. Tatro the option of resigning in lieu of termination, and he chose to accept this alternative. Mr. Tatro's employment with ASI ended effective as of November 5, 2004.

22.    After I confronted Mr. Tatro and informed him that his employment with ASI would not continue, he sent me an e-mail message, a copy of which is attached hereto as Exhibit C. In this e-mail, Mr. Tatro apologized to me again and thanked me for my "decency" in letting him resign. He also told me that the latter part of his employment with ASI was "too stressful" for him, and he did "not handle it well at home or at work."

23.    In November 2003 (when Mr. Tatro's employment ended), ASI was supposed to have started a substantial project for Merrill Lynch. As mentioned above, Mr. Tatro had a relationship with, and actually procured some work for ASI from, Merrill Lynch. After Mr. Tatro's employment ended, the Merrill Lynch project ceased suddenly and without any meaningful explanation. I believe, but cannot at this point prove, that Mr. Tatro displaced ASI by wrongfully performing services for Merrill Lynch in violation of his Non-Compete Agreement.

24.    On January 4, 2005, upon my arrival in the office, around 8:30 AM, I received a voice mail message from Bob Leach of Manulife Financial.  As mentioned above, Mr. Tatro procured work from Manulife for ASI and, in fact, is a former employee of Manulife.  Mr. Leach's voice-mail message indicated that Manulife needed support from ASI.

25.    I spoke with Mr. Leach later in the day on January 4, 2005 and he indicated that he wanted Jonathan Clymer's help for a two-month period.  I discussed various aspects of this working arrangement with Mr. Leach, including financial issues, and Mr. Leach then indicated that he would proceed to get higher management approval for this assignment.

26.    I next spoke to Mr. Leach on Friday, January 7, 2005.  During this conversation, Mr. Leach informed me that Manulife would not be hiring ASI and Mr. Clymer for the project we had discussed earlier in the week.  When I probed Mr. Leach on why Manulife had decided to change course on this assignment, he informed me that Manulife intended to hire Mr. Tatro to do this project.

27.    I told Mr. Leach that I believed that Mr. Tatro was subject to a Non-Compete Agreement, that precluded him from accepting this engagement.

28.    I believe that ASI's experiences with Manulife and Merrill Lynch after Mr. Tatro's employment ended have damaged ASI, and are reflective of what would occur if Mr. Tatro were allowed to compete with ASI in violation of the Non-Compete Agreement.

29.    I reviewed Mr. Tatro's affidavit dated January 27, 2005 which he filed in this matter.  In Paragraph 11 of that affidavit, Mr. Tatro claims that prior to his employment, he had conversations with me in which he was led to believe that the sole purpose of the Non-Compete Agreement was to protect proprietary products ASI had developed and patented.  This is simply not true.

30.    Mr. Tatro will not be precluded from working as an actuary if the Non-Compete Agreement is enforced by this Court.  Indeed, Mr. Tatro worked at various insurance companies and financial institutions prior to joining ASI, and there is, in my view, nothing in the Non-Compete Agreement that would prevent him from doing so again now (provided he abides by the other provisions of that Agreement).  The Non-Compete Agreement is intended *only* to prevent Mr. Tatro from providing services for eighteen months to competing actuarial consulting firms.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 23rd DAY OF FEBRUARY, 2005.

_____
Cary Lakenbach

Subscribed and sworn to before me this 23rd day of February, 2005.

_____
Notary Public
My Commission Expires:

**CHERELYN JOYCE**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES MAY 31, 2009

# EXHIBIT A



ACTUARIAL STRATEGIES Inc.

CARY LAKENBACH, FSA, MAAA, CLU
President

December 16, 2002

Mr. Charles Dana Tatro
49 George Street
Mendon, MA 10756

Dear Dana:

Dana, it has been a couple of months since we started getting to know each other. My colleagues and I have been very impressed with you. Your accumulated expertise and experience are unusually strong, in our view. Your references have spoken very highly of your contributions and work ethic. Because of this, and because we are highly optimistic that you will grow no less rapidly and broadly in the future, I am very pleased to extend this offer to you to join Actuarial Strategies, Inc.

Here are the details of this offer:

1. The position would be Consulting Actuary in our Bloomfield, CT office. You will report to me. Upon acceptance and satisfaction of the terms and conditions of this letter, your employment will begin on January 2, 2003.

2. The key requirements of this position will include the following:

- **Significant Client Management**.

   We look to you to participate in and/or lead product development projects, maintain and adhere to workplans for such projects, participate actively in the actual work effort, research issues as needed, routinely report on projects to clients as well as to your colleagues at Actuarial Strategies, and communicate and/or visit with clients as necessary to update them on work progress.

   I expect that over time you will visit with prospective clients, and enter into new relationships. We also expect you to be highly sensitive to the needs of current clients, including identifying issues which Actuarial Strategies could help them address.

One Northwestern Drive, Suite 103, Bloomfield, CT 06002-3400  •  Telephone: (860) 726-9292  •  Facsimile: (860) 726-9299
*www.actstrat.com*

Charles Dana Tatro
Page 2

- **High level maintenance and expansion of actuarial and marketing skills.**

  We need you to remain extremely current within the actuarial field, including but not limited to actuarial issues, tax laws, current market needs, competitor services and products, etc., as well as the marketing applications and needs which drive our business. You bring certain experiences to the table, in annuities particularly, that suggest we may be able to expand the breadth of our actuarial efforts beyond the current core product development business.

  - In particular we need you to develop a strong understanding of universal life and the marketplace it serves. Of course, this includes an intensive working knowledge of XXX and AXXX requirements.

  - We also want you to develop a comprehensive understanding of the 2001 CSO Table and the transition rules governing its use.

- **Identification, Researching, Selection, Planning, and Execution of New Business Opportunities.**

  A requirement of this position is again to keep an eye out for new business opportunities. We want to make sure that we are "ahead of the curve" so to speak and our key niche in the consulting world is to be two steps in front of the competition in all, but especially critical areas.

- **Common actuarial tool expertise.** Our pricing is done on both PTS and internal systems, including sophisticated Excel models. Extensive knowledge in the use of these vehicles is critical.

- **Offer guidance in the management, strategically and tactically, of our business.** I look forward to sharing opportunities, brainstorming issues and problem-solving, with you, and to receiving your input and guidance.

  I believe that significant cross-pollination can occur within our actuarial operation. Open discussions are critical to achieving this. Consistent internal communications are extremely vital to the success of our projects.

  Organization and maintaining accurate and dated material for each project you work on is essential and is required.

- Regular and periodic attendance at interoffice and professional meetings, for both business and marketing purposes, will be expected.

3. We are pleased to offer you an annual salary of **$170,000**.

Actuarial Strategies, Inc. 12-16-02

Charles Dana Tatro
Page 3

4. After continued successful six months of employment with Actuarial Strategies, a bonus of $8,000 will be paid to you. Your continued employment with Actuarial Strategies on such date is a prerequisite for such bonus.

5. You may be eligible to receive a discretionary annual bonus based upon personal and Actuarial Strategies' performance. The amount, it any, of this bonus shall be in the absolute sole discretion of Actuarial Strategies. This bonus, if any, will be paid on or about December 31 of each year and your continued employment with Actuarial Strategies on such date is one prerequisite for such bonus.

6. Actuarial Strategies currently maintains both a Money Purchase Pension Plan and a Profit Sharing Plan. Eligibility is January 1 or July 1 after two years of employment. The terms of these pension plans are currently under review. The purpose of the review is not benefit reduction.

7. Vacation time is three weeks annually accrued at 1.25 days per month Vacation days are not permitted to be carried over to the following year. You will also receive two floating days to use as personal days.

8. Actuarial Strategies offers a medical benefits package, to which it currently contributes 85% of the cost of coverage. This percentage can change any time.

9. Actuarial Strategies will reimburse you for the reasonable costs of moving your family and household possessions to Connecticut, up to a maximum amount of $4,000. Any expense above the amount of $4,000 may or may not be paid.

10. This offer is contingent upon: 1) your providing documents to establish your identity and authorization to work in the United States as required by the Immigration Reform and Control Act of 1986 on your first day of employment; 2) your signing of the attached Non-Disclosure Agreement and Covenant Not to Compete; and 3) your signing of a receipt of the employee handbook, a copy of which is also attached.

11. I will want to discuss billing rate issues with you at an appropriate time.

Charles Dana Tatro
Page 4

A change in direction such as you are contemplating is a family affair, and the staff at Actuarial Strategies welcome and look forward to the opportunity to meet your wife and to try to address the many questions she may have. In particular, we would be pleased to have you as our guests in Bloomfield so that we can also meet her and she us.

Dana, there you have it. I hope you view the offer as attractive, and I look forward to your joining us. There is a great opportunity for you and Actuarial Strategies to fruitfully grow and prosper together.

I look forward to hearing from you.

Sincerely,

Cary Lakenbach

/cl

Accepted and agreed as of this _20_th_ day of December, 2002.

Charles Dana Tatro

# EXHIBIT B



## Intellectual Property Agreement Covenant Not to Compete

As a condition and in consideration of my continued employment by Actuarial Strategies, Inc., or any of its successors or assigns (hereinafter referred to as the EMPLOYER), I, the EMPLOYEE named below, agree as follows:

1.    Unless the EMPLOYER has acquired specific authorization, I will not disclose to or use in my work with the EMPLOYER any proprietary information of others, including any of my prior employers.

2.    During the term of this Agreement and at all times thereafter, I will keep in confidence and will not publish, use or disclose to others, without the prior written consent of the EMPLOYER, any Trade Secrets or other confidential information related to the EMPLOYER or the EMPLOYER's business. As used herein, the phrase "Trade Secret"" is to be considered as used in accordance with the definition of Trade Secret found under Connecticut law in effect at the time of the execution of this Agreement. Without limiting this definition, and for information purposes only, a Trade Secret is the whole or any portion of any technical or non-technical information, including a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, financial plan, product plan or customer or supplier information that is actually or potentially valuable because it is not generally known to others and that is subject to reasonable efforts by the EMPLOYER to maintain its secrecy.

