UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARLES DANA TATRO, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | No. 05-cv-40024-FDS |
| ) | |
| ACTUARIAL STRATEGIES, INC., ) | |
| ) | |
| Defendant. ) | |

# MEMORANDUM & ORDER ON
# PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**SAYLOR, J.**

Charles Dana Tatro seeks preliminary injunctive relief against his former employer, Actuarial Strategies, Inc. ("ASI"), enjoining ASI from enforcing a covenant not to compete that he signed when he accepted his employment with ASI. The Court held a hearing on the motion on March 4, 2005, and denied the motion in open court. What follows is a more complete statement of the Court's reasons for that decision.

**I.    Factual Background**

Except where so noted, the following facts are not in dispute.

Tatro is an actuary who resides in Mendon, Massachusetts. He graduated from the University of Connecticut in 1991 and is a Fellow of the Society of Actuaries. Tatro was employed by Manulife Financial in Boston as Actuary Vice President and Pricing Officer for the period from 1993 to 2001. After that, Tatro joined Allmerica Financial Corporation in Worcester as Vice President and Chief Actuary for the years 2001 to 2003. Tatro's main area of expertise is variable-annuity product development, risk management, and valuation.

ASI is an actuarial consulting firm located in Bloomfield, Connecticut. Cary Lakenbach, the president of ASI, started the company and remains one of only five ASI employees. ASI focuses on developing new products for insurance companies and financial services institutions. ASI considers itself to be a creative product-development enterprise that identifies market opportunities and structures products to take advantage of those opportunities.

ASI's most significant product is its Total Retirement Income Program ("TRIP"). TRIP is a proprietary product of ASI that simplifies the application and underwriting process for life-insurance policies so that such policies may be sold more easily by a broad range of financial-services professionals. ASI is in the process of seeking a patent for TRIP. Like most companies, ASI also has marketing strategies, customer lists, and other business information that are proprietary and that it seeks to protect as confidential.

In December 2002, while Tatro was employed at Allmerica, Lakenbach offered him a position as a consulting actuary with ASI. When Lakenbach approached Tatro, Tatro had approximately twelve years of actuarial experience for Manulife and Allmerica, both of which are large insurance companies. According to Tatro, ASI principally sought his services based upon his experience in the area of variable annuities. Tatro contends that Lakenbach led him to believe that the employment opportunity with ASI was based upon ASI's desire to expand into the area of variable annuities, which were not being pursued aggressively by ASI at that time.

According to Lakenbach, he envisioned that Tatro would eventually become a principal of ASI and would evolve into a successful rainmaker for the company. Tatro was to have a variety of responsibilities, including client management, execution of new business opportunities, and offering advice on ASI's business management. Tatro's starting salary was to be $170,000, and

2

he was eligible to receive significant discretionary bonuses.

Lakenbach formalized the offer in a letter dated December 16, 2002, that set forth various employment terms. Tatro accepted Lakenbach's offer on December 20, 2002, and countersigned the offer letter.

Tatro's employment was conditional, among other things, upon his execution of an agreement entitled Intellectual Property Agreement Covenant Not to Compete [*sic*] (the "Covenant"). Tatro executed the Covenant on December 20, 2002, the same day that he formally accepted ASI's offer of employment.

Paragraph 8 of the Covenant states, in part, that:

I shall not, for a period of eighteen (18) months following the termination of my employment with [ASI], directly or indirectly:

(a) perform services, similar to those I have performed for [ASI] for any person, persons, company, partnership or corporation whose business is competitive with the business being carried on by [ASI] or with respect to such services, solicit any actual or active prospective customer of [ASI] for whom I performed services while employed by [ASI] during the twelve months preceding my termination of employment;

(b) nor call upon, divert or solicit any person, persons, company, partnership or corporation for the purpose of selling or marketing services or products competitive with the business being carried on by [ASI].

(Covenant, ¶ 8.) The Covenant further provides that if any of its provisions is held to be "excessively broad as to time, duration, geographical scope, activity or subject, it shall be construed, by limited [*sic*] and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear." (¶ 9.)