3.    Upon leaving the employ of the EMPLOYER, I will not take with me any written, printed or electronically stored Trade Secret or other confidential information or any other property of the EMPLOYER obtained by me as the result of my employment, or any reproductions thereof. All such property and all copies thereof shall be surrendered by me to the EMPLOYER on termination of employment or at any time on request by the EMPLOYER.

4.    I agree that all trade secrets, inventions, works of authorship (including illustrations, writings, software and computer programs), improvements, devices, designs, discoveries, practices, processes, methods, formulae, products and the like (hereinafter collectively called "INVENTIONS") and all other business or technical information created or conceived by me, either alone or with others, while employed by the EMPLOYER and related to the existing or contemplated business or research of the EMPLOYER or resulting from my work with the EMPLOYER, belong to the

EMPLOYER. Until proven otherwise, any INVENTION shall be presumed to have been conceived during such employment if within one (1) year after termination of such employment it is disclosed to others, or it is completed, or it has a patent application filed thereon.

5.      I will promptly disclose to the EMPLOYER all INVENTIONS, and any other information which belong to the EMPLOYER under paragraph 4 above; and I will assign to the EMPLOYER, or to others as directed by the EMPLOYER, all of my interest in such INVENTIONS, without charge, and I will execute any papers and do any acts which the EMPLOYER may consider necessary to secure to it any and all rights relating to such INVENTIONS, including all patents and copyrights (and renewals thereof) in any country.

6.      I recognize, further, that all records, reports, notes, compilations, or other recorded matter, and copies or reproductions thereof, relating to the EMPLOYER's operations, activities or business, made or received by me during any period of my employment with the EMPLOYER are and shall be the property of the EMPLOYER exclusively, and I will keep the same at all times subject to the EMPLOYER's control and will surrender the same at the termination of my employment, if not before.

7.      I attach hereto a complete list of all INVENTIONS that I have made or conceived prior to my employment by the EMPLOYER and I desire that the INVENTIONS shall be excluded from this Agreement.

8.      I shall not, for a period of eighteen (18) months following the termination of my employment with the EMPLOYER, directly or indirectly:

(a)      perform services, similar to those I have performed for the EMPLOYER for any person, persons, company, partnership or corporation whose business is competitive with the business being carried on by the EMPLOYER or with respect to such services, solicit any actual or active prospective customer of the EMPLOYER for whom I performed services while employed by the EMPLOYER during the twelve months preceding my termination of employment;

(b)      nor call upon, divert or solicit any person, persons, company, partnership or corporation for the purpose of selling or marketing services or products competitive with the business being carried on by the EMPLOYER;

(c)      nor employ or attempt to employ or assist anyone else to employ any person who is at such time, or at any time during the preceding year, was an employee of or consultant to the EMPLOYER, provided that this clause shall not restrict employment of a third party vendor who supplies generic services to the industry. As used in this section, the verb "employ" shall include its variations, for example, retain, engage or conduct business with.

9.    This Agreement shall be construed in accordance with and governed for all purposes by the laws of the State of Connecticut. The parties have entered into this Agreement in the belief that its provisions are valid, reasonable and enforceable. However, if any one or more of the provisions contained in this Agreement shall, under existing or hereafter enunciated law, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. If, moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to time, duration, geographical scope, activity or subject, it shall be construed, by limited and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

This Agreement supersedes all prior oral or written agreements and is effective with respect to the subject matter hereof subsequent to the date executed.

I acknowledge receipt of an executed copy of this Agreement.

This Agreement is executed this _20^TH_ day of _December_, 20_02_ at _Mendon_ , _MA_ .
        city                      state


Actuarial Strategies, Inc.

BY
_Cary Lakenbach_

Print Name   _CARY LAKENBACH_

Title   _President_


EMPLOYEE

Signature _[signature]_

Print Name _Dana Tatro_

Residence _49 George St_

City _Mendon_

State _Ma_

# EXHIBIT C

-----Original Message-----
**From:** alleymansfield@comcast.net [mailto:alleymansfield@comcast.net]
**Sent:** Wednesday, November 03, 2004 2:44 PM
**To:** Cary Lakenbach
**Subject:**

Cary,

I would like to apoligize again and thank you for your decency in letting me resign.  I know we have had our differences, but I enjoyed the first year or so at ASI.  The last part was too stressful for me and I did not handle it well at home or at work.

Thank you

**EXHIBIT 2**



**ACTUARIAL STRATEGIES** Inc.

CARY LAKENBACH, FSA, MAAA, CLU
President

December 16, 2002

Mr. Charles Dana Tatro
49 George Street
Mendon, MA 10756

Dear Dana:

Dana, it has been a couple of months since we started getting to know each other. My colleagues and I have been very impressed with you. Your accumulated expertise and experience are unusually strong, in our view. Your references have spoken very highly of your contributions and work ethic. Because of this, and because we are highly optimistic that you will grow no less rapidly and broadly in the future, I am very pleased to extend this offer to you to join Actuarial Strategies, Inc.

Here are the details of this offer:

1. The position would be Consulting Actuary in our Bloomfield, CT office. You will report to me. Upon acceptance and satisfaction of the terms and conditions of this letter, your employment will begin on January 2, 2003.

2. The key requirements of this position will include the following:

- **Significant Client Management.**

  We look to you to participate in and/or lead product development projects, maintain and adhere to workplans for such projects, participate actively in the actual work effort, research issues as needed, routinely report on projects to clients as well as to your colleagues at Actuarial Strategies, and communicate and/or visit with clients as necessary to update them on work progress.

  I expect that over time you will visit with prospective clients, and enter into new relationships. We also expect you to be highly sensitive to the needs of current clients, including identifying issues which Actuarial Strategies could help them address.

Charles Dana Tatro
Page 2

- **High level maintenance and expansion of actuarial and marketing skills.**

  We need you to remain extremely current within the actuarial field, including but not limited to actuarial issues, tax laws, current market needs, competitor services and products, etc., as well as the marketing applications and needs which drive our business. You bring certain experiences to the table, in annuities particularly, that suggest we may be able to expand the breadth of our actuarial efforts beyond the current core product development business.

  - In particular we need you to develop a strong understanding of universal life and the marketplace it serves. Of course, this includes an intensive working knowledge of XXX and AXXX requirements.

  - We also want you to develop a comprehensive understanding of the 2001 CSO Table and the transition rules governing its use.

- **Identification, Researching, Selection, Planning, and Execution of New Business Opportunities.**

  A requirement of this position is again to keep an eye out for new business opportunities. We want to make sure that we are "ahead of the curve" so to speak and our key niche in the consulting world is to be two steps in front of the competition in all, but especially critical areas.

- **Common actuarial tool expertise.** Our pricing is done on both PTS and internal systems, including sophisticated Excel models. Extensive knowledge in the use of these vehicles is critical.

- **Offer guidance in the management, strategically and tactically, of our business.** I look forward to sharing opportunities, brainstorming issues and problem-solving, with you, and to receiving your input and guidance.

  I believe that significant cross-pollination can occur within our actuarial operation. Open discussions are critical to achieving this. Consistent internal communications are extremely vital to the success of our projects.

  Organization and maintaining accurate and dated material for each project you work on is essential and is required.

- Regular and periodic attendance at interoffice and professional meetings, for both business and marketing purposes, will be expected.

3. We are pleased to offer you an annual salary of **$170,000**.

Charles Dana Tatro
Page 3

4.  After continued successful six months of employment with Actuarial Strategies, a bonus of $8,000 will be paid to you. Your continued employment with Actuarial Strategies on such date is a prerequisite for such bonus.

5.  You may be eligible to receive a discretionary annual bonus based upon personal and Actuarial Strategies' performance. The amount, it any, of this bonus shall be in the absolute sole discretion of Actuarial Strategies. This bonus, if any, will be paid on or about December 31 of each year and your continued employment with Actuarial Strategies on such date is one prerequisite for such bonus.

6.  Actuarial Strategies currently maintains both a Money Purchase Pension Plan and a Profit Sharing Plan. Eligibility is January 1 or July 1 after two years of employment. The terms of these pension plans are currently under review. The purpose of the review is not benefit reduction.

7.  Vacation time is three weeks annually accrued at 1.25 days per month Vacation days are not permitted to be carried over to the following year. You will also receive two floating days to use as personal days.

8.  Actuarial Strategies offers a medical benefits package, to which it currently contributes 85% of the cost of coverage. This percentage can change any time.

9.  Actuarial Strategies will reimburse you for the reasonable costs of moving your family and household possessions to Connecticut, up to a maximum amount of $4,000. Any expense above the amount of $4,000 may or may not be paid.

10. This offer is contingent upon: 1) your providing documents to establish your identity and authorization to work in the United States as required by the Immigration Reform and Control Act of 1986 on your first day of employment; 2) your signing of the attached Non-Disclosure Agreement and Covenant Not to Compete; and 3) your signing of a receipt of the employee handbook, a copy of which is also attached.

11. I will want to discuss billing rate issues with you at an appropriate time.

Charles Dana Tatro
Page 4

A change in direction such as you are contemplating is a family affair, and the staff at Actuarial Strategies welcome and look forward to the opportunity to meet your wife and to try to address the many questions she may have. In particular, we would be pleased to have you as our guests in Bloomfield so that we can also meet her and she us.

Dana, there you have it. I hope you view the offer as attractive, and I look forward to your joining us. There is a great opportunity for you and Actuarial Strategies to fruitfully grow and prosper together.