According to Tatro, it was his impression, "based upon both conversations he had with Mr. Lakenbach in conjunction with the initial interviewing process, together with the agreement

itself that [the Covenant] was being entered into primarily and for the sole purpose of protecting proprietary rights to products the Defendant had developed and patented." (Plaintiff's Mem. at 2.) Tatro claims that it was only because of this understanding of the Covenant that he agreed to sign it. The Covenant contains an integration clause that states in part, "This Agreement supersedes all prior oral or written agreements."

Tatro was also required to sign, as a condition of employment, ASI's Policy Guidelines on E-mail and the Internet System ("ASI's Internet Policy"). ASI's Internet Policy provides in part that "the transmittal, retrieval or storage of information that is discriminatory or harassing, obscene, pornographic or X-rated is not permitted." ASI's Internet Policy also states that "[f]ailure to comply with this policy may result in disciplinary action up to and including termination."

Finally, Tatro was required to sign an Actuarial Strategies Employee Handbook, which specifically states (under the heading "<u>At Will Employment</u>") that "[ASI] does not offer tenured or guaranteed employment. Except as [ASI] has otherwise expressly signed in writing, your employment is at will and may be terminated by you or by [ASI] at any time for any reason, or no reason."

Tatro's employment with ASI officially commenced on January 6, 2003. In October or November 2003, Tatro was promoted to Vice President and Consulting Actuary in Charge of Variable Annuities. In the course of his employment, ASI afforded Tatro access to information about ASI's products (including TRIP), services, customers, pricing policies, marketing plans and strategies, product development techniques and plans, personnel, salaries and performance information, and business plans. Tatro was allowed to work from home three days a week and

4

report to the office only two days per week.

Tatro brought two significant clients to ASI: Manulife and Merrill Lynch. As noted above, Tatro formerly worked at Manulife. ASI claims, however, that Tatro actually played little role in providing services to Manulife or otherwise maintaining that client relationship. Tatro also had a connection with Merrill Lynch and procured some work for ASI from that company.

Both parties report that the relationship between ASI and Tatro began to deteriorate by 2004. According to ASI, Tatro had a difficult personality, and he was not as productive as expected. Questions about his productivity caused Rita McCarty, ASI's director of operations, to scan the laptop computer that ASI had provided Tatro for use in connection with his work duties.

In doing so, Ms. McCarty discovered that Tatro had downloaded pornographic materials onto the laptop. ASI determined that, dating back to at least early 2004, Tatro had apparently spent many hours using his ASI laptop to visit pornographic web sites while working both from home and from ASI's Bloomfield facility. Because Tatro's conduct violated ASI's Internet Policy, Lakenbach informed Tatro that he would be terminated effective November 5, 2004, unless he voluntarily resigned before then.

Tatro's version of events is somewhat different. He claims that, sometime in 2004, his suspicions and fears regarding ASI's commitment to developing the variable-annuity business began to increase. Lakenbach requested that Tatro develop a business plan for the variable-annuity business. Tatro prepared the requested plan, but Lakenbach rejected it. At the same time, Tatro claims, Lakenbach continued to make unrealistic demands to generate additional business without providing him the proper resources and funding as outlined in his business plan. Tatro claims that Lakenbach did these things to force Tatro's resignation.

Tatro further claims that ASI's asserted reason for requesting his resignation, the unauthorized use of ASI's laptop computer, is pretextual. According to Tatro, he was allowed to use the ASI-provided laptop when he was traveling or at home. Tatro states that "the information gained as a result of [the] scanning [of his computer] was not a surprise to Plaintiff as he had used the laptop for personal use while on the road and working out of his home." (Plaintiff's Mem. at 5.) Tatro further states that the real reason he was "forced" to resign was that ASI wanted to avoid paying him a year-end bonus and to prevent him from qualifying for the company's pension plan.

According to ASI, Tatro gratefully accepted the opportunity to resign. Indeed, upon doing so, ASI claims, Tatro admitted to having a "problem" and apologized for his behavior. Tatro later sent an e-mail to Lakenbach, repeating his apology and thanking Lakenbach for providing him with the opportunity to exit ASI gracefully.