I look forward to hearing from you.

Sincerely,

Cary Lakenbach

/cl

Accepted and agreed as of this _20th_ day of December, 2002.

Charles Dana Tatro

# EXHIBIT 3



## Intellectual Property Agreement Covenant Not to Compete

As a condition and in consideration of my continued employment by Actuarial Strategies, Inc., or any of its successors or assigns (hereinafter referred to as the EMPLOYER), I, the EMPLOYEE named below, agree as follows:

1.      Unless the EMPLOYER has acquired specific authorization, I will not disclose to or use in my work with the EMPLOYER any proprietary information of others, including any of my prior employers.

2.      During the term of this Agreement and at all times thereafter, I will keep in confidence and will not publish, use or disclose to others, without the prior written consent of the EMPLOYER, any Trade Secrets or other confidential information related to the EMPLOYER or the EMPLOYER's business. As used herein, the phrase "Trade Secret"" is to be considered as used in accordance with the definition of Trade Secret found under Connecticut law in effect at the time of the execution of this Agreement. Without limiting this definition, and for information purposes only, a Trade Secret is the whole or any portion of any technical or non-technical information, including a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, financial plan, product plan or customer or supplier information that is actually or potentially valuable because it is not generally known to others and that is subject to reasonable efforts by the EMPLOYER to maintain its secrecy.

3.      Upon leaving the employ of the EMPLOYER, I will not take with me any written, printed or electronically stored Trade Secret or other confidential information or any other property of the EMPLOYER obtained by me as the result of my employment, or any reproductions thereof. All such property and all copies thereof shall be surrendered by me to the EMPLOYER on termination of employment or at any time on request by the EMPLOYER.

4.      I agree that all trade secrets, inventions, works of authorship (including illustrations, writings, software and computer programs), improvements, devices, designs, discoveries, practices, processes, methods, formulae, products and the like (hereinafter collectively called "INVENTIONS") and all other business or technical information created or conceived by me, either alone or with others, while employed by the EMPLOYER and related to the existing or contemplated business or research of the EMPLOYER or resulting from my work with the EMPLOYER, belong to the

EMPLOYER. Until proven otherwise, any INVENTION shall be presumed to have been conceived during such employment if within one (1) year after termination of such employment it is disclosed to others, or it is completed, or it has a patent application filed thereon.

5.    I will promptly disclose to the EMPLOYER all INVENTIONS, and any other information which belong to the EMPLOYER under paragraph 4 above; and I will assign to the EMPLOYER, or to others as directed by the EMPLOYER, all of my interest in such INVENTIONS, without charge, and I will execute any papers and do any acts which the EMPLOYER may consider necessary to secure to it any and all rights relating to such INVENTIONS, including all patents and copyrights (and renewals thereof) in any country.

6.    I recognize, further, that all records, reports, notes, compilations, or other recorded matter, and copies or reproductions thereof, relating to the EMPLOYER's operations, activities or business, made or received by me during any period of my employment with the EMPLOYER are and shall be the property of the EMPLOYER exclusively, and I will keep the same at all times subject to the EMPLOYER's control and will surrender the same at the termination of my employment, if not before.

7.    I attach hereto a complete list of all INVENTIONS that I have made or conceived prior to my employment by the EMPLOYER and I desire that the INVENTIONS shall be excluded from this Agreement.

8.    I shall not, for a period of eighteen (18) months following the termination of my employment with the EMPLOYER, directly or indirectly:

(a)    perform services, similar to those I have performed for the EMPLOYER for any person, persons, company, partnership or corporation whose business is competitive with the business being carried on by the EMPLOYER or with respect to such services, solicit any actual or active prospective customer of the EMPLOYER for whom I performed services while employed by the EMPLOYER during the twelve months preceding my termination of employment;

(b)    nor call upon, divert or solicit any person, persons, company, partnership or corporation for the purpose of selling or marketing services or products competitive with the business being carried on by the EMPLOYER;

(c)    nor employ or attempt to employ or assist anyone else to employ any person who is at such time, or at any time during the preceding year, was an employee of or consultant to the EMPLOYER, provided that this clause shall not restrict employment of a third party vendor who supplies generic services to the industry. As used in this section, the verb "employ" shall include its variations, for example, retain, engage or conduct business with.

9.    This Agreement shall be construed in accordance with and governed for all purposes by the laws of the State of Connecticut. The parties have entered into this Agreement in the belief that its provisions are valid, reasonable and enforceable. However, if any one or more of the provisions contained in this Agreement shall, under existing or hereafter enunciated law, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. If, moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to time, duration, geographical scope, activity or subject, it shall be construed, by limited and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

This Agreement supersedes all prior oral or written agreements and is effective with respect to the subject matter hereof subsequent to the date executed.

I acknowledge receipt of an executed copy of this Agreement.

This Agreement is executed this ___20^TH___ day of _December_, 20_02_ at
_Mendon_____, ___MA___.
         city                              state

Actuarial Strategies, Inc.                        EMPLOYEE

BY _Cary Leinbach_____                  Signature _Dana Tatro_____

Print Name __CARY LAKENBACH__          Print Name _Dana Tatro_____

Title _President_____                   Residence _49 George St_____

                                        City _Mendon_____

                                        State _Ma_____

Page 3 of 3

# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARLES DANA TATRO, ) | |
| ) | |
| Plaintiff, ) | Civil Action  No. 4:05-cv-40024-FDS |
| ) | |
| v. ) | |
| ) | |
| ACTUARIAL STRATEGIES, INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |

## AFFIDAVIT OF RITA MCCARTY

I, Rita McCarty, state the following upon my own information and belief:

1.    I am over 18 years of age and I believe in the obligation of an oath.

2.    Unless otherwise stated herein, I have personal knowledge of the facts attested to in this affidavit.

3.    I have worked at Actuarial Strategies, Inc. ("ASI") since November 1999.  My current job title is Director of Operations.

4.    I first met Mr. Tatro while he was interviewing with ASI in late 2002.

5.    I was present when Mr. Tatro signed the ASI Employee Handbook, which in part forbids "the transmittal, retrieval or storage of information that is discriminatory or harassing, obscene, pornographic or X-rated is not permitted."  A true and accurate copy of Mr. Tatro's signed copy of the ASI Employee Handbook is attached hereto as Exhibit A.

6.    While employed by ASI, Mr. Tatro did not perform a significant percentage of the work done for Manulife Financial ("Manulife").  Rather, Jonathan Clymer performed the bulk of this work.  Mr. Clymer worked a total of 1,212 hours for Manulife in 2003 and 2004.  This

41575403_1(HARTFORD)1.DOC
February 28, 2005 8:30 AM

Mr. Tatro did not create any difficulties.  Rather, after he finished speaking with Mr. Lakenbach

he walked ~~into my office~~ and said "I'm sorry." He then left the premises.

    12.    It is my firm belief that Mr. Tatro was terminated solely because he viewed and

downloaded hardcore pornography on his ASI laptop in violation of the policies set forth in the

ASI Employee Handbook.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _____ DAY OF

FEBRUARY, 2005.

                                                    Rita McCarty

Subscribed and sworn to before me this ___ day of February, 2005.

    Notary Public
    My Commission Expires:

                    Karen B Stetson
                    NOTARY PUBLIC
            My Commission Expires Feb. 28, 2007

equates to approximately 95% of the work ASI performed for Manulife during Mr. Tatro's employment at ASI.

7.     In ~~November~~ late RM 2004, I became concerned about Mr. Tatro's productivity. Because of these concerns, I decided to assess Mr. Tatro's productivity by scanning the contents of the laptop computer that ASI had provided to him. Mr. Lakenbach, President of ASI, was neither involved in nor aware of my decision to scan Mr. Tatro's laptop.

8.     With the help of a computer expert under contract with ASI, I scanned the contents of Mr. Tatro's laptop. In doing so, I discovered that Mr. Tatro had downloaded at least sixteen hardcore pornographic movie clips. The scan revealed that he had begun downloading these movie clips during the summer of 2004. In addition, I discovered that, dating back to early 2004, Mr. Tatro had frequently used his ASI laptop to visit pornographic websites. I was morally repulsed by Mr. Tatro's actions. I was particularly offended by the fact that the websites Mr. Tatro visited featured teenage girls, many of whom appeared to be underage.

9.     I was further able to determine that he had visited pornographic websites not only while using his laptop at home, but also on days when he was in ASI's Bloomfield, Connecticut office. In addition, he visited these pornographic websites during work hours.

10.     I informed Mr. Lakenbach of Mr. Tatro's conduct. We both considered his conduct to be in plain violation of the policies set forth in the ASI Employee Handbook. As a result of this violation, Mr. Lakenbach decided to offer Mr. Tatro the opportunity to resign or be terminated.

11.     I was in ASI's Bloomfield, Connecticut office on the day that Mr. Lakenbach spoke with Mr. Tatro about his egregious misuse of his ASI laptop. At my request, the Bloomfield Police were also in the building in case Mr. Tatro created a disturbance. However,



# Employee Handbook

## About This Handbook

The following pages contain information regarding many of the policies and procedures of Actuarial Strategies, Inc. This is not an employment contract and is not intended to create contractual obligations of any kind.

The policies and procedures outlined in this handbook will be applied at the discretion of Actuarial Strategies, Inc. and Actuarial Strategies, Inc. reserves the right to deviate from the policies and procedures of this handbook, or to withdraw or change them, at any time.

Actuarial Strategies, Inc. values the many talents and abilities of its employees and seeks to foster an open, cooperative, and dynamic environment where employees and the company alike can thrive. If you would like further information or have questions about any of the policies and procedures outlined in this handbook, please feel free to bring them to the attention of the Operations Manager or President.