In late 2004, ASI was scheduled to have begun a project for Merrill Lynch. After Tatro left ASI in November 2004, however, this potential project suddenly disappeared. ASI suspects that Tatro usurped this business opportunity.

Later, in January 2005, ASI lost a project for Manulife Financial, a former employer of Tatro and a client of ASI. Manulife had approached Lakenbach regarding a short-term project and indicated that it wanted to work with Jonathan Clymer, the ASI employee who had performed the bulk of ASI's work for Manulife. ASI and Manulife began negotiating the terms of this engagement. When Manulife suddenly informed Lakenbach that ASI would not be receiving this project, Lakenbach inquired further; Manulife soon admitted that it had solicited Tatro to do the work directly in lieu of dealing with ASI. ASI considered this a violation of the express terms of

the Covenant and informed Manulife of Tatro's covenant not to compete. As a result, Tatro lost the Manulife opportunity.

## II. Legal Analysis

In determining whether a preliminary injunction should issue, the Court must consider (1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm to the plaintiff if the injunction is denied; (3) the balance of relevant impositions, that is, the hardship to the non-moving party if enjoined as contrasted with the hardship to the moving party if no injunction issues; and (4) the effect, if any, of the court's ruling on the public interest. *See Black Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *see Black Tea Soc'y*, 378 F.3d at 15 (affirming the moving party's likelihood of success on the merits and addressing the remaining three prongs of the preliminary injunction test "[i]n the interest of completeness").

As discussed below, Tatro has not established (1) that he is likely to succeed on the merits of his case; (2) that he will suffer irreparable harm as a result of ASI's actions; and (3) that his alleged harm outweighs the harm that ASI would suffer if the Court were to grant the preliminary injunction.

### A. Likelihood of Success on the Merits

The plaintiff's ability to prove a likelihood of success on the merits is a critical factor in the preliminary-injunction calculus. *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993). Although this case comprises several claims, Tatro's motion appears to turn exclusively on

whether the Covenant is enforceable against him.[1]  Tatro proposes three reasons why the Court should not enforce the Covenant:  (1) because the Covenant only applies to ASI's proprietary information; (2) because ASI breached its employment contract with him; and (3) because the Covenant is overly broad and unreasonable.  The Court will consider each argument in turn.

### 1. **Language of the Covenant**

Tatro first argues that ASI's interpretation of the Covenant to preclude him from accepting the opportunity with Manulife is erroneous because it reaches "far beyond" the application of the Covenant, which, Tatro claims, is "extremely narrow."  Tatro asserts that the Covenant was intended and can be interpreted to protect only the "propriety and intellectual property of the Defendant." (Plaintiff's Mem. at 6.)  The parties agree that the law of Connecticut applies to the interpretation and enforcement of the Covenant.

Under Connecticut law, the intent of the parties to a contract must be ascertained based upon the contract's plain language.  *DeCarlo & Doll, Inc. v. Dilozir*, 45 Conn. App. 633, 638 (1997).  "[W]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law."  *Id.* at 639.  The Court need not look outside the four corners of the contract to determine the parties' intent when its language bears only one possible interpretation.  *Id.*  In particular, "the circumstances surrounding the making of the contract, the purposes which the parties sought to accomplish and their motives cannot prove an intent contrary to the plain meaning of the language used."  *Id.*

---

[1] Specifically, Tatro filed a complaint seeking relief on four counts:  (1) tortious interference with contract or advantageous relations; (2) Mass. Gen. Laws ch. 93A; (3) declaratory judgment; and (4) injunctive relief.  ASI answered and asserted three counterclaims:  (1) breach of contract; (2) Mass. Gen. Laws ch. 93A; and (3) injunctive relief.

Paragraph 8(a) of the Covenant states that, for a period of eighteen months after termination, Tatro cannot:

> perform services, similar to those [he performed at ASI] for any person, persons, company, partnership or corporation whose business is competitive with the business being carried on by [ASI] or with respect to such services, solicit any actual or active prospective customer of [ASI] for whom [he] performed services while employed by [ASI] during the twelve months preceding [his] termination of employment.

(Covenant, ¶ 8(a).) The quoted language explicitly restricts Tatro's right to perform certain services for a competitor of ASI and his right to solicit certain customers of ASI.