# Table of Contents

ABOUT THIS HANDBOOK ................................................................................................ 2

TABLE OF CONTENTS ................................................................................................... 3

STANDARD EMPLOYMENT PRACTICES ........................................................................ 7

At Will Employment ........................................................................................................... 7

Equal Employment Opportunity ......................................................................................... 7

Sexual and Other Unlawful Harassment ........................................................................... 7

Immigration Law Compliance ............................................................................................. 8

Criminal Convictions ......................................................................................................... 8

Standards of Conduct ....................................................................................................... 8

Personnel File .................................................................................................................... 9

GENERAL POLICIES AND PROCEDURES ...................................................................... 9

Orientation ......................................................................................................................... 9

Reporting Changes ............................................................................................................ 9

Job Classifications ............................................................................................................. 9

Hours of Work ................................................................................................................. 10

Breaks ............................................................................................................................. 10

Salary Increases .............................................................................................................. 10

Payroll ............................................................................................................................. 10

Performance Reviews ...................................................................................................... 10

Expense Reimbursement ................................................................................................. 11

Attendance & Punctuality ................................................................................................ 11

Mandatory Meetings ........................................................................................................ 11

Holidays ........................................................................................................................... 12

Vacations ....................................................................................................................... 12

Drugs and Alcohol ....................................................................................................... 12

Violence & Weapons .................................................................................................... 13

Smoking ........................................................................................................................ 13

Workplace Attire .......................................................................................................... 13

Voice Mail and Electronic Mail ................................................................................... 13

Use of Company Property ............................................................................................ 14

Internet and E-Mail Use .............................................................................................. 14

Personal Property ........................................................................................................ 14

Personal Safety ............................................................................................................ 14

Office Security .............................................................................................................. 14

Monitoring .................................................................................................................... 14

Confidential Information .............................................................................................. 15

Conflicts of Interest ..................................................................................................... 15

LEAVE POLICIES ......................................................................................................... 15

Sick Leave ..................................................................................................................... 15

Jury Duty ....................................................................................................................... 16

Funeral Leave ............................................................................................................... 16

Forced Closings and Severe Weather ......................................................................... 16

EMPLOYEE BENEFITS ................................................................................................ 16

Benefits Eligibility ....................................................................................................... 16

Medical Insurance ........................................................................................................ 16

Profit Sharing Plan ....................................................................................................... 17

Worker's Compensation ............................................................................................... 17

COBRA ........................................................................................................................... 17

p. 5          860 726-9299          Actuarial Strategies          Mar 01 05 04:11p

# DISCIPLINARY POLICIES ................................................................ 17
Problem Resolution ........................................................................ 17

Discipline ...................................................................................... 17

# SEPARATION POLICIES ................................................................ 18
Job Abandonment .......................................................................... 18

Termination .................................................................................... 18

Termination Process ...................................................................... 18

# EXHIBIT A - ACKNOWLEDGEMENT OF RECEIPT & UNDERSTANDING .................. 19

# EXHIBIT B - TRAVEL & EXPENSE POLICY ................................ 20
Original receipts are required for reimbursement of all expenses (except for tips) ............... 20

# EXHIBIT C – INTELLECTUAL PROPERTY AGREEMENT COVENANT NOT TO COMPETE ............................................................................. 22

# EXHIBIT D – LIST OF PRIOR INVENTIONS AND ORIGINAL WORKS OF AUTHORSHIP ................................................................... 25

# EXHIBIT E – INTERNET AND E-MAIL USE POLICY ..................... 26
Section 1 -USE OF CORPORATE ONLINE SYSTEMS ............................... 26

Section 2 - ONLINE SYSTEMS POLICIES ................................................. 27

Section 3 - OWNERSHIP OF ELECTRONIC COMMUNICATIONS .............. 27

Section 4 - MAINTAINING A HOSPITABLE ENVIRONMENT ..................... 28

Section 5 -NON-DISCRIMINATION ............................................................ 28

Section 6 - CONFIDENTIALITY .................................................................. 28

Section 7 -MAINTAINING SYSTEM SECURITY ........................................ 29

Section 8 -COMPANY PUBLIC IMAGE ...................................................... 29

Section 9 - COPYRIGHT ............................................................................ 30

Section 10 -E-MAIL ................................................................................... 30

## Standard Employment Practices

### At Will Employment

Actuarial Strategies, Inc. does not offer tenured or guaranteed employment. Except as Actuarial Strategies, Inc. has otherwise expressly agreed in writing, your employment is at will and may be terminated by you or by Actuarial Strategies, Inc. at any time for any reason, or no reason.

### Equal Employment Opportunity

Actuarial Strategies, Inc. is committed to providing equal employment opportunities to all individuals without regard to race, color, religion, sex, national origin, age, disability, marital status, sexual orientation, or any other characteristic protected by law.

Employees with questions or concerns about any type of discrimination in the work place are encouraged to bring these issues to the attention of the Operations Manager or President of Actuarial Strategies, Inc. Employees can raise legitimate concerns and make good faith reports without fear of reprisal. Anyone found to be engaging in any type of unlawful discrimination will be subject to disciplinary action, up to and including discharge.

### Sexual and Other Unlawful Harassment

Actuarial Strategies, Inc. will endeavor to maintain a work environment that nourishes respect for the dignity of each individual. This policy is adopted in furtherance of that tradition.

It is against the policies of Actuarial Strategies, Inc. for an employee to harass another person because of the person's sex, race, color, religion, national origin, age, disability, sexual orientation, marital status, or other characteristic protected by law. Actions, words, or comments based on such characteristics will not be tolerated.

Consequently, it is against the policies of Actuarial Strategies, Inc. for an employee to sexually harass another person. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when: (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or environment.

Any employee who believes that he or she is being unlawfully harassed should immediately contact the Operations Manager or President.

All complaints of harassment will be promptly, thoroughly and confidentially investigated, and where necessary, appropriate corrective action will be taken. Any person found to have unlawfully harassed another employee will be subject to appropriate disciplinary action, up to and including discharge.

Immigration Law Compliance

Actuarial Strategies, Inc. does not hire anyone that is not a citizen of the United States, or is not a non-citizen that is authorized to work in the U.S. under the Immigration Reform and Control Act of 1986. As a condition of employment, all new and past employees must show valid proof that they are eligible to work in the United States.

Criminal Convictions

Actuarial Strategies, Inc. reserves the right not to hire, or retain anyone that has been convicted of a criminal offense, except as required by Connecticut law. Conviction of a crime that involves dishonesty may result in an automatic termination of employment. Before any decision is made, the nature of the crime and circumstances surrounding the conviction will be considered.

Standards of Conduct

Actuarial Strategies, Inc. expects that all employees conduct themselves in a professional and ethical manner. An employee should not conduct business that is unethical in any way, nor should an employee influence other employees to act unethically. Further, an employee should report any dishonest activities, or damaging conduct to an appropriate supervisor.

In the event that you become aware of another employee's behavior or actions which you believe, are inappropriate, illegal, problematic, or in any way inhibit or affect your job performance or the Actuarial Strategies, Inc. work environment, you should discuss such behavior or actions with the President or Operations Manager or other appropriate management personnel.

All reasonable concerns will be promptly, thoroughly and confidentially investigated by Actuarial Strategies, Inc. and, where necessary, appropriate corrective action will be taken. You should not discuss such actions or behavior with other Actuarial Strategies, Inc. employees. Your discussing such matters with other employees may – in and of itself – create an unacceptable work environment for which you will be held responsible and for which you may be disciplined in accordance with Actuarial Strategies, Inc.'s disciplinary policy.

Personnel File

Actuarial Strategies, Inc. keeps personnel files on each of its employees. These files are confidential in nature, and are managed by the Operations Manager. All employees may obtain a copy of his or her personnel file. Said copy will be provided, upon written request, to the employee within a reasonable period of time.

Employees who wish to review their own personnel file should contact the Operations Manager. With reasonable advance written notice, employees may review their own personnel files in Actuarial Strategies, Inc.'s offices and in the presence of the Operations Manager.

**General Policies and Procedures**

Orientation

In accordance with federal law, both new employees and re-hires will be required to provide documentation of identity and eligibility to work in the United States. The I-9 form will be used for this purpose.

New employees will also receive a copy of the Employee Handbook, and will be given the time to read it, and ask any clarifying questions. The signed copy of the "Acknowledgement & Receipt of Understanding" will be placed in the employees personnel file.

Reporting Changes

You are responsible for promptly notifying the Operations Manager of any change in your name, address, telephone number, marital status, citizenship, tax withholding allowances, emergency contact information, insurance beneficiary, or dependent insurance coverage. Accurate and correct information is vital for benefits and insurance records and other Company files.

Each employee is required to notify management, in advance, of the dates of vacation or leave time to be taken.

Job Classifications

Full-time employees are classified "Exempt" status."

(1) Exempt employees are generally salaried and fall into one or more of the following classifications: executive, professional, and administrative. These employees are exempt from the applicable provisions of state and federal wage and hour laws (FLSA).

Part-time employees are paid on an hourly basis.

Employees are also classified as one of the following three statuses:

(1) Full-time: any employee that is regularly scheduled to work 40 hours a week or more. Full-time employees are eligible for standard company benefits.

(2) Part-time: any employee that is regularly scheduled to work less than 40 hours per week. Part-time employees are not eligible for the standard company benefits.

(3) Temporary: any temporary worked that has a predetermined start and end date of employment. Temporary employees are not eligible for the standard company benefits.

<u>Hours of Work</u>

Actuarial Strategies, Inc.'s standard workweek for full-time employees is five days. Schedules may vary based on the Company's needs.