Tatro contends that the Covenant restricts *only* his right to use ASI proprietary information. He gives two reasons for such a narrow interpretation: first, because the Covenant is titled "Intellectual Property Agreement Covenant Not to Compete," and second, because he was led to believe prior to signing the Covenant that it was "primarily and for the sole purpose" of protecting ASI's proprietary information. These arguments, however, ignore the unambiguous language described above. Paragraph 8 cannot be simply read out of the contract. Furthermore, the title of the Covenant, while admittedly awkward, does not negate the express language of the Covenant itself. Finally, the Covenant is an integrated agreement, and Tatro's alleged understandings and impressions prior to its execution cannot be used to contradict its express terms.

Accordingly, Plaintiff is not likely to succeed on the merits of his case based on his narrow interpretation of the Covenant's scope. The Covenant plainly includes a covenant not to compete, independent of any obligation to protect proprietary materials.

### 2. Alleged Breach of Contract By ASI

Tatro further claims that ASI breached its employment contract with him and thus cannot enforce the terms of the Covenant. The material breach of an employment contract by an employer is a recognized defense to the enforcement of a covenant not to compete. *See Van Dyck Printing Co. v. DiNicola*, 43 Conn. Supp. 191, 199 (1993), *aff'd*, 231 Conn. 272 (1994).

Tatro concedes that he was an at-will employee at ASI. To the extent that Tatro did have an employment contract, he does not cite to any terms that ASI may have breached. Rather, he claims ambiguously that ASI placed him in an "untenable position" and that when Tatro failed to reach the company's goals, ASI used the pretext of "unauthorized computer use" to force his resignation and thereby "avoid [ASI's] contractual obligation to the Plaintiff." (Plaintiff's Mem. at 8.) At the hearing, Tatro suggested that ASI breached the implied covenant of good faith and fair dealing by terminating him on a pretext before he was eligible to receive a year-end bonus and to participate in ASI's pension plan. At this preliminary stage, however, there is simply no evidence supporting that position.

Furthermore, Tatro conceded that he "technically" violated ASI's Internet Policy when he engaged in unauthorized computer use by viewing and downloading pornographic materials. That policy explicitly states that "the transmittal, retrieval or storage of information that is . . . obscene, pornographic or X-rated is not permitted," § 4.1, and that "[f]ailure to comply with [the] policy may result in disciplinary action up to and including termination," § 11.1. Because it is highly likely on this record that ASI was entitled to terminate Tatro because of his violation of ASI's Internet Policy, it therefore appears highly unlikely that Tatro is legally excused from his obligations under the Covenant due to ASI's material breach of an employment agreement.

### 3.     The Breadth and Reasonableness of the Covenant

Tatro also asserts that the Covenant, as interpreted by ASI, is overly broad and unreasonable. Specifically, Tatro points out that the Covenant is not confined geographically, is unreasonable as to the scope of prohibited activity, and effectively prevents him from pursuing his occupation as an actuary.

Under Connecticut law, a covenant that restricts activities of employment following an employee's termination is valid and enforceable only if its restraints are reasonable. *See Scott v. General Iron & Welding Co.*, 171 Conn. 132, 137 (1976). Courts consider five factors in determining the reasonableness and enforceability of an employment covenant not to compete: "(1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests." *Robert S. Weiss & Assocs., Inc. v. Wiederlight*, 208 Conn. 525, 529 n.2 (1988).

The Covenant, which applies for 18 months, does not restrict Tatro for an unreasonably long period of time. Courts applying Connecticut law have held that similar or longer periods are enforceable. *See, e.g.*, *Minnesota Mining & Mfg. Co. v. Francavilla*, 191 F. Supp. 2d 270, 280 (D. Conn. 2002) [hereinafter *3M*] (holding that a two-year covenant not to compete was enforceable in part because an employer "clearly has a legitimate business interest in seeking that [a former employee] does not disclose its confidential and proprietary information to a competitor"); *Robert S. Weiss & Assocs.*, 208 Conn. at 530 (affirming trial court's decision that a two-year covenant not to compete was reasonable). Here, the 18-month restriction fairly protects ASI's interests in the actuarial-consulting business while ensuring that Tatro can return to that

field within a definite and reasonable period of time. *See 3M*, 191 F. Supp. 2d at 280.