The office is open from 8:00 a.m. to 5:00 p.m., Mondays through Fridays. Actuarial Strategies, Inc. preference is for employees to work within this schedule. However, it is understood and expected that exempt employees may be periodically required to work extra hours to accommodate certain deadlines. If such extended hours are required, Actuarial Strategies, Inc. will allow some flexibility with the expectation that employees will make every effort to align their hours with office hours. This is in order to facilitate consistent and reliable availability for meetings and other interactions, which are elemental to the smooth operation of this business.

<u>Breaks</u>

Actuarial Strategies, Inc. management determines appropriate lunch breaks. Typically, a meal break is provided consisting of 60 minutes. Meal breaks are scheduled throughout the workday, so as not to disrupt the business processes of Actuarial Strategies, Inc.

<u>Salary Increases</u>

Salary increases are based on performance or promotion. All salary increases are at the discretion of the President.

<u>Payroll</u>

Both exempt and nonexempt employees will have federal and state taxes withheld from their wages. Payroll checks will not be released to anyone other than the employee.

<u>Performance Reviews</u>

Actuarial Strategies, Inc. will endeavor to evaluate each employee's performance at least once a year. Management will give these reviews. The reviews will focus on job-related

strengths and weaknesses, as well as overall fit with the Company.  Based on these performance reviews, Actuarial Strategies, Inc. will endeavor to map out goals and improvement plans each review period.  All performance reviews and responses will become part of an employee's personnel file.

## Expense Reimbursement

Actuarial Strategies, Inc. will reimburse employees for reasonable pre-approved business expenses. Reasonable expenses while traveling on Company business include travel fares, accommodations, meals, tips, telephone and fax charges, entertainment of clients, and purchases on behalf of the Company.  Local expenses include Company purchases, taxi or public transportation fares when on Company business, and entertainment of clients.

All expenses must be submitted to the Operations Manager for reimbursement. Unreasonable or excessive expenses will not be reimbursed.

## Attendance & Punctuality

Regular attendance is important to the smooth operation of Actuarial Strategies, Inc. If you are consistently late or excessively absent, Actuarial Strategies, Inc.'s ability to perform work is affected and an unfair burden is placed on your co-workers. Therefore, unless your absence is permitted or excused under Actuarial Strategies, Inc.'s holiday, vacation, sick leave or other policies, you are responsible for being at work and arriving on time. If you are going to be absent or late, it is your responsibility to call Actuarial Strategies Inc. as soon as possible, preferably in advance of lateness and no later than one hour after the start of the workday. If you are absent for several days, you must notify Actuarial Strategies Inc. each day.

An employee who is absent for reasons other than those permitted or excused by Actuarial Strategies, Inc.'s holiday, vacation, or leave policies, or who repeatedly fails to provide notice as required, will be subject to appropriate disciplinary action, up to and including discharge.

## Mandatory Meetings

Employees may be required to attend mandatory team meetings.

Holidays

The following are paid holidays for eligible employees:

New Year's Day (January 1)
Memorial Day (last Monday in May)
Independence Day (July 4)
Labor Day (first Monday in September)
Thanksgiving Day (fourth Thursday in November) and the following Friday
Christmas Day (December 25)

Note: Actuarial Strategies, Inc. will make reasonable efforts to accommodate holidays pertaining to an employee's established beliefs that are not included in the above list. Employees should speak with their supervisors to obtain approval for taking time off to observe such holidays.

Vacations

Vacation time is offered to full-time eligible employees based on the following schedule:

15 working days per year, earned at a rate of 1-1/4 days for each full month of employment per calendar year.

For employees hired prior to January 1, 2003, an additional two floating vacation days are earned per calendar year.  Any employee hired after January 1, 2003 and has achieved FSA status will also earn an additional two floating vacation days per calendar year.

Vacations are earned from January 1 to December 31 of each calendar year, and are taken in the same year in which they are earned (for example, vacation time earned in 2002 is to be taken between January 1, 2002 and December 31, 2002). Vacation time must be scheduled and approved in advance.  Actuarial Strategies, Inc. will not carry over or pay out any unused vacation time from one year to the next, unless required to do so by state law.

An authorized Company holiday that falls on a normal business day during your vacation is not counted as a vacation day.

When given advance notice, Actuarial Strategies, Inc. will consider requests for additional time without pay. If you have a special type of vacation in mind, talk to management to see what can be worked out.

Drugs and Alcohol

Actuarial Strategies, Inc. will not tolerate the use or possession of alcohol or illegal drugs on the job or on Company property.

Employees using or possessing alcohol or illegal drugs on Company property or while at work or who report to work under the influence of alcohol or illegal drugs will be subject to disciplinary action, up to and including discharge.

Violence & Weapons

Actuarial Strategies, Inc. takes threats of violence extremely seriously. Any act or threat of violence by or against any employee, customer, supplier, partner or visitor is strictly prohibited. This policy applies to all Company employees, whether on or off Company property.

Any use or possession of weapons, whether illegal or not, is prohibited on Company property, or while on Company business. This includes knives, guns, martial arts weapons, or any other object that is used as a weapon. Any employee caught possessing a weapon will be disciplined, up to and including termination.

Smoking

Smoking is not allowed in Actuarial Strategies, Inc. offices.

Workplace Attire

Actuarial Strategies, Inc. has a business casual dress environment.

Employees are to dress in appropriate business attire for meetings with clients or vendors at Actuarial Strategies, Inc.'s offices or other locations.

Voice Mail and Electronic Mail

All electronic and telephone communication systems and all communications and information transmitted by, received from, or stored in these systems are the property of Actuarial Strategies, Inc. and as such are intended for job-related purposes. Personal use should be kept to a minimum. Electronic or telephone communication systems may not be used to transmit messages that may be considered inappropriate under Actuarial Strategies, Inc.'s policies, including those prohibiting harassment. Employees are not permitted to use a code, access a file, or retrieve any stored communication unless authorized to do so or unless they have received prior clearance from an authorized Company representative. All pass codes are the property of Actuarial Strategies, Inc. and may be used by Actuarial Strategies, Inc. to access electronic and telephone communications at any time. Actuarial Strategies, Inc. reserves the right to monitor any electronic, telephone, or other communications made using Actuarial Strategies, Inc. systems or property.

## Use of Company Property

All Company workspace, including file cabinets are the property of Actuarial Strategies, Inc., and must be available to management at all times.

## Internet and E-Mail Use

Please refer to Exhibit E – Internet and E-Mail Use Policy attached.

## Personal Property

Employees may not bring or display in the office any property that may be viewed as inappropriate or offensive to others.

## Personal Safety

The safety of each employee's health and security is very important to Actuarial Strategies, Inc. Actuarial Strategies, Inc. is willing to make reasonable efforts to address an employee's safety concerns. Employees should remember to use caution and good judgment in all activities, and should notify management if they believe there is a safety issue that should be addressed.

## Office Security

Shortly after an employee's start date, he/she may be given a key to gain access to the offices. The last employee to leave the office at night is responsible for making certain that all doors are locked.

## Monitoring

All Company property is subject to monitoring and review at all times. This includes, but is not limited to, computers and email files. Reasons for searches and reviews include, but are not limited to, personal abuse of company property, theft investigation and improper disclosure of confidential information.

Actuarial Strategies, Inc. retains the right to conduct searches at any time. This includes the right to search individual computers or files, even if protected by a password. Any employee that attempts to obtain or alter a password for the purpose of accessing restricted files will be subject to disciplinary action, up to and including termination.

Intellectual Property Agreement And Covenant Not To Compete

Upon employment all employees of Actuarial Strategies, Inc. must sign an Intellectual Property Agreement And Covenant Not To Compete. Any violation of the Intellectual Property Agreement And Covenant Not To Compete may result in immediate discharge.

Confidential Information

Actuarial Strategies, Inc. requires that employees not disclose information held to be confidential by Actuarial Strategies, Inc., and also requires new employees to sign a non-disclosure agreement. Any questions about this policy should be addressed to the President.

Conflicts of Interest

Actuarial Strategies, Inc. requires that employees not compromise the Company, its customers, partners or suppliers for personal gain. Examples of conflict of interest include, but are not limited to conducting business for personal gain. Employees are required to disclose all conflicts of interest to the President. Failure to do may result in disciplinary action, up to and including termination.

**Leave Policies**

As with all policies, Actuarial Strategies, Inc. reserves the right to revise or rescind these policies at its discretion, subject to legal requirements. This statement of leave policies is not intended to create a contract between Actuarial Strategies, Inc. and its employees.

Sick Leave

Sick leave is at management's discretion.

The following guidelines are designed for the proper use of sick leave:

a) If you do not report to work, you must phone Actuarial Strategies or have someone call for you as early as possible after the office opens. This procedure allows your supervisor to rearrange work schedules in your absence.

b) If you must leave the office before closing time because of illness, inform management.

c) If you foresee the need to take sick leave (e.g., for non-emergency surgery or for a doctor's appointment), tell management as soon as possible so that plans can be made to cover your absence.

## Jury Duty

Employees summoned for jury duty will be allowed the necessary time off from work to perform this civic responsibility. Employees must give Actuarial Strategies, Inc. 15 days advance notice. Actuarial Strategies, Inc. may require the employee to supply documentation from the court affirming the employee's jury duty service.

## Funeral Leave

When a death occurs in an employee's immediate family, an employee may take up to three days with pay in order to attend the funeral or make funeral arrangements. In unusual circumstances, additional time off may be granted, with or without pay, at the discretion of Actuarial Strategies, Inc. For purposes of the funeral leave policy, "immediate family" means an employee's spouse or child, as well as a parent, grandparent, brother, or sister of the employee or the employee's spouse.

## Forced Closings and Severe Weather

In the event that the Company closes due to severe weather conditions or another reason, you will not be required to report to work. You will be paid for that day, and it will not be counted as a vacation day.