Furthermore, the mere fact that the Covenant lacks a geographic scope does not preclude its enforcement. Indeed, in *3M*, the court upheld a covenant not to compete that had a world-wide geographic scope. *Id.* The court reasoned that it was "narrowly tailored to protect [the employer] only in the geographic areas where it does business." *Id.* ASI's particular business is not limited to a specific geographic area; rather, ASI potentially competes nationally and, apparently, internationally. Here, as in *3M*, the Covenant's geographic scope is not overly broad because it protects against competition only in locations where ASI vies for business. *See* 191 F. Supp. 2d at 280; *see also Robert S. Weiss*, 208 Conn. at 531 (holding that a covenant not to compete that lacked an express geographical scope was enforceable where by its own terms it only protected employer in areas where employer did business).

The Covenant also appears to be fair in terms of the protection that it affords to ASI's business interests. "When the character of the business and the nature of employment are such that the employer requires protection for his established business against competitive activities by one who has become familiar with it through employment therein, restrictions are valid when they appear to be reasonably necessary for the fair protection of the employer's business or rights." *3M*, 191 F. Supp. 2d at 280-81 (quoting *May v. Young*, 125 Conn. 1, 6 (1938)). ASI asserts that it has invested substantial amounts of time, effort and money into its confidential and proprietary products (including TRIP), as well into developing its confidential customer lists and marketing plans and strategies, and that this investment warrants protection. *See id.* at 276, 281 (protecting, in part, employer's methods and capabilities for manufacturing certain products, employer's proprietary methods, and employer's customers lists); *May*, 125 Conn. at 6-7 (observing that a

covenant not to compete is especially appropriate "if the employment involves the imparting of trade secrets, methods or systems and contacts and associations with clients or customers"). Considering Tatro's access to ASI's confidential and proprietary information and products and his ability to use intellectual property to compete against the company, ASI has a legitimate interest in temporarily restraining Tatro from performing services that are competitive with ASI. *See 3M*, 191 F. Supp. 2d at 280-81 (holding that enjoining plaintiff for two years from working for a competitor was a fair protection for the employer); *Branson Ultrasonics Corp. v. Stratman*, 921 F. Supp. 909, 913-14 (D. Conn. 1996) ("When . . . a high degree of similarity between an employee's former and current employment makes it likely that the former employer's trade secrets and other confidential information will be used and disclosed by the employee in the course of his new work, enforcement of a covenant not to compete is necessary to protect against such use and disclosure.").

The Covenant also adequately protects Tatro's ability to pursue his occupation. The Covenant only prevents Tatro from performing actuarial services if he is doing so for an entity that provides consulting actuarial services in direct competition with ASI. Thus, Tatro can earn a living as an actuary with any other entity—such as, for example, an insurance company, as he did for more than a decade prior to joining ASI. *See 3M*, 191 F. Supp. 2d at 281 (holding that the covenant was enforceable in part because it did not "attempt to prohibit the defendant from working for an organization that is not a competitor"); *Scott*, 171 Conn. at 140 (holding that covenant not to compete restricting an individual from participating in the management of a similar business was not an undue restriction on employee's ability to earn a living because the individual could still participate in his trade as an employee). The Covenant does not force Tatro

to sacrifice his livelihood. *See 3M*, 191 F. Supp. 2d at 281.

Whether Tatro is forbidden by the Covenant from accepting a particular opportunity will depend upon the specific facts and circumstances presented. On the one hand, the Covenant would prohibit Tatro from being a self-employed actuarial consultant in competition with ASI.[2] On the other hand, as ASI concedes, the Covenant would not prohibit him from accepting a position as an actuary at an insurance company, even if he performed services similar to those he performed at ASI.