## Employee Benefits

The following is a list of benefits that Actuarial Strategies, Inc. makes available to Eligible Employees. The descriptions in this handbook are a summary only. The separate plan documents explain each benefit in more detail and the language of the plans' documents controls the various plans. Benefits may be modified, added or terminated at any time by the insurance company or benefit provider, per the terms of the plan, or by Actuarial Strategies, Inc., at its discretion.

## Benefits Eligibility

Full-time employees that have successfully completed the evaluation period are eligible for the benefits outlined below. Part-time employees (less than 40 hours per week), are not eligible for these benefits.

## Medical Insurance

Medical insurance is available for Eligible Employees and their qualified dependents. Refer to the plan summary for details regarding coverage, eligibility, waiting periods and cost.

## Profit Sharing Plan

Employees are eligible after two years of service.  Refer to the plan summary for details regard this plan.

## Worker's Compensation

Actuarial Strategies, Inc. requires that all employees report job-related accidents or injuries to a supervisor immediately, whether the accident occurred on or off Company premises. Failure to report an injury, regardless of how minor, could result in difficulty with the employee's claim.

All workers' compensation claims will be paid directly to employees, and employees are expected to return to work immediately upon release by their doctor.

## COBRA

The Consolidated Omnibus Budget Reconciliation Act (COBRA) gives employees and their qualified beneficiaries the opportunity to continue health coverage under the Company's health plan, should the employee lose his or her eligibility (e.g., upon termination).  Under COBRA, the employee pays the full cost of coverage at the Company's group rate, plus an administrative fee.  Details of COBRA coverage and how to apply for it will be provided by a Human Resources Manager at the time eligibility is lost.

## Disciplinary Policies

### Problem Resolution

Actuarial Strategies, Inc. seeks to deal openly and directly with its employees, and believes that communications between employees and management is critical to solving problems.

Employees that have a problem with any individual within the company should first go to the individual and state the problem.  If a resolution cannot be agreed upon, the employee should present his or her problem, to the Company President.

### Discipline

Actuarial Strategies, Inc.'s policy is to attempt to deal constructively with employee performance problems and employee errors. The disciplinary process will be determined by Actuarial Strategies, Inc. in light of the facts and circumstances of each case. Depending upon the facts and circumstances, the discipline applied may include, among other things, oral or written warnings, or immediate discharge. Each situation will be considered in light of a variety of factors including, but not limited to, the seriousness of the situation, the employee's past conduct and length of service, and the nature of the employee's previous

performance or incidents involving the employee. Details of this process are outlined further in the Corrective Action section below.

**Separation Policies**

Job Abandonment

Employees of Actuarial Strategies, Inc. that are absent for more than two consecutive days without notifying management are considered to have voluntarily abandoned their employment with the Company. The effective date of termination will be the last day the employee reported for work. If an employee abandons a job, he or she will not be entitled to accrued vacation days, unless required by law.

Termination

Actuarial Strategies, Inc. does not have tenure or guaranteed employment. You or Actuarial Strategies, Inc. may terminate your employment at any time for any reason, or no reason.

Termination may result from any of the following: (i) Corrective action measures, which include infractions for violation of company policies, and (ii) involuntary dismissal, which may include poor performance reviews or failure to demonstrate an acceptable attitude in the workplace.

Termination Process

Actuarial Strategies, Inc. requires that employees return all documents, files, computer equipment, uniforms, company tools, business credit cards, keys and other Company owned property on or before the last day of work. When all Company owned property has been collected, the employee will receive his or her final paycheck.

Employment References

The Operations Manager will provide dates of employment and positions held only.



Inc.

## EXHIBIT A - Acknowledgement of Receipt & Understanding

I hereby certify that I have read and fully understand the contents of this Employee Handbook. I also acknowledge that I have been given the opportunity to discuss any policies contained in this handbook with a Company official. I agree to abide by the policies set forth in this handbook, and understand that compliance with Actuarial Strategies, Inc.'s rules and regulations is necessary for continued employment. My signature below certifies my knowledge, acceptance and adherence to the Company's policies, rules, and regulations.

I acknowledge that the Company reserves the right to modify or amend its policies at any time, without prior notice. These policies do not create any promises or contractual obligations between this Company and its employees.

Signature _____     Date _12/20/02_

_Dana Tatro_
Name (Printed)



Inc.

**Exhibit B - Travel & Expense Policy**

This guide is to help you manage internal and client related expenses.  As with everything, we expect you to act responsibly and professionally when incurring and submitting costs.

Please use the following guidelines to learn about reimbursable expenses. If you have any questions, please see the Operations Manager.

<u>General Guidelines</u>

Original receipts are required for reimbursement of all expenses (except for tips).

Expenses must be submitted within thirty days to the Operations Manager.

Expenses will be paid to employees at the end of the month in which expenses were incurred, provided all expenses are reasonable and have receipts attached.

Use your American Express Corporate Card when possible—in addition to convenience, it provides insurance coverage and other benefits.

<u>Ground Travel</u>

Actuarial Strategies, Inc. does not pay for "normal travel" to and from the office. Travel outside of normal business hours (between 8:00 p.m. and 6:00 a.m. weekdays) will be reimbursed if you work more than 10 hours that day. Holiday and weekend travel to and from the office will be reimbursed if you work more than four hours.

You are strongly encouraged to use public transportation when available and practical. If not, use a taxi. Car services should be limited to airports and hard to reach places, or when other transportation is not practical.

If you use your car for business travel, you will be reimbursed at Federal income tax deductible limits as determined by Actuarial Strategies for mileage.  You will also be reimbursed for other charges such as tolls and parking fees. You will not be reimbursed for fuel, maintenance, traffic or parking violations.

If you are on a company trip, you should only rent cars when public transportation is not convenient or readily available and where the use of taxis would be more expensive. We always rent mid-size or compact. If you use your American Express Corporate Card, you

will be covered for all insurance and liability, so you do not need to accept the rental company's plans.

<u>Traveling on Actuarial Strategies, Inc. Business</u>

Travel and related expenses must be pre-approved by the President.

Travel arrangements including airfare, hotel and automobile rentals are made by the Operations Manager.

Travel plans frequently change, so make sure the Operations Manage is apprised of any cancellations that need to me made — you will be held responsible for any costs incurred if you don't.

<u>Non-reimbursable travel expenses</u>

The following expenses are not reimbursable:

Personal travel insurance
Personal reading materials
Personal grooming services (shoe shines, haircuts, manicures...)
Toiletries, cosmetics, or other grooming products
Expenses incurred by spouses, children, or relatives
In-room movies or video games



**Exhibit D – List of Prior Inventions and Original Works of Authorship**

Identifying Number
____Title____          ____Date____                          or Brief Description

___ No inventions or improvements
___ Additional Sheets Attached

Signature of Employee: _Dora te_____

Print Name of Employee: _Dora Tutro_

Date: _12/20/02_____

Actuarial Strategies, Inc. 11-15-02
Page 25



Inc.

**Exhibit E – Internet and E-Mail Use Policy**

**PLEASE READ THIS AGREEMENT CAREFULLY. THIS AGREEMENT DESCRIBES THE BASIC RESPONSIBILITIES THAT YOU ARE REQUIRED TO OBSERVE AS AN EMPLOYEE IN USING CORPORATE ONLINE SYSTEMS. ACTUARIAL STRATEGIES, INC. BELIEVES THAT THIS AGREEMENT STRIKES A FAIR BALANCE BETWEEN THE COMPANY'S INTERESTS AND YOUR INDIVIDUAL RIGHTS, NEEDS AND EXPECTATIONS. THIS AGREEMENT HAS BEEN MADE TO PROTECT BOTH YOU AND THE COMPANY BY BEING AS CLEAR AND PRECISE AS POSSIBLE.**

This Agreement, effective as of the date shown below, by and between Actuarial Strategies, Inc. and you, as an employee:

**Section 1 - USE OF CORPORATE ONLINE SYSTEMS**

Corporate online systems (including but not limited to online services, e-mail and Internet access) increase company production and employee effectiveness, but they can become a time waster instead of enhancing production if used without policy guidelines. The Company has total discretion over employee's access privileges and the nature of public discussions on the online system, making it a productive and stable environment.

Corporate online systems are company properties that are provided for general business purposes to increase production and employee effectiveness only. To ensure the use of company online systems in a productive manner, a list of guidelines has been established. All employees are required to abide by these guidelines; any improper use of corporate online systems is not acceptable and will not be permitted.

_Employees are not permitted to access files, messages, or any documents or correspondence created by or intended for other employees or for third parties, unless directed to do so by Actuarial Strategies, Inc. management._

**Section 2 - ONLINE SYSTEMS POLICIES**

**2.1 Monitoring Tools.** Actuarial Strategies, Inc. routinely monitors usage patterns for its online communications. The reasons for monitoring are _to monitor compliance with applicable laws_ and to leverage online productivity, as well as

for better planning and management of network resources. _Understand that by accepting these policies, and affixing your signature, gives Actuarial Strategies, Inc. written consent to monitor e-mail communications and the individual employee's compliance with these Policies._

a. **Blocking of Internet Access**. Different access and service levels for different types of personnel may be given to employees depending on the nature of the work. Company reserves the absolute right to block access to certain Internet sites if it becomes necessary.

b. **Reasons for Policies**.

   a. To collect data for Internet access and to ensure that productivity during work hours stays productive
   b. To track and control the flow of traffic
   c. To improve capacity planning
   d. To decrease network slowdown and keep productivity up
   e. To maintain good availability of network bandwidth
   f. To reduce cost
   g. To guard against the introduction of unwanted "clutter" and computer viruses
   h. To ensure compliance with applicable laws and regulations.