Between those two alternatives (one clearly forbidden, one clearly permitted) are a multitude of other possible arrangements. It is difficult to say in the abstract where the line should be drawn between permitted and prohibited activity.[3] Tatro might, for example, be asked to perform actuarial work as an independent contractor or a temporary employee at a particular company for a single project or for a relatively short duration of time. ASI argues that, to avoid the Covenant's restrictions, Tatro must go on the payroll at a company in a relationship of "reasonable permanence." That argument, however, appears to be unduly restrictive; the Covenant would not appear, for example, to prohibit Tatro from acting as an independent contractor for a single insurer in a relationship of "reasonable permanence," nor from going on the payroll of an insurer as an employee in a relationship of substantial impermanence.

In any event, it is not necessary for the Court to draw the precise contours of the conduct

---

[2] Although the issue is not entirely free from doubt, the Court interprets the contract to prohibit self-employment as an actuarial consultant; such self-employment would involve working for a "person" (that is, Tatro himself) "whose business is competitive with" ASI.

[3] Tatro could not, under any scenario, solicit customers of ASI for whom he had performed services during the period November 2003 to November 2004 in violation of Paragraph 8(a) of the Covenant, nor could he disclose intellectual property that is protected under the agreement.

that is permitted and forbidden by the Covenant. Tatro seeks to enjoin enforcement of the Covenant in its entirety; it is sufficient for present purposes to say that there are *some* positions that, even if they do not involve the use of ASI's proprietary information, are off-limits, and that therefore the Covenant is enforceable.

Finally, Tatro does not argue that enforcing the Covenant would adversely affect the public interest. The Court notes, however, that there is nothing in the record to suggest that enforcing the Covenant would have an unreasonably anti-competitive effect, or would otherwise affect the public interest in any respect.

In light of the foregoing, the Court concludes that the Covenant is both reasonable and enforceable.[4] Hence, the Plaintiff has not established that he is likely to succeed on the merits of his claim and therefore his motion for a preliminary injunction must be denied. For the sake of completeness, however, the Court will address the other relevant factors below.

**B.**     **Irreparable Harm**

Tatro alleges that he will suffer irreparable harm because ASI's attempt to enforce the Covenant has rendered him "unable to pursue employment and business opportunities." Because any harm to Tatro is remediable in damages and because the Covenant does not prevent Plaintiff from earning a living as an actuary, Plaintiff has not shown that he will suffer irreparable harm.

---

[4] Connecticut law provides that a court may revise, or "blue pencil," a covenant not to compete when the parties demonstrate an intent to make the terms of the covenant severable. Here, even if the Court were to rule that the Covenant is overly broad, the Court could revise the Covenant and enforce the revised terms. *See Gartner Group, Inc. v. Mewes*, No. CV910118332S, 1992 Conn. Super. LEXIS 38, at *10-11 (Conn. Super. Ct. Jan. 3, 1992) (citing *Beit v. Beit*, 135 Conn. 195, 63 A.2d 161 (1948)). The Covenant expressly provides that if "any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to time, duration, geographical scope, activity or subject, it shall be construed, by limited and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear." (Covenant, ¶ 9.) Because the Court has concluded that the Covenant is not overly broad or unreasonable, it is not necessary to exercise this "blue-pencil" power.

Tatro alleges that he was denied a short-term opportunity to work for Manulife. But Tatro himself values the lost Manulife opportunity at $64,000. (Compl., ¶ 42.) This lost opportunity—measurable by a specific amount of damages—is not the type of harm that a preliminary injunction is designed to prevent. *See Auburn News Co. v. Providence Journal Co.*, 659 F.2d 273, 277 (1st Cir. 1981) (holding that preliminary injunction was not warranted where monetary damages would be an adequate remedy); *Fidelity Summer St. Trust v. Toronto Dominion (Tex.), Inc.*, No. 02-11285-GAO, 2002 U.S. Dist. LEXIS 15276, at *18 (D. Mass. 2002) ("When monetary damages can serve as an adequate remedy later on, a preliminary injunction usually is inappropriate."). Accordingly, the lost Manulife opportunity or any other monetarily quantifiable opportunity does not constitute irreparable harm.[5]

Further, as explained above, Tatro's claim that the Covenant prevents him from earning a living is spurious. The Covenant merely prevents him, for 18 months, from competing with ASI as a consulting actuary; accordingly, the Covenant permits Tatro to serve as an actuary for any entity that is not in direct competition with ASI, as he did for many years prior to 2003. Because Tatro can make a living within his chosen profession notwithstanding the Covenant, he will not suffer irreparable harm from the denial of the motion.