## Section 3 - OWNERSHIP OF ELECTRONIC COMMUNICATIONS

3.1 **All Communications Over Corporate Online Systems Are Property of Actuarial Strategies, Inc.** All messages created, sent, or retrieved over the corporate online systems are the property of Employer, and employees should not assume electronic communications are totally private. The employer reserves the absolute right to access and monitor all messages and files on the corporate online systems. Actuarial Strategies, Inc. _reserve the right, without notice to the employee, or in the employee's absence, to access and review electronic files, messages, mail, etc., and to monitor the use of electronic communications as is necessary to ensure that there is no misuse of violation of Company policy or any law._

## Section 4 - MAINTAINING A HOSPITABLE ENVIRONMENT

4.1 **Maintaining A Hospitable Environment.** To ensure corporate online systems a productive and stable environment, the transmittal, retrieval or storage of information that is discriminatory or harassing, obscene, pornographic or X-rated is not permitted. The use of corporate online systems for personal gain or any other purpose which is illegal or against company policy or contrary to the company's best interest is not permitted.

## Section 5 -NON-DISCRIMINATION

**5.1 Non-Discrimination.**    The transmittal of messages with derogatory or inflammatory remarks about a person's race, color, sex, age, disability, religion, national origin, physical attributes and sexual preference is strictly prohibited. *Similarly prohibited is any communication, electronic or otherwise, that contains content that may be reasonably considered offensive or disruptive to any employee, client, representative or contractor. "Offensive conduct" includes, but is not limited to, sexual comments or images, racial slurs, gender-specific comments, or any comments that could offend someone on the basis of his or her age, sexual orientation, religious or political beliefs, national origin or ancestry, color, physical or mental disability, medical conditions, marital status, pregnancy, childbirth or related medical condition.*

## Section 6 - CONFIDENTIALITY

**6.1 Communications of Messages Disclosing Trade Secrets is Prohibited.** You should recognize that your position with the Company requires considerable responsibility and trust.  Relying on your ethical responsibility and undivided loyalty, the Company expects to entrust you with highly sensitive, confidential, restricted, and proprietary information involving Proprietary Information and Trade Secrets (as defined in Section 6.2).  You are legally and ethically responsible for protecting and preserving the Company's proprietary rights. No messages disclosing sensitive, confidential, restricted, non-public, or proprietary information involving trade secrets can be transmitted over the corporate online systems.  Discussion of any internal company affairs on any online system other than the in-house system may also be prohibited.

**6.2 Trade Secrets Defined.**    For purposes of this Agreement, "Proprietary Information" and "Trade Secrets" is any information, including, but not limited to:

(1)    The operation of Company's business, consisting, for example, and not intending to be inclusive, of its lists or other identifications of clients or prospective clients of the Company (and key individuals employed or engaged by such clients or prospective clients), fee charged or to be charged, proposals, inventions, methodologies, algorithms, formulae, processes, compilations of information, form and content of databases, designs, drawings, models, equipment, results of research proposals, technical or non-technical data, patterns, programs, devices, techniques, product plans, job notes, reports, records, specifications, software, firmware and procedures used in, or related to, Company's products;

(2)    Company's relations with its employees including without limitation, salaries, job classifications and skill levels;

(3)     Financial, sales and marketing data compiled by Company as well as Company's financial sales and marketing plans and marketing plans and strategies, lists of actual or potential customers or suppliers and non-public pricing that derive economic value, actual or potential, from not being generally know to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use;

(4)     All ideas, concepts, information and written material about a client disclosed to Employee by Company, or acquired from a client of Company, and all financial, accounting, statistical, personnel and business data and plans of clients, are and shall remain the sole and exclusive property and proprietary information of the Company, or said client;

(5)     Any and all information that can reasonably be construed as private must be kept confidential.  If uncertain, you are required to ask and obtain permission from management prior to the release of any information which might be proprietary.

## Section 7 - MAINTAINING SYSTEM SECURITY

**7.1 Keeping the Online System Secure From Computer Viruses.** No unauthorized downloading/uploading of software or files is allowed in order to prevent viruses from entering the corporate online systems.  All software downloaded must be authorized by, and registered to, the Company.  You must obtain permission from MIS prior to downloading software.

**7.2 Infringement Risk.** Employee stocking *or using* unauthorized software is illegal and therefore strictly prohibited.

## Section 8 - COMPANY PUBLIC IMAGE

**8.1 Employees' Conduct in Public.** Corporate online systems is a public place for business communications, and all communications over corporate online systems reflect corporate image.  All employees are, therefore, responsible to maintain and enhance the *corporation's* public image, and no abusive, discriminatory, harassing, inflammatory, profane, pornographic or offensive language or other materials are to be transmitted through the corporate online system.

**8.2 Employees' Identity.** No message can be transmitted without the employee's identity.  Transmittal of messages with anonymous or fictitious names is prohibited.

## Section 9 - COPYRIGHT

9.1   **Intellectual Property Infringement.   Actuarial Strategies, Inc.** does not permit copying, downloading, or distributing any copyrighted materials including but not limited to messages, e-mail, text files, program files, image files, database files, sound files and music files through the corporate online systems.  *Please note that text, graphics and software that appear to be freely available on the Internet are often subject to intellectual property laws that limit their copying, distribution, and use.  You should also be aware that violations of copyright and intellectual property laws may lead to personal liability and, in addition, legal action against your Employer.*

## Section 10 -E-MAIL

10.1.   **E-mail is not guaranteed to be private.**  People who operate the system do have access to all mail.  Please note that even when the message is deleted, it is still possible to recreate the message.

10.2.   **Non-business related e-mail** is permitted to and from your e-mail address, but responding to non-business e-mail is allowed only during non-business hours.

10.3.   **E-mail that is sexually explicit, obscene,** offensive, threatening, degrading or otherwise intended to harass or demean recipients is strictly prohibited.

10.4.   **Do not subscribe to updates,** notices or other automatic e-mail services unless it has a clear business purpose.  This is to limit 'junk' or unsolicited e-mail.

10.5.   **E-mail is *NOT* casual conversation.**  E-mail leaves a permanent record and is limited in its capacity to convey context and emotion.

10.6.   **Personal e-mail must contain disclosures.**  While we permit some non-business related e-mail, you must be careful to include a disclaimer in all Internet postings making it clear that you are speaking ONLY for yourself, and not the Company.  An example of such a disclaimer is, *"The contents of this message relates to and represents solely the individual sender, and does not purport to represent or be authorized by the Company."*

## Section 11 -VIOLATIONS

11.1.   **Failure to Comply.**  Failure to comply with this policy may result in disciplinary action up to and including termination.

**ACCEPTED:**

As an employee of Actuarial Strategies, Inc. I have received a copy of the corporation's Policy Guidelines on e-mail and the Internet system. I hereby accept and agree to abide by the standards set in the Policy for the duration of my employment with Actuarial Strategies, Inc.

_____          _____
Employee Signature                                Date

_____
Employee Print Name



Inc.

## Exhibit F –Termination Certification

This is to certify that I do not have in my possession, nor have I failed to return, any software, devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to Actuarial Strategies, Inc. Incorporated, its subsidiaries, affiliates, successors or assigns (together the "Company").

I further certify that I have complied with all the terms of the Company's Employment, Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the Employment, Confidential Information and Invention Assignment Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months from this date, to the extent permitted by law, I will not hire any employees of the Company and I will not solicit, induce, recruit or encourage any of the Company's employees to leave their employment.

I further agree that for twelve (12) months from this date, to the extent permitted by law, I will not either directly or indirectly engage in (whether as an employee, consultant, proprietor, partner, director or otherwise), or have any ownership interest in, or participate in the financing, operation, management or control of, any person, firm, corporation or business that engages or proposes to engage in a business competitive with any business in which the Company was engaged during the term of my employment or in which, during the term of my employment, the Company proposed to later become engaged. The scope of this covenant shall be worldwide. I acknowledge that the Company's technology and products have worldwide application, including without limitation over the Internet, and that such scope is reasonable.

_____

(Employees Signature)

Date: _____

_____

(Type/Print Employees Name)

# EXHIBIT 5



**Exhibit E – Internet and E-Mail Use Policy**

**PLEASE READ THIS AGREEMENT CAREFULLY. THIS AGREEMENT DESCRIBES THE BASIC RESPONSIBILITIES THAT YOU ARE REQUIRED TO OBSERVE AS AN EMPLOYEE IN USING CORPORATE ONLINE SYSTEMS. ACTUARIAL STRATEGIES, INC. BELIEVES THAT THIS AGREEMENT STRIKES A FAIR BALANCE BETWEEN THE COMPANY'S INTERESTS AND YOUR INDIVIDUAL RIGHTS, NEEDS AND EXPECTATIONS. THIS AGREEMENT HAS BEEN MADE TO PROTECT BOTH YOU AND THE COMPANY BY BEING AS CLEAR AND PRECISE AS POSSIBLE.**

This Agreement, effective as of the date shown below, by and between Actuarial Strategies, Inc. and you, as an employee:

## Section 1 -USE OF CORPORATE ONLINE SYSTEMS

Corporate online systems (including but not limited to online services, e-mail and Internet access) increase company production and employee effectiveness, but they can become a time waster instead of enhancing production if used without policy guidelines. The Company has total discretion over employee's access privileges and the nature of public discussions on the online system, making it a productive and stable environment.

Corporate online systems are company properties that are provided for general business purposes to increase production and employee effectiveness only. To ensure the use of company online systems in a productive manner, a list of guidelines has been established. All employees are required to abide by these guidelines; any improper use of corporate online systems is not acceptable and will not be permitted.