### C. Balance of Hardships

In addition, Tatro "must show that issuing an injunction will burden [ASI] less than

---

[5] At the hearing, plaintiff's counsel cited *Merryfield Animal Hosp. v. Mackay*, No. CV020464586S, 2002 WL 31000298 (Conn. Super. July 31, 2002), for the proposition that irreparable harm to Tatro is established by ASI's threat to enforce the Covenant. *Merryfield Animal Hospital* actually stands for the inverse proposition—namely, that irreparable harm *to the employer* is established by the former employee's threat to breach the covenant not to compete. *See id.* at *2 ("Loss of the benefits of compliance with such agreements is recognized as an irreparable injury since a party's actual injury is not, because of its nature, susceptible to determination.").

denying an injunction would burden [him]." *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 128 (D. Mass. 2003). Here, a balancing of the hardships reveals that, if the Court were to enjoin ASI from enforcing the Covenant, ASI would stand to lose business opportunities and, possibly, vital intellectual property. In contrast, Tatro would still be able to pursue a career as an actuary.

Without the limitations imposed by the Covenant, Tatro can readily compete against ASI by using its proprietary products, information, and strategies—intellectual property that ASI has spent substantial amounts of time, effort and expense in developing. More specifically, if the Court were to enjoin ASI from enforcing the Covenant, ASI would be unable to protect at least three sets of business interests.

First, Tatro's knowledge of TRIP and ASI's other methodologies with respect to insurance products would be attractive to competing actuarial consulting firms. If Plaintiff provided ASI's competitors with any proprietary information relating to TRIP, that firm could compete with ASI without having to develop its own proprietary products and could affect ASI's patent application for TRIP.

Second, Tatro had complete access to ASI's customer lists, which took substantial effort to develop. If Tatro provided services to a competing firm, he would conceivably be able to leverage ASI's customer relationships and compete unfairly with ASI.

Third, Tatro had access to, and understanding of, ASI's strategic marketing plans and strategies. Tatro was similarly familiar with ASI's global strategies and long-term marketing plans. Tatro would be able to exploit his knowledge of ASI's marketing plans and strategies and engage in unfair competition.

If ASI is unable to enforce the Covenant to protect its interests, ASI would suffer great harm.

In contrast, Tatro's harm is less substantial. The Covenant does not preclude Tatro from earning a living as an actuary—it merely prevents him, for 18 months, from competing with ASI as a consulting actuary or soliciting certain ASI's customers. ASI is not in competition with insurance companies, who regularly employ actuaries. Indeed, Plaintiff himself was previously employed as a vice president and chief actuary for Allmerica Financial, an insurance company in Worcester, Massachusetts. Nothing in the Covenant prevents him from seeking a similar position at another insurance company. Plaintiff can seek employment with any entity that does not provide competing consulting actuarial services and is not among the ASI customers that Tatro is forbidden from soliciting.

While it is true that the Covenant restricts Plaintiff's ability to work for a competing firm of consulting actuaries, the "consequence of every covenant not to compete . . . is that the covenantor is deprived of a possible means of earning his living. . . ." *Marine Contractors Co. v. Hurley*, 365 Mass. 280, 289 (1974); *see also Hilb, Rogal & Ham Co. of Hartford v. Pawlich*, No. CV940705183, 1995 Conn. Super. LEXIS 506, at *21-22 (Conn. Super. Ct. Feb. 16, 1995) (enforcing covenant not to compete; noting that employee's "fortunes will suffer but that hardly can be used as a reason to void the legal effect of [a covenant] he willingly entered into with [his employer]"). Nevertheless, such covenants are still enforceable.

Considering the severe harm that ASI faces if it is enjoined from enforcing the Covenant, and the minimal harm that may befall Plaintiff, the balance of the hardships favors ASI.

**D.    Public Interest**

Neither party has argued that the public interest will be positively or negatively affected by the imposition of an injunction here.

### III. Conclusion

For the reasons stated above, plaintiff's motion for preliminary injunction is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: March 10, 2005