_Employees are not permitted to access files, messages, or any documents or correspondence created by or intended for other employees or for third parties, unless directed to do so by Actuarial Strategies, Inc. management._

## Section 2 - ONLINE SYSTEMS POLICIES

**2.1 Monitoring Tools.** Actuarial Strategies, Inc. routinely monitors usage patterns for its online communications. The reasons for monitoring are _to monitor compliance with applicable laws_ and to leverage online productivity, as well as

for better planning and management of network resources. _Understand that by accepting these policies, and affixing your signature, gives Actuarial Strategies, Inc. written consent to monitor e-mail communications and the individual employee's compliance with these Policies._

a. **Blocking of Internet Access**. Different access and service levels for different types of personnel may be given to employees depending on the nature of the work. Company reserves the absolute right to block access to certain Internet sites if it becomes necessary.

b. **Reasons for Policies**.

   a. To collect data for Internet access and to ensure that productivity during work hours stays productive
   b. To track and control the flow of traffic
   c. To improve capacity planning
   d. To decrease network slowdown and keep productivity up
   e. To maintain good availability of network bandwidth
   f. To reduce cost
   g. To guard against the introduction of unwanted "clutter" and computer viruses
   h. To ensure compliance with applicable laws and regulations.

## Section 3 - OWNERSHIP OF ELECTRONIC COMMUNICATIONS

3.1 **All Communications Over Corporate Online Systems Are Property of Actuarial Strategies, Inc.** All messages created, sent, or retrieved over the corporate online systems are the property of Employer, and employees should not assume electronic communications are totally private. The employer reserves the absolute right to access and monitor all messages and files on the corporate online systems. Actuarial Strategies, Inc. _reserve the right, without notice to the employee, or in the employee's absence, to access and review electronic files, messages, mail, etc., and to monitor the use of electronic communications as is necessary to ensure that there is no misuse of violation of Company policy or any law._

## Section 4 - MAINTAINING A HOSPITABLE ENVIRONMENT

4.1 **Maintaining A Hospitable Environment.** To ensure corporate online systems a productive and stable environment, the transmittal, retrieval or storage of information that is discriminatory or harassing, obscene, pornographic or X-rated is not permitted. The use of corporate online systems for personal gain or any other purpose which is illegal or against company policy or contrary to the company's best interest is not permitted.

## Section 5 -NON-DISCRIMINATION

**5.1 Non-Discrimination.**    The transmittal of messages with derogatory or inflammatory remarks about a person's race, color, sex, age, disability, religion, national origin, physical attributes and sexual preference is strictly prohibited. *Similarly prohibited is any communication, electronic or otherwise, that contains content that may be reasonably considered offensive or disruptive to any employee, client, representative or contractor. "Offensive conduct" includes, but is not limited to, sexual comments or images, racial slurs, gender-specific comments, or any comments that could offend someone on the basis of his or her age, sexual orientation, religious or political beliefs, national origin or ancestry, color, physical or mental disability, medical conditions, marital status, pregnancy, childbirth or related medical condition.*

## Section 6 - CONFIDENTIALITY

**6.1 Communications of Messages Disclosing Trade Secrets is Prohibited.** You should recognize that your position with the Company requires considerable responsibility and trust.   Relying on your ethical responsibility and undivided loyalty, the Company expects to entrust you with highly sensitive, confidential, restricted, and proprietary information involving Proprietary Information and Trade Secrets (as defined in Section 6.2).    You are legally and ethically responsible for protecting and preserving the Company's proprietary rights.  No messages disclosing sensitive, confidential, restricted, non-public, or proprietary information involving trade secrets can be transmitted over the corporate online systems.  Discussion of any internal company affairs on any online system other than the in-house system may also be prohibited.

**6.2 Trade Secrets Defined.**    For purposes of this Agreement,  "Proprietary Information" and "Trade Secrets" is any information, including, but not limited to:

(1)       The operation of Company's business, consisting, for example, and not intending to be inclusive, of its lists or other identifications of clients or prospective clients of the Company (and key individuals employed or engaged by such clients or prospective clients), fee charged or to be charged, proposals, inventions, methodologies, algorithms, formulae, processes, compilations of information, form and content of databases, designs, drawings, models, equipment, results of research proposals, technical or non-technical data, patterns, programs, devices, techniques, product plans, job notes, reports, records, specifications, software, firmware and procedures used in, or related to, Company's products;

(2)       Company's relations with its employees including without limitation, salaries, job classifications and skill levels;

(3)     Financial, sales and marketing data compiled by Company as well as Company's financial sales and marketing plans and marketing plans and strategies, lists of actual or potential customers or suppliers and non-public pricing that derive economic value, actual or potential, from not being generally know to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use;

(4)     All ideas, concepts, information and written material about a client disclosed to Employee by Company, or acquired from a client of Company, and all financial, accounting, statistical, personnel and business data and plans of clients, are and shall remain the sole and exclusive property and proprietary information of the Company, or said client;

(5)     Any and all information that can reasonably be construed as private must be kept confidential. If uncertain, you are required to ask and obtain permission from management prior to the release of any information which might be proprietary.

## Section 7 – MAINTAINING SYSTEM SECURITY

**7.1 Keeping the Online System Secure From Computer Viruses.**  No unauthorized downloading/uploading of software or files is allowed in order to prevent viruses from entering the corporate online systems.  All software downloaded must be authorized by, and registered to, the Company. You must obtain permission from MIS prior to downloading software.

**7.2 Infringement Risk.** Employee stocking _or using_ unauthorized software is illegal and therefore strictly prohibited.

## Section 8 – COMPANY PUBLIC IMAGE

**8.1 Employees' Conduct in Public.** Corporate online systems is a public place for business communications, and all communications over corporate online systems reflect corporate image. All employees are, therefore, responsible to maintain and enhance the _corporation's_ public image, and no abusive, discriminatory, harassing, inflammatory, profane, pornographic or offensive language or other materials are to be transmitted through the corporate online system.

**8.2 Employees' Identity.** No message can be transmitted without the employee's identity.  Transmittal of messages with anonymous or fictitious names is prohibited.

Actuarial Strategies, Inc. 10-26-02
Page 29

## Section 9 - COPYRIGHT

9.1 **Intellectual Property Infringement.   Actuarial Strategies, Inc.** does not permit copying, downloading, or distributing any copyrighted materials including but not limited to messages, e-mail, text files, program files, image files, database files, sound files and music files through the corporate online systems.  *Please note that text, graphics and software that appear to be freely available on the Internet are often subject to intellectual property laws that limit their copying, distribution, and use.  You should also be aware that violations of copyright and intellectual property laws may lead to personal liability and, in addition, legal action against your Employer.*

## Section 10 -E-MAIL

10.1. **E-mail is not guaranteed to be private.**  People who operate the system do have access to all mail.  Please note that even when the message is deleted, it is still possible to recreate the message.

10.2. **Non-business related e-mail** is permitted to and from your e-mail address, but responding to non-business e-mail is allowed only during non-business hours.

10.3. **E-mail that is sexually explicit, obscene,** offensive, threatening, degrading or otherwise intended to harass or demean recipients is strictly prohibited.

10.4. **Do not subscribe to updates,** notices or other automatic e-mail services unless it has a clear business purpose.  This is to limit 'junk' or unsolicited e-mail.

10.5. **E-mail is *NOT* casual conversation.**  E-mail leaves a permanent record and is limited in its capacity to convey context and emotion.

10.6. **Personal e-mail must contain disclosures.**  While we permit some non-business related e-mail, you must be careful to include a disclaimer in all Internet postings making it clear that you are speaking ONLY for yourself, and not the Company.  An example of such a disclaimer is, *"The contents of this message relates to and represents solely the individual sender, and does not purport to represent or be authorized by the Company."*

## Section 11 -VIOLATIONS

11.1. **Failure to Comply.**  Failure to comply with this policy may result in disciplinary action up to and including termination.

**ACCEPTED:**

As an employee of Actuarial Strategies, Inc. I have received a copy of the corporation's Policy Guidelines on e-mail and the Internet system. I hereby accept and agree to abide by the standards set in the Policy for the duration of my employment with Actuarial Strategies, Inc.

_____          _____
Employee Signature                        Date

_____
Employee Print Name

# EXHIBIT 6

49 George St
Mendon, MA 01756

Home: (508) 634 2067
Mobile: (508) 254-5829

# Charles Dana Tatro FSA, MAAA

**Experience**          2003– 2004          Actuarial Strategies          Bloomfield, CT
**Vice President & Consulting Actuary**

- Responsible for VA and VUL marketing activities
- Generated $600K of business in 2004
- Developed and maintained relationships with new and existing clients
- Developed innovative VA and VUL designs
- Worked closely with marketing groups of major insurance companies and brokerage firms to determine suitable products for their distribution
- Developed pricing and reserving models for VUL, VA and UL products
- Developed RSLN2 generator and stochastic model for use with equity guarantees, FAS 133, C3 P2, SOP 03-1, and hedging analysis
- Analyzed capital solutions such as hedging programs, securitization and cat cover for VA guarantees and life products
- Developed marketing platform and systems for securitization of AXXX and XXX reserves
- Managed Staff on 1

2001 - 2003          Allmerica Financial          Worcester, MA
**Vice President and Chief Actuary**

- Responsible for Life and P&C pricing and reserve review
- Member of Executive Committee responsible for the review and approval of all Allmerica initiatives
- Developed enterprise risk management group and risk monitoring platform
- Responsible for capital management and capital financing
- Indirectly managed actuarial staff for life and P&C
- worked closely with ratings agencies and regulators

1993 – 2003          Manulife Financial          Boston, MA
**AVP and Pricing Officer, U.S Annuities**

- VA pricing and design, including equity guarantees
- Assisted in the implementation of MCCSR for seg fund guarantees for annuity business
- working closely with WoodLogan in the development of annuity products
- member of U.S ALCO
- working closely with systems, administration and filing areas in the implementation of annuity products
- Managed reinsurance programs and risk management for U.S Annuity

Division
- development of new business plan
- Managed staff of 4

**Education**     1987 - 1991     University of Connecticut     Storrs, CT
- B.S, Actuarial Science